# Exhibit A

**EXPERT REPORT OF REBECCA E. KUEHN**

In the matter of Magallon v. Robert Half

January 5, 2024

## I.    INTRODUCTION

My name is Rebecca E. Kuehn.  I am an attorney focusing on consumer financial services and consumer protection matters in the Washington, D.C. office of Hudson Cook, LLP.  I prepared this expert report (Report) at the request of Robert Half, Inc. (RHI), which sought my expert analysis regarding the standards and practices of employers in the use of consumer reports.  Specifically, I was asked to analyze and opine on RHI's process for providing consumers with a pre-adverse action notice prior to taking adverse action based in whole or in part on a consumer report.

As set forth more fully below, based on my extensive knowledge of and experience with the use of consumer reports in employment, my knowledge of industry standards for employers using criminal background checks, and review of the record in this case, my expert opinion is that the process in place at RHI during the class period to provide pre-adverse action notices prior to taking adverse actions was and is consistent with industry standards and practices and otherwise reasonable based on my knowledge of the industry. [1]

## II.    EXPERT QUALIFICATIONS

I am an expert in the policies, procedures, and practices that consumer reporting agencies (CRAs) and users of consumer reports employ to ensure compliance with the Fair Credit Reporting Act (FCRA) and other consumer reporting regulations.  I developed this expertise through substantial experience in the industry, advising CRAs, lenders, and other users of credit reports on the development of procedures designed to comply with fair credit reporting laws.  I also gained expertise and insight into the practices of the industry through five years working at the Federal Trade Commission (FTC), which is a federal agency tasked with the enforcement of the FCRA (as discussed more fully herein).

In all, I have over two decades of experience in advising companies, consumers, industry, and policymakers on fair credit reporting laws and their requirements.  Beginning in 1997, with the advent of litigation against credit furnishers following the 1996 amendments to the FCRA, I defended banks and other financial institutions against claims asserting violations of the reinvestigation provisions of the FCRA.  My practice expanded to include litigation and counseling matters involving CRAs and public records vendors that retrieve records for use by CRAs.  Through this work, I developed an expertise in the FCRA, which led to my move to the FTC.

---

[1] In forming my opinions, I have become aware and gained an understanding of the facts and allegations involved in the present case.  I was provided access to all the materials in the case, which are listed in Exhibit A.  My report references those sources I specifically relied upon for my opinions.

In May 2006, I was appointed Assistant Director in the Division of Privacy and Identity Protection at the FTC.  That division oversees issues related to consumer privacy, credit reporting, identity theft, and information security.  In that role with the FTC, I led the FCRA program and oversaw the FTC's enforcement, outreach, and rulemaking activities in that area.  I regularly coordinated with federal financial agencies in developing, issuing, and interpreting interagency rules, such as the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Disputes Rules, and amendments to the Gramm-Leach-Bliley Privacy Rule.

During my tenure at the FTC, I also supervised several investigations involving employment and tenant screening companies, as well as employers that used consumer reports, some of which resulted in cases brought by the FTC.[2]  In addition, I met with a number of industry representatives and consumer advocates on a variety of issues related to the FCRA, including trade associations focused on employment screening, as well as staffing companies.  My work at the FTC also included oversight and participation in the development of education about the use of consumer reports in employment and tenant screening.[3]  My team and I worked with the Federal Interagency Reentry Council, a federal interagency group established by the U.S. Attorney General in January 2011 to coordinate re-entry efforts and policies.  As part of that effort, we worked with representatives from the Equal Employment Opportunity Commission (EEOC) to develop Reentry Myth Busters on Hiring/Criminal Records Guidance[4] and Criminal Histories and Employment Background Checks,[5] which were fact sheets to clarify the federal policies that affect individuals who were formerly incarcerated.

In addition, I oversaw the development and issuance of the FTC staff report titled *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* (40 Years Report).  The 40 Years Report, issued in July 2011, is a compilation of FTC staff guidance and incorporates much of the FTC's prior "Commentary" (published in 1990).  The 40 Years Report is regularly relied upon by government and industry as an authoritative source on the FCRA.

---

[2] *See, e.g.*, *United States v. Rail Terminal Services, LLC*, https://www.ftc.gov/enforcement/cases-proceedings/082-3023/united-states-america-federal-trade-commission-plaintiff-v; *United States v. Quality Terminal Services, LLC*, https://www.ftc.gov/legal-library/browse/cases-proceedings/082-3022-united-states-america-federal-trade-commission-plaintiff-v-quality-terminal-services-llc-limited.  In general, only those investigations that result in an enforcement action (whether a settlement or a filed action) are made public; I supervised more investigations related to the use of consumer reports in employment than the publicly available cases reflect.

[3] In my role as Assistant Director of the FTC's Division of Privacy and Identity Protection, I spoke at a number of industry conferences about the work of the FTC and the requirements of the FCRA.  A selected list of presentations is listed in Exhibit C.

[4] https://nationalreentryresourcecenter.org/sites/default/files/inline-files/reentryMythBuster_hiringCrimRecord.pdf

[5] https://nationalreentryresourcecenter.org/sites/default/files/inline-files/reentryMythBuster_employBackgroundChecks.pdf

Building on my knowledge and understanding of the consumer reporting industry in this country, my work at the FTC additionally supported global credit reporting initiatives.  For example, in 2007, while at the FTC, I was selected to work with the U.S. Agency for International Development (USAID) to provide technical assistance to the Central Bank of Egypt in the development of regulations and oversight over credit bureaus.  I worked with representatives of the Central Bank to provide them insight into the FCRA and oversight over credit bureaus in the United States.  I also served as the FTC's representative to the World Bank Task Force on Credit Reporting.  This international Task Force worked to develop an agreed framework in the form of international standards for credit reporting systems' policy and oversight.  This work culminated in a report, *General Principles for Credit Reporting*, issued September 2011.[6]

From September 2011 through April 2015, I served as Vice President and Senior Regulatory Counsel for CoreLogic, Inc., a leading provider of consumer, financial and other information, analytics and services to business and government.  In that capacity, I was the lead lawyer and coverage counsel for CoreLogic's credit reporting and consumer data businesses, which included a tenant screening company (formerly known as SafeRent), a credit report reseller, and a CRA that provides reports in the short-term lending market.  CoreLogic also is a public records vendor, and obtains, normalizes, and licenses public record data of different types, including data on real estate transactions, criminal records, and tenant history data.  CoreLogic obtains records from a variety of sources, covering 99.9% of U.S. properties obtained from over 3,100 counties nationwide.

In my role as counsel to CoreLogic, I worked with operations and compliance personnel to develop and revise policies, procedures, and standards related to ensuring maximum possible accuracy and completeness and up-to-date processes, including the development of a consumer report that leveraged the public record property data in consumer report products.  I also worked on policy issues related to access to public records.  I provided advice and guidance to management on a wide variety of consumer data and privacy-related regulatory issues, including the FCRA and Gramm-Leach Bliley Act.

I am currently a partner at the law firm Hudson Cook, LLP, a nationally-leading firm in consumer financial services law and compliance.  I joined the firm's Washington, D.C. office in April 2015.  At Hudson Cook, I work with users of consumer reports, including employers and financial institutions, public record vendors, and consumer reporting clients of different sizes that I advise on legal compliance matters.  My practice is focused on consumer privacy and

---

[6] *See* World Bank, *General Principles for Credit Reporting* (Sept. 2011), https://documents1.worldbank.org/curated/en/662161468147557554/pdf/70193-2014-CR-General-Principles-Web-Ready.pdf.

consumer reporting issues.  I regularly provide advice and representation to businesses involved in the consumer reporting industry, including CRAs, users of consumer reports (*e.g.*, automotive finance companies, property managers, and employers), and furnishers of information to CRAs (*e.g.*, credit card companies).  I advise employment screening companies serving various industries, including those that serve staffing companies, on compliance with the FCRA and in connection with the provision of pre-adverse action and adverse action notice services to their employer clients, as well as the development of programs to assist employers with compliance with state and federal EEO and ban-the-box laws.[7]  I also advise trade associations in the consumer reporting industry, including the Consumer Data Industry Association, a trade association representing the nationwide credit bureaus, regional and specialized bureaus, background check companies, and others; and the Professional Background Screening Association (formerly the National Association of Professional Background Screeners), which is an internationally-prominent trade association consisting of employment and tenant screening companies.  Through my trade association work, I have met with user (employer) working groups on issues such as the stand-alone disclosure requirement under the FCRA and pre-adverse action notices.

I participated as an Observer in the Uniform Law Commission's Criminal Records Accuracy Committee, which worked to develop model legislation to assist states in improving the accuracy of criminal record information.   In December 2019, I was the only private industry lawyer invited to participate as a panelist at the "Accuracy in Consumer Reporting" workshop hosted by the CFPB and FTC, where I participated in a discussion about navigating the dispute process.

As noted above, through my work at the FTC and my compliance counseling and public policy work at Hudson Cook, I am familiar with the issues facing staffing companies under the FCRA and related equal employment laws affecting the use of criminal record screening.

I am an active member of the Consumer Financial Services Committee, which is part of the American Bar Association (ABA)'s Section of Business Law.

For the past several years, I have taught new attorneys about the FCRA as part of the ABA's National Institute on Consumer Financial Services Law, and I have served as chair of the National Institute.  I am a Fellow of the American College of Consumer Financial Services Lawyers.  I regularly monitor the industry developments and government activities relating to fair credit reporting regulation and matters of consumer data privacy more generally.  I speak

---

[7] I have not provided compliance advice to RHI.

frequently at industry conferences on FCRA and other financial services and privacy topics. Exhibit C to my Report provides a representative sample of presentations I have given.

The publications I have authored in the past 10 years are also listed on Exhibit B, which is attached to my Report.  During the past four years, I have provided trial or deposition testimony in the following matters: *Collins v. Milliman, Inc.*, Civil Action No. 2:22-cv-00061-RAJ, in the Western District of Washington; *Duane E. Norman, Sr. v. Trans Union, LLC*, Civil Action No. 18-5225, in the United States District Court for the Eastern District of Pennsylvania; *In re: Capital One Consumer Data Security Breach Litigation,* MDL No. 1:19md2915 (AJT/JFA), in the United States District Court for the Eastern District of Virginia; *Theresa Hill v. LexisNexis Risk Solutions Bureau LLC*, Civil Action No. 4:18-00560-CV-RK, in the United States District Court for the Western District of Missouri, Western Division; and *Kelly v. RealPage, Inc., d/b/a/ On-Site and RP On-Site LLC*, Civil Action No. 2:19-cv-01706, in the United States District Court for the Eastern District of Pennsylvania.

In May 2021, I testified before the U.S. House Committee on Financial Services, Subcommittee on Oversight & Investigations, on behalf of the Consumer Data Industry Association, at a hearing on "Consumer Credit Reporting: Assessing Accuracy and Compliance." In addition, I testified on proposed legislation affecting consumer reporting agencies before the Maryland House Economic Matters Committee at the request of the Consumer Data Industry Association.

I hold a Bachelor of Arts degree (*summa cum laude)* from Frostburg State University and a Juris Doctor (*with high honors*) degree from the National Law Center at George Washington University.  I am a member of the Virginia, Maryland, and District of Columbia bars, and am admitted to practice before the United States Supreme Court.

A copy of my resume is appended hereto as Exhibit C.  I am being compensated at the rate of $835 per hour for my work in this matter.  I have no financial or other stake in the outcome of this case.

III.    **NATURE AND REGULATION OF THE CONSUMER REPORTING INDUSTRY**

A.    **The Fair Credit Reporting Act**

Enacted in 1970, the Fair Credit Reporting Act—or FCRA—governs the collection, assembly, and use of consumer report information and provides the framework for our nation's consumer reporting system.  Its dual and equally important purposes are: (1) to protect consumers by preventing the misuse of their sensitive personal information and improving the accuracy of consumer report information; and (2) to promote the efficiency of the nation's

banking and consumer credit systems.[8]  The FCRA is a complex statute,[9]  which Congress has amended a number of times in many significant respects.  The FCRA's requirements govern all aspects of credit reporting, an industry that has changed significantly since the statute's original passage.  The FCRA sets forth a number of responsibilities on CRAs and others, some highly technical.

The FCRA regulates the practices of three principal groups: (1CRAs; (2) furnishers of consumer report information to the CRAs; and (3) users of consumer reports, including employers.  CRAs collect and compile consumer information into consumer reports and provide them to authorized users—for example, landlords, property managers, credit grantors, insurance companies, and employers—that make eligibility decisions about those consumers.  Information included in employment screening consumer reports typically includes the consumer's credit history (credit report), employment history, as well as demographic, identifying, and other public record information, such as criminal records.  The reports help employers by enabling them to predict the risks associated with employing an individual, including fraud, embezzlement, and workplace violence.

With that statutory context in mind, in enacting the FCRA, Congress recognized the value of the consumer reporting industry, finding that all forms of CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."[10]  The FCRA "seeks to balance the needs of consumers and businesses" with respect to the use of consumer information.[11]

The primary enforcement agency for the FCRA since its enactment in 1970 has been the FTC.  The FTC has brought over one hundred enforcement actions for asserted violations of the FCRA.[12]  In addition, although it has only limited formal rulemaking authority, the FTC has offered extensive interpretations and guidance on the FCRA over the years, including issuing over 430 opinion letters and eight formal interpretations, as well as publishing a compliance manual and other educational tools for businesses.  In 1990, the FTC published a "Commentary," consolidating all its FCRA guidance issued to that date.  In July 2011, the Commentary was incorporated in large part, along with other FTC formal and informal guidance and interpretations, into the FTC's *40 Years Report*, which I mention above as part of my experience.  The Report was provided to the Consumer Financial Protection Bureau (CFPB), which now shares enforcement authority over the FCRA with the FTC over non-depository

---

[8] 40 Years Report at 1.

[9] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007) (observing that the FCRA is a "less-than-pellucid" statute).

[10] 15 U.S.C. § 1681a(3).

[11] S. Rep. No. 209, 103rd Cong., 2d Sess. (1993).

[12] 40 Years Report at 4; *see also* FTC's website page on the FCRA: https://www.ftc.gov/tips-advice/business-center/privacy-and-security/credit-reporting  (last visited 1/2/2024).

institutions and also has rulemaking authority.[13]  The *40 Years Report* is relied upon by government and industry.

### B.    FCRA Protections for Use of Consumer Reports in Employment

In 1996, the FCRA was amended to include additional protections for consumers when consumer reports were used in connection with employment.[14]  The FCRA was amended to require employers to provide consumers with a written disclosure prior to obtaining consumer reports, and to obtain specific written consent.  The 1996 amendments also added protections for consumers when an employer or other end user takes "adverse action" based in whole or in part on information in a consumer report.

The FCRA defines "adverse action" in the context of employment as "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee."[15]  Although the FCRA already required employers or other users of consumer reports to provide an adverse action notice in connection with an adverse employment decision,[16] the 1996 amendments added the requirement to provide a consumer with an additional notice <u>prior to</u> taking adverse action.[17]

In a Senate Report, relating to the 1996 amendments, the Committee noted its concern that current and prospective employees may be "unreasonably harm[ed] … if there are errors in their reports" and, to address such concerns, the bill required:

> [E]mployers, before taking an adverse action based on a consumer report, provide the current or prospective employee with a copy of the report, a description of the individual's rights under the FCRA, and a reasonable opportunity to respond to any information that is disputed by the consumer. The Committee does not intend to require that employers await the results of a

---

[13] 40 Years Report, *supra* n. 8, at pp. 5-7.  Specifically, the CFPB and FTC have concurrent FCRA enforcement authority over non-depository institutions.  With respect to banks and other depository institutions, which are exempt from FTC authority, the CFPB shares jurisdiction with the federal bank regulatory agencies.

[14] Title II, Subtitle D, Chapter 1, of the Omnibus Consolidated Appropriations Act for Fiscal Year 1997 (Pub. L. 104-208, Sept. 30, 1996) ("1996 Amendments"); see also 40 Years Report at 2 (noting that the 1996 amendments increased the obligations of users of consumer reports, particularly employers).

[15] 15 U.S.C. § 1681a(k)(B)(ii).  With respect to "decision for employment purposes," the FCRA further defines "employment purposes" to mean "used for the purpose of evaluating a consumer for employment, promotion, reassignment, or retention as an employee."  15 U.S.C. § 1681a(h).

[16] Pursuant to Section 615(a) of the FCRA, 15 U.S.C. § 1681m(a), the notice provided to the individual after the adverse action ("adverse action notice") must include (1) the name, address, and telephone number of the consumer reporting agency (CRA) that furnished the report; (2) a statement that the CRA did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; (3) notice of the consumer's right to obtain a free copy of the report from the CRA upon request within 60 days; and (4) notice of the consumer's right to dispute with the CRA the accuracy or completeness of information in the consumer report.

[17] 15 U.S.C. §§ 1681b(b)(3).

formal, 30-day reinvestigation by the consumer reporting agency before taking action based on a consumer report.  Rather, the Committee bill specifies that a reasonable opportunity need not exceed five business days from the date of the receipt of the report by the consumer.[18]

Under Sections 604(b)(3) of the FCRA, 15 U.S.C. §§ 1681b(b)(3), any person intending to take adverse action based in whole or in part on a consumer report used for employment purposes must provide "before taking any adverse action based in whole or in part on the report" certain notice to the consumer.  The term "adverse action" is defined by Section 603(k) of the FCRA, 15 U.S.C. § 1681a(k), to include, inter alia, "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee."  Under Section 603(h) of the FCRA, 15 U.S.C. § 1681a(h), the term "employment purposes" means "for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee."

Pursuant to Section 604(b)(3) of the FCRA, 15 U.S.C. § 1681b(b)(3), the notice provided to the individual prior to the adverse action (pre-adverse action notice) must include copies of (1) the consumer report upon which the decision is based, and (2) the Summary of Consumer Rights Under the FCRA, 12 C.F.R. Part 1022, Appendix K.  As the FTC staff noted in the 40 Years Report, however, the FCRA does not specify a time period between the pre-adverse action notice and the adverse action notice:

> There is no specific period of time an employer must wait after providing a pre-adverse action notice and before taking adverse action against the consumer. Some reasonable period of time must elapse, but the minimum length will vary depending on the particular circumstances involved.  An employer can comply with the pre-adverse action disclosure requirement by sending a copy of the report to the consumer (with the summary of consumer rights) as soon as it is prepared by the CRA or received by the employer.[19]

The FTC staff further recognized that there would be situations where the information obtained in a consumer report would disqualify a consumer from employment, and noted that the FCRA required a pre-adverse action notice was required even when the result was inevitable: "[e]mployers must comply with the pre-adverse action disclosure requirement even where the information contained in the consumer report (such as a criminal record) would automatically

---

[18] S. Rep. 104-185, 104th Cong,, 1st Sess. (1995) ("Senate Report"), available at https://www.congress.gov/congressional-report/104th-congress/senate-report/185/1.  The final version of the bill did not include the specific 5 day waiting period.  See 1996 Amendments, supra n. 14.

[19] 40 Years Report, *supra* n. 8 at 52-53.

disqualify the individual from employment or lead to an adverse employment action."[20] As the staff explained in a related opinion letter, "If the report is in error, the employer may reconsider his or her tentative decision to take adverse action."[21]

### C.    The EEOC's Enforcement Guidance and the Expansion of Fair Hiring Laws

For employers using criminal records background checks, another significant consideration is the impact of the position of the EEOC on the use of criminal background information in employment, which culminated in the 2012 Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights (Guidance).[22]  The Guidance, which is based on the EEOC's existing guidance and court decisions, noted that certain racial classes are arrested and incarcerated at rates disproportionate to the general population and that, as a result, an employer using criminal records to screen applicants may disproportionately impact some individuals protected under Title VII.

The Guidance recommends that employers ensure that they are only using records where the use of such records meets business necessity: following the *Green v. Missouri Pacific Railroad* test, employers should consider (1) the nature and gravity of offense, (2) the time passed since offense or sentence, and (3) the nature of the job sought in devising their screening policies.

The Guidance describes "targeted exclusions" that are compliant examples of employers' criminal history applicant screening policies:

> An employer policy or practice of excluding individuals from particular positions for specified criminal conduct within a defined time period, as guided by the <u>Green</u> factors, is a targeted exclusion. Targeted exclusions are tailored to the rationale for their adoption, in light of the particular criminal conduct and jobs

---

[20] 40 Years Report, *supra* n. 8 at 53 ("Certainty of Adverse Action").

[21] Advisory Opinion to Rosen (06-09-98), available at https://www.ftc.gov/legal-library/browse/advisory-opinions/advisory-opinion-rosen-06-09-98.

[22] "Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964," April 25, 2012 (EEOC Guidance), available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions.   Although issued in 2012, the EEOC noted that it had investigated and challenged the discriminatory use of criminal records since at least 1969 and had issued three policy statements on the issue in 1987 and 1990.  See https://www.eeoc.gov/laws/guidance/questions-and-answers-about-eeocs-enforcement-guidance-consideration-arrest-and.  Prior to issuing the guidance in 2012, the EEOC held public meetings in November 2008 and July 2011, and received and reviewed approximately 300 public comments.  Id.

> involved, taking into consideration fact-based evidence, legal requirements,
> and/or relevant and available studies.[23]

In addition to these policy criteria, the Guidance recommends developing a policy that includes
an "individualized assessment":

> Individualized assessment generally means that an employer informs the
> individual that he may be excluded because of past criminal conduct; provides an
> opportunity to the individual to demonstrate that the exclusion does not
> properly apply to him; and considers whether the individual's additional
> information shows that the policy as applied is not job related and consistent
> with business necessity.[24]

The Guidance identifies a complex set of transactional factors that can be part of an
"individualized assessment" of an applicant.    The individual's showing may include information
that he was not correctly identified in the criminal record, or that the record is otherwise
inaccurate.  Other relevant individualized evidence includes, for example:

- The facts or circumstances surrounding the offense or conduct;
- The number of offenses for which the individual was convicted;
- Older age at the time of conviction, or release from prison;
- Evidence that the individual performed the same type of work, post-conviction, with the
  same or a different employer, with no known incidents of criminal conduct;
- The length and consistency of employment history before and after the offense or
  conduct;
- Rehabilitation efforts, e.g., education/training;
- Employment or character references and any other information regarding fitness for the
  particular position; and
- Whether the individual is bonded under a federal, state, or local bonding program.

The Guidance advises that even though businesses may be able to avoid Title VII liability
through a targeted criminal records screen that follows the *Green* factors, the use of
individualized assessments can help employers avoid Title VII liability by allowing them to
consider more complete information on individual applicants or employees, as part of a policy
that is job related and consistent with business necessity.

States and localities similarly have sought to address the concern regarding the appropriate use
of criminal records, with a number of jurisdictions similarly requiring an "individualized

---

[23] Guidance, Sec. V. B. 8.
[24] Guidance, Sec. V. B.9.

assessment."[25]  The laws take different approaches with respect to the use of criminal records in hiring decisions, but the focus is on applying the *Green* factors **prior** to determining whether a particular criminal record would disqualify an applicant from a position, and then providing the applicant with additional notice of the potentially disqualifying record before taking final adverse action.  California, for example, requires a private employer to conduct an individualized assessment applying the *Green* factors **before** making a preliminary denial decision, and **then** provide written notice of the preliminary decision to the applicant with a copy of the report.  California requires that the applicant be allowed at least 5 business days to respond before the employer can make a final decision.[26]

## IV.    UNDERSTANDING OF THE CASE

It is my understanding Plaintiff Bonnie Magallon commenced this action against RHI, seeking statutory and punitive damages under the FCRA, among other forms of relief.  Plaintiff alleges that RHI failed to provide her with a pre-adverse action notice (as described above) prior to taking adverse action on Plaintiff as the result of a criminal record on her consumer report.  ECF No. 1.

In forming my opinions, I have become aware and gained an understanding of the facts and allegations involved in the present case.  Though the following description is not exhaustive, it is my understanding that the record reflects the following facts:

- RHI is a staffing company that provides temporary and permanent professionals for a number of areas, including finance, accounting, technology systems, and office administration.  ECF No. 34.  When an individual applies to be considered as a candidate for temporary or permanent placement through RHI, RHI may obtain a criminal background report (or consumer report) on the applicant.  Irish 2014 Dep. (Irish Dep.) at 15:11-16, 34:16-37:6.  Generally, RHI would place an applicant on hold (also known as a "do not use status") and obtain a background report if: (a) the applicant discloses criminal convictions on their application or (b) RHI's client requires a criminal background check.  Irish Dep. at 34:16-37:6; 138:16-139:8; Waldman Dep. at 36:1-6, 70:15-20.  In these cases, the applicant will be in a holding pattern until their background check is run, the legal department has reviewed that background check, and (if the results are potentially disqualifying) the candidate has the opportunity to contest the results of the background check after the issuance of a pre-adverse action notice.  Waldman Dep. at 66:16-67:20, 68:11-13, 70:15-71:7; Irish Dep. at 111:16-112:12,

---

[25] Practical Law Labor & Employment, "Ban-the-Box State and Local Laws Chart:  Overview" Westlaw (2023).
[26] Cal. Gov't Code § 12952, as amended by A.B. 2845 and implementing regulations (Cal. Code of Regs. tit. 2, § 11017.1, as amended (effective Oct. 1, 2023)).

132:12-14, 133:18-134:8; Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023).

- RHI obtains criminal background checks from consumer reporting agencies, such as General Information Systems (GIS). Irish Dep. at 42:16-19. Since October 2010 through the end of the class period, GIS was RHI's primary vendor for background checks. Irish Dep. at 121:4-11.

- When GIS performed a background screening on a placement candidate, it applied RHI's or, in some cases, the client's criteria, and, based on the results, coded or flagged the report as needing additional review. Irish Dep. at 145:14-146:15. Similarly, in those instances when RHI obtained criminal background checks from other vendors, those background checks that were returned with records were identified as needing additional review. In either case, experienced employment counsel in RHI's legal department then reviewed all background checks that needed additional review. If the report contained records that could negatively impact a candidate's eligibility, the legal department would review the report to determine whether the record was in fact disqualifying and a pre-adverse action notice should be sent. Irish Dep. 63:8-20, 66:10-67:4, 101:15-102:1, 106:22-107:9.; Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023).

- As part of the legal review, RHI counsel conducted an individualized assessment of most background check results to determine whether the particular records were potentially disqualifying. Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023).[27] Counsel would consider factors such as how long it had been since the offense, the nature of the offense, whether the offenses related to the particular field in which the applicant was being considered (such as a financial-related crime for someone in a finance field), etc. *Id.* Over the relevant time period, there were various iterations of the process, but the focus was to comply with EEOC directives to consider only those offenses that were relevant. *Id.* If, after review, the background check report contained potentially disqualifying records, the legal department would determine that a pre-adverse action notice should be sent. *Id.*

- It is and was at all times during the class period RHI's practice and procedure to provide a pre-adverse action notice. See, e.g., RHI0000046-75; Irish Dep. at 69:2-73:20, 81:15-82:3, 108:23-110:20; see also Irish Dep., Corrections to 69:5-12, 71:4-5, 71:24. Prior to October 2013, field personnel at RHI branches sent pre-adverse action notices. Irish

---

[27] Some offenses, such as a simple DUI conviction, did not need legal review because they were not potentially disqualifying. *Id.*

Dep. at 69:2-73:20; see also Irish Dep., Corrections to 69:5-12, 71:4-5, 71:24. The corporate office of RHI maintained written policies and procedures on the company's intranet that set forth the requirement to provide a pre-adverse action notice, and the corporate office conducted periodic training on the policies. Irish Dep. at 84:24-91:1. RHI's trainings were conducted via the internet and telephone, but did not require participants to sign in or otherwise verify their attendance. Irish Dep. at 90:14-94:7.[28]

- Since October 2013 through the class period, RHI used its background screening vendor, GIS, to send the pre-adverse action notices packages to candidates. Irish Dep. 100:6-24, 108:23-109:7, 113:10-120:13. RHI continued to send out pre-adverse action notice packages for background reports that were not run by GIS. Irish Dep. at 42:16-43:7, 73:14-20, 100:16-101:3; RHI0000053 ("Derogatory Results for Strategic Account and Non-GIS Background Check"). During the relevant period, RHI did not have a separate background check compliance department, Irish Dep. at 42:2-15, but did have a team of experienced employment attorneys who reviewed the results and determined whether a pre-adverse action notice should be sent. Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023).

- The pre-adverse action notice sent by RHI (whether by itself or through its vendor) includes a copy of the background report as well as the Summary of Rights as required by the FCRA. RHI0000056-61. The package also includes a letter that advises the candidate that "[a]n adverse decision may be based, in whole or in part, on the enclosed consumer report" and advises the candidate to contact the consumer reporting agency immediately if the information is incomplete or inaccurate. RHI0000058.

- During the class period, RHI's policy and practice required that no adverse employment action may be taken until the conclusion of a ten-day waiting period following the transmittal of the pre-adverse action notice. *See, e.g.*, RHI0000056 ("No Adverse employment action can be based upon the results of the background check [(i.e., consumer report)] until the ten-day waiting period [following the pre-adverse action letter] has passed."); *see also* Waldman Dep. at 33:8-34:3; 75:20-76:6. During that ten-day period, the candidate is not immediately placeable, but they are in a "holding

---

[28] Further, it appears that during the class period, and prior to beginning to use its background screening vendor to provide pre-adverse action notice packages, RHI did not have a robust record keeping system or regular audit program. Irish Dep. at 82:15-84:23. In my experience, however, the use of compliance management tools such as robust recordkeeping and auditing has been a slower development in industries that are not subject to direct regulatory examination, like the financial industry. During my time at the FTC, for example, it was not uncommon for companies not to have even written policies and procedures, except where specifically required by the FCRA (such as the Red Flags Rule or the Furnisher Rule). The FCRA does not have a record keeping requirement for the transmittal of pre-adverse action notices (or for training or audits, for that matter), so the absence of records is not a violation of the FCRA.

pattern" until they contest the results of the background check or the ten-day period has expired.  Waldman Dep. at 51:5-11.  If the candidate disputes the results of their background check within that ten-day waiting period, the decision on the application is suspended to allow the candidate to go through the dispute process.  Irish Dep. at 120:14-21.  This waiting period provides the candidate an opportunity to contest the results of the background check (Irish. Dep. at 116:3-121:3) and has resulted in candidates being re-categorized to placeable.  Irish. Dep. at 97:1-11, 98:18-21; ECF 161.2 ¶7; Waldman Dep. at 68:11-13, 72:7-22, 75:20-76:6; Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023).

- In my review of the record, I noted that language in RHI's internal background check procedures stated that pre-adverse action letters "must be sent immediately when a background check is returned with discrepant and/or derogatory results (red or yellow flag)." See, e.g., RHI0000049. As noted above, however, it was RHI's practice during the relevant period to refer background reports containing potentially disqualifying records for legal review.

- In certifying the class, the Court found that RHI's own criminal background check policy was sufficient to create common class questions as to whether RHI willfully violated the FCRA. *See* ECF No. 46. The basis of the Court's ruling was the language in RHI's internal background check policies with respect to sending a pre-adverse action letter "immediately" upon the receipt of the background check.  However, the FCRA does not require an immediate notice – just a notice "before taking any adverse action based in whole or in part on the report" – and the practice of RHI was to not send pre-adverse action notices to Candidates until after legal review, rather than "immediately" (when employing a literal, strict definition of the word). *See* Irish Depo., Corrections to 69:5-12, 71:4-5, 71:24.

**V.     EXPERT OPINIONS**

Based on my review of the record, including RHI's policies and procedures, it is my opinion that RHI's process for providing pre-adverse action notices and its implementation of a ten-day waiting period prior to taking adverse action is consistent with (and in some ways exceeds) industry standards for employers using criminal background checks and practices and otherwise reasonable based on my knowledge of the industry.

Once RHI receives a consumer report with potentially disqualifying records, RHI's process provides for an individualized review of the background check results by its legal department.  The legal department reviews the results of the background check to determine whether the results disqualify a candidate from onboarding with RHI or based on a particular client's criteria.  If the legal department determines that the records could lead to an adverse

employment decision (i.e., rejection of an employment application),then the legal department directs that a pre-adverse action notice package be sent.  During that time, the candidate remains in a holding pattern.

I understand that Plaintiffs contend that RHI should have sent out pre-adverse action notices immediately upon receipt of potentially disqualifying background check results.  Based on my understanding of RHI's process, however, RHI's receipt of a potentially disqualifying background check result causes the candidate to be put "on hold," but does not result in a final placeability determination because these results are reviewed individually by the legal department.  The referral to the legal department is an integral part of RHI's individualized evaluation of the background check results to assess whether the records returned would disqualify a candidate from employment (consistent with EEOC guidance).  Until the legal department conducts its evaluation, RHI does not know whether a particular record will lead to an adverse action. RHI's process requires that the candidate receive a pre-adverse action notice prior to any final decision to reject an application based on background check results.

Further, although RHI's written policy requires the pre-adverse action package to issue "immediately" upon RHI's receipt of a background check from GIS, it is clear from the overall policy that it is meant to comply with the FCRA, and the "immediately" language does not arise from the FCRA's text or legislative history. The FCRA does not require that an employer provide a pre-adverse action notice immediately upon the discovery of potentially disqualifying information in a consumer report.  To the contrary, the FCRA requires the pre-adverse action letter be sent to the candidate before a final hiring decision is made, i.e., "before taking adverse action."[29]  RHI's legal review is a step towards making that final determination, i.e., RHI's legal review happens before the ultimate hiring decision is made. Thus, even if RHI's practice of deferring the transmittal of the pre-adverse action notice until after legal review was not in accordance with RHI's written policy, it was not a violation of the FCRA itself.

RHI's practice of subjecting background check results to an individualized review by the legal department exceeds the general industry standard for employers and is not mandated by the FCRA. In practice, RHI provides additional protection to applicants because the review by seasoned employment attorneys results in a number of background check results not being considered disqualifying at all, rendering a pre-adverse action notice unnecessary.  Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023). Under RHI's individualized assessment process, applicants receive additional consideration beyond the statutorily mandated

---

[29] This is in contrast to the requirement in the FCRA that a CRA that provides a consumer report containing public record information that is "likely to have an adverse effect upon a consumer's ability to obtain employment" either provide notice to the consumer or maintain strict procedures to ensure that such information is complete and up to date. 15 U.S.C. § 1681k(a).

opportunity to challenge the factual accuracy of the background check results following the pre-adverse action notice.[30]  It is not only FCRA-compliant, it surpasses industry standard by affording additional protection to applicants.

Further, RHI's waiting period prior to taking adverse action –of ten business days – exceeds the industry standard for employers of five business days.  As noted above, the FCRA does not specify a time period between providing a pre-adverse action notice and taking adverse action, and the final version of the pre-adverse action notice requirement did not adopt the originally proposed five-day waiting period.  In response to industry inquiries, however, the FTC staff indicated that a five-day waiting period between a pre-adverse action notice and taking adverse action would be reasonable.  *See* Weisberg, FTC Staff Op. Letter (June 27, 1997) ("The final issue raised by your letter concerns the period of time that an employer must wait after supplying the materials required by Section 604(b), before taking adverse action… [a] five day period…appears reasonable.").  As a result, many employers have adopted a waiting period of at least five days after a pre-adverse action is sent.[31]

Further, RHI's process – which places the application in a holding pattern while the background check issues are addressed – is consistent with industry practice.  Whether the potentially disqualifying item was based on RHI's own criteria or that of its clients, RHI would not be able to place the candidate into an open position until the background check issue was resolved.  For time sensitive positions, it may mean that the open placement is given to another candidate who already had been onboarded with RHI, and that the candidate – if their results were resolved or otherwise overturned – would need to wait for another open opportunity.  This is consistent with industry practice, as the FCRA does not require that an employer hold a position open until a dispute is resolved.[32]  The purpose of the pre-adverse action notice is to provide the candidate with the opportunity to explain the results to the employer before it

---

[30] The pre-adverse action notice process did allow applicants to dispute inaccurate records (whether those records were mis-identified as belonging to the applicant or contained other errors) and to identify subsequent events that may be relevant to the hiring determination, such as a subsequent adjudication or expungement.  Interview with Kathleen Cattani and Ted Mawla (Dec. 28, 2023).

[31] State and local fair chance laws have started to follow that trend, providing for a five to ten day waiting period between advising a consumer of a potentially disqualifying record and making the final determination.  Practical Law Labor & Employment, "Ban-the-Box State and Local Laws Chart:  Overview" Westlaw (2023).

[32] *See, e.g.,* Senate Report, supra n. 18 ("The Committee does not intend to require that employers await the results of a formal, 30-day reinvestigation by the consumer reporting agency before taking action based on a consumer report."); *see also* "The Step-by-Step Plan for Staying in Compliance with Your Adverse Action Process," HR Professionals Magazine (July 2022) (employment industry publication noting that "employers are NOT required to hold a position open until the dispute is settled"), available at https://hrprofessionalsmagazine.com/2022/07/04/the-step-by-step-plan-for-staying-in-compliance-with-your-adverse-action-process/

finalizes its decision.[33]  Here, RHI's policy to place the application in a holding pattern is consistent with that purpose.

It is my understanding that Plaintiff contends that she did not receive a pre-adverse action notice package or an adverse action notice. ECF No. 1. Here, RHI has established a commercially reasonable process for providing pre-adverse action notices with a reasonable waiting period between the delivery of the pre-adverse action notice and taking adverse action. Assuming there was an issue with the notice sent to Plaintiff, the issue that occurred with respect to Plaintiff's pre-adverse action notice more likely was the result of an isolated human error.  Further, RHI's process of sending pre-adverse action notices after legal review but prior to taking adverse action complies with the FCRA, but also addresses the dual purposes of addressing compliance with Title VII by allowing for an individualized assessment of the particular criminal record by RHI's internal lawyers.  Even if RHI did not send a pre-adverse action notice package immediately upon the receipt of a potentially disqualifying background check record, RHI's process was to send the package **prior to** taking adverse action, which is what the FCRA requires.

---

[33] Federal Trade Commission, "Background Checks:  What Employers Need to Know" (Feb. 2014) ("By giving the person the notice in advance, the person has an opportunity to review the report and explain any negative information."), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0142-background-checks-what-employers-need-know.pdf ; Federal Trade Commission, "Using Consumer Reports:  What Employers Need to Know" (June 2016) ("Giving the person the notice in advance gives the person the opportunity to review the report and tell you if it is correct."), available at https://www.ftc.gov/business-guidance/resources/using-consumer-reports-what-employers-need-know. .

## VI.    CONCLUSION

In my opinion, the process in place at RHI to provide pre-adverse action notices prior to taking adverse actions was and is consistent with industry standards and practices and otherwise reasonable based on my knowledge of the industry.

**SIGNED:**

Date: Jan. 5, 2024

_____

Rebecca E. Kuehn

# EXHIBIT A

**Exhibit A to Expert Report of Rebecca Kuehn**

**Materials Provided or Available to Expert**

Documents and Materials from Magallon v. Robert Halfl, Inc.

Interview with Kathleen Cattani and Ted Mawla (December 28, 2023)
All documents produced to Plaintiffs
All deposition transcripts and exhibits thereto
All pleadings in the case and exhibits thereto
All motion briefs, supporting declarations, and exhibits thereto.


Other

All additional and/or other materials cited and/or referenced in my Report, including statutes,
      regulations, government publications, and websites

# EXHIBIT B

**Exhibit B to Expert Report of Rebecca Kuehn**

**Additional Information**

<u>**Publications Authored by Rebecca Kuehn**</u>

"CFPB Bites of the Month – 2022 Annual Review – Credit Reporting," Hudson Cook *Insights*, January 2023, co-authored with Eric Johnson and Justin Hosie

"Don't Cross the Double Lines: CFPB Reminds Credit Report Users to Have Permissible Purpose Before Obtaining Credit Reports," Spot Delivery, August 2022

"Lessons Learned from Dun & Bradstreet," Hudson Cook *Insights*, February 2022, co-authored with Meg Nicholls

Kuehn, Rebecca; *Blowing the Whistle on Discrimination: Spotlight on Regulatory Interest in Discrimination by Algorithms*, Spot Delivery, January/February 2022

Kuehn, Rebecca, and Anthony, David; *FCRA Year in Review: FCRA Appellate Decisions*; ABA, July 2021

Kuehn, Rebecca, and Newman, Cierra; *FTC Brings First Enforcement Action Alleging Failure to Provide Documentation of Identity Theft to Victims*; Hudson Cook Insights, June 2020

Kuehn, Rebecca, and McArthur, Webb, *Springing Consumer Rights: Responding to the Federal Government Shutdown and Anticipating Another*, Hudson Cook Insights, March 2019

Kuehn, Rebecca, and Udell, Nora R., *Dead Men Violate No Injunctions*, Hudson Cook Insights, October 2018

Kuehn, Rebecca; *The Myth of Fingerprints: The Privacy Pitfalls of Biometric Data*; Spot Delivery, July 2018

Kuehn, Rebecca, and Zaman, Latif, *New York Court of Appeals to Consider Scope of Law Prohibiting Discrimination Based on a Criminal Conviction*, Hudson Cook Insights, January 2017

Kuehn, Rebecca, and Denson, Allen H.; *Important Rules of the Road for BHPH Dealers Who Furnish Information to Credit Bureaus*; Spot Delivery, September 2015

Kuehn, Rebecca, and Musselman, Meghan S., *Third Circuit Thwarts Challenge to FTC's Data Security Authority*, Spot Delivery, September 2015

# EXHIBIT C

**Rebecca E. Kuehn**

Hudson Cook, LLP
1909 K Street, N.W., 4th Floor
Washington, DC  20006
202-715-2008
rkuehn@hudco.com

*Professional Profile*

Experienced consumer financial services attorney with significant privacy expertise.

*Work Experience*

**Hudson Cook, LLP**, Washington, D.C.
Partner, April 2015 to Present

Practice focuses on consumer financial services and consumer protection matters. Counsels financial institutions, consumer reporting agencies, service providers, and others in complying with consumer financial laws and prohibitions against unfair, deceptive, or abusive trade practices. Represents clients before federal and state agencies and the courts, particularly the Federal Trade Commission and Consumer Financial Protection Bureau, in investigations and other proceedings.

**CoreLogic**, McLean, VA
Vice President and Senior Regulatory Counsel, September 2011 to April 2015

Served as lead lawyer and coverage counsel for the CoreLogic credit reporting and consumer data businesses, providing advice and guidance to management on a variety of consumer data and privacy-related regulatory issues, including the Fair Credit Reporting Act (FCRA) and the Gramm-Leach-Bliley Act.

**Federal Trade Commission**, Bureau of Consumer Protection, Washington, D.C.
Assistant Director, Division of Privacy and Identity Protection, May 2006 to September 2011

Supervised attorneys and other staff on investigations and policy work related to credit reporting, consumer privacy, identity theft, and information security.  Primarily responsible for the Fair Credit Reporting Act program, leading the Commission's enforcement, policy, outreach, and rulemaking activities in that area.  Regularly coordinated with the federal financial agencies in the development, issuance, and interpretation of interagency rules, including the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Dispute Rules, and the amendments to Gramm-Leach-Bliley Privacy Rule.

Responsibilities included analyzing and providing comment on legislative proposals to senior Commission staff and Congressional staff, coordinating legal interpretations and policy across intra- and interagency boundaries, and serving as a subject matter expert and resource to Commission staff and industry.  Provided technical assistance to Egypt on oversight and regulation of credit bureaus as part of USAID mission.  Served on the World Bank Credit Reporting Task Force, providing significant contributions to the development of a consultative draft report entitled General Principles for Credit Reporting.

**LeClair Ryan**, Alexandria, VA
Partner, January 2002 to May 2006
Associate, February 2000 to December 2001

Developed litigation and counseling practice concentrated on the representation of financial service providers and consumer reporting agencies, including claims brought under state law, the Fair Credit Reporting Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act.  Significant first-chair trial experience.  Responsible for the supervision of junior attorneys and the management of case assignments for office.

**Reed Smith Hazel & Thomas LLP**, Falls Church, VA
Associate, January 1997 to February 2000

Primarily responsible for a variety of civil litigation matters, including commercial matters, software and other technology-related disputes, lender liability, medical malpractice defense, and products liability actions.

**Spriggs & Hollingsworth**, Washington, D.C.
Associate, September 1994 to January 1997

Litigation practice, primarily focused on commercial matters, multi-party toxic tort actions, and insurance coverage disputes.

### *Bar Contributions*

Co-Chair, FCRA Litigation Subcommittee, American Bar Association, Section of Litigation, Consumer Litigation Committee

Faculty, National Institute for Consumer Financial Services Basics, 2013 to present (Chair, 2016)

Observer, Criminal Records Accuracy Committee, Uniform Law Commission, 2015 – 2018

Co-Chair, Woman Advocate Committee, American Bar Association, Section of Litigation

*Education*

**The George Washington University, National Law Center, Washington, D.C.**
Juris Doctor with High Honors, May 1994
Class Rank: Top 5%
Member, The Order of the Coif
Member, *The George Washington Law Review*
Anne Wells Branscomb Award for Graduating Student with Highest Average
 in Part-Time Course of Study

**Frostburg State University, Frostburg, MD**
Bachelor of Arts, Magna Cum Laude, December 1988
English Major with Business Minor
Commencement Speaker for Graduating Class

*Bar Admissions*

Admitted to practice in Maryland, Virginia, and the District of Columbia

*Selected Presentations*

"The Post Pandemic Consumer Financial Protection Landscape," American Bar Association, February 2023

"Regulatory Response to New Dynamics," World Credit Reporting Conference, September 2022

"Keeping on the Right Side of Fair Lending," OLA Compliance University, July 2022

"Driving Change: Litigation & Enforcement Developments in the Consumer Reporting Industry," CDIA Virtual Law & Industry Conference, June 2022

"Removing Bias in Lending for a More Equitable Financial System," LendIt Fintech USA 2022, May 2022

"Getting a Clearer Picture or Merely a Caricature? The Use of Alternative Data and Artificial Intelligence in Credit Decisions, Servicing and Collection," CCFL Annual Consumer Financial Services Conference, May 2022

"Fair Lending Tune-Up," FICO World 2022, May 2022

"Tracking New Debt Collection Regulations and Policy: Opportunities in Loss Prevention," FICO World 2022, May 2022

"Tenant and Employment Screening Under the FCRA," PBSA Webinar, April 2022

"Big Changes in Reporting Medical Collections Debt: A CDIA Webinar exploring what happened, what's next and why it matters," CDIA Webinar, April 2022

"From the Hill: the regulatory landscape in motion," Experian Vision 2022, April 2022

"The War on Tenant Screening: How Regulatory and Legislative Changes in Washington Are Impacting the Industry," PBSA 2022 Mid-Year Legislative and Regulatory Conference, April 2022

"Fast and Furious with the FCRA: Fifty Minutes on the Latest Developments in FCRA Litigation," ABA Litigation Section, Consumer Litigation Committee, The Woman Advocate Committee Webinar, April 2022

"The CFPB's View of Credit Reporting," CDIA Webinar, March 2022

"A Holistic View of Red Flags," Hudson Cook Compliance Coffee Break, March 2022

"Mingling with Membership: Data Privacy and Security: Lessons Learned from FTC Developments," North Carolina Bar Association Webinar, February 2022

"FTC Expands Safeguards Rule to Address Cybersecurity Risks & Privacy," CDIA Webinar, December 2021

"Regulatory Changes Pave the Way for a New Era of Consumer Protection," CDIA Webinar, November 2021

"What to Expect in Supervisory Examinations in the Biden Administration," INFiN MoneyTrends, November 2021

"Credit Reporting," ABA Consumer Financial Services Basics Virtual Conference, October 2021

"Stretching Your Outside Counsel Dollar: Strategies for Maximizing Your Legal Budget," Professional Background Screening Association Annual Conference, September 2021

"Rise of the Machines: Using AI and Other Data Analytics to Improve Compliance and Deliver Better Products," Professional Background Screening Association Annual Conference, September 2021

"Litigation & Enforcement Trends: What will we see in 2021," CDIA 2021 Virtual Law & Industry Conference, July 2021

"Consumer Protection Gotchas for Lenders and MSBs: Privacy, Safeguards, Red Flags and the ADA," INFiN Webinar, July 2021

"Supreme Court Decision: *TransUnion v. Ramirez*," CDIA Webinar, June 2021

"Employment/Income/Asset Verification: New Trends in Underwriting," 2021 Virtual Financial Services Conference, May 2021

"VCDPA - The newest consumer data privacy law comes to Virginia," Hudson Cook Compliance Coffee Break, April 2021

"Compliance Priorities for Tenant Screeners to Reduce Regulatory and Litigation Risk," Professional Background Screening Association Virtual 2021 Mid-Year Legislative & Regulatory Conference, April 2021

"FCRA Litigation: A Review of Top Issues from 2020 and What to Expect in 2021," ABA Consumer Litigation Committee Virtual Roundtable, February 2021

"The Changing Dynamics of Litigation & Enforcement," CDIA Webinar Rebroadcast, December 2020

"The Changing Dynamics of Litigation & Enforcement," CDIA 2020 Virtual Law & Industry Conference, September 2020

"FCRA Basics for Screeners - Distance Learning Style," Professional Background Screening Association Virtual Conference, September 2020

"FTC to Ramp Up the GLBA Safeguards Rule," CDIA Webinar, August 2020

"CFPB Director Kraninger To Address Credit Reporting Industry - A CDIA Teleseminar with comments on the impact of the CARES Act on the compliance ecosystem," CDIA Webinar, June 2020

*Fair Lending Fundamentals in Today's Information-based World, NAFCU Webinar, May 2020*

*Consumer Protection Considerations for Small Dollar Lenders During Covid-19, Hudson Cook webinar, April 2020*

*COVID-19 in the Screening Industry Q&A Part I, Professional Background Screening Association Webinar, April 2020*

*The CARES Act: Modifications to Data Furnishers' FCRA Obligations, CDIA Webinar, April 2020*

*Conducting Internal Investigations Post-Connolly, ABA 2020 Corporate Counsel CLE Seminar, February 2020*

*CDIA Briefing on CFPB/FTC Workshop on Accuracy in Credit Reporting, CDIA Webinar, December 2019*

*Data Management for Business Operations, and Compliance Speedsmarts: Technology, AFSA Annual Meeting, October 2019*

*Navigating the Challenges in Today's Litigation and Enforcement Environment, CDIA webinar,*

*October 2019*

*Lessons for Tenant Screeners from the Front Lines, and Ask the Lawyers, Professional Background Screening Association, September 2019*

*Getting Prepared for Data Privacy in Debt Collections, and Data Privacy meet Regulatory Oversight in Debt Collection, Automotive Intelligence Summit, July 2019*

*Examining the Hottest Claims of 2019 Under the FCRA and ECOA, ACI Consumer Finance: Class Actions, Litigation & Government Enforcement Actions, July 2019*

*Managing Risk in an Always-Changing Litigation & Enforcement Environment, CDIA Law & Industry Conference, June 2019*

*A New Way to (Really) Know Your Customers: Consumer-Permissioned Access to Financial Accounts, and Privacy in the New World: Post-GDPR State Law Privacy Developments in the United States, Consumer Financial Services Conference, Hudson Cook/CounselorLibrary, April 2019*

*Trends in Fraud, and How to Avoid It, CBA Live 2019, April 2019*

*Privacy in the New World: Post-GDPR State Law Privacy Developments, FiSCA Annual Conference & Expo, October 2018*

*You've Got Questions – They've Got Answers, and Island of Misfit Toys: How Does the FCRA Apply to FINRA Onboarding, and Other 'Not Quite Employment' Circumstances (If at All)?, National Association of Professional Background Screeners Annual Conference, October 2018*

*State and Local Law Developments in Residential Screening, National Consumer Reporting Association Conference, November 2017*
*A Conversation with the Federal Trade Commission,* and *Don't Let Your Audit Reports Become "Exhibit A" in Court:  The Do's and Don'ts of Conducting Audits to Manage Compliance and Litigation Risk,* National Association of Professional Background Screeners Annual Conference, September 2017

*Tenant Screening Basics,* National Association of Professional Background Screeners Annual Conference, September 2016

*Class Actions After Spokeo, Inc. v. Robins*, ABA Section of Business Law Annual Meeting, September 2016

*Privacy Law Developments – Emerging Data Trends, Privacy Law Developments – Employment, Privacy Law Update,* Counselor Library Conference 2016, April 2016

*The Automobile as the Ultimate Mobility Device – Autonomous, Connected, Electric Shared*, FICO World 2016 Conference, April 2016

*Simplified Compliance Management for Screening Companies*, National Association of Professional Background Screeners Annual Conference, September 2015

*Fair Credit Reporting Act:  Litigation, Regulatory and Enforcement Developments in the Financial Services Industry and Beyond*, Stafford Conferences Webinar, June 2015

*Big Data and Global Privacy*, FICO World Conference, November 2014

*Fair Credit Reporting Act and Financial Privacy*, ABA National Institute on Consumer Financial Law Basics, October 2014

*Alternative Credit Data*, Credit Builders Alliance Credit Building Symposium, July 2014

*CFPB and Furnisher FCRA Obligations*, ABA Consumer Financial Services Committee Winter Meeting, January 2014

*Background Screening:  Is FCRA Compliance Enough or Does the FTC Want More?*, International Association of Privacy Professionals, December 2013

*Top 10 Compliance Challenges for CRAs*, National Association of Professional Background Screeners Annual Conference, September 2013

*International Credit Reporting and Alternative Data*, NCLC/Suffolk Law School, Credit Reporting and Credit Scoring Symposium, June 2012

*Update by the Federal Trade Commission*, 2011 National Association of Professional Background Screeners Annual Conference, March 22, 2011

*Update on the FTC*, 2010 National Credit Reporting Association Annual Conference, November 11, 2010

*Federal FCRA* and *FTC Enforcement Initiatives*, 24th Annual Payment Card Institute, May 6-7, 2010

*The Inside Straight on the Changing Government Role in the Economy*, ACA International's 70th Annual Convention, July 14, 2009

*Implementation of the Affiliate Sharing Rule and Red Flags Rule*, American Bar Association Consumer Financial Services Committee, 2008 Winter Meeting, January 11, 2009

*The FCRA:  It's Not Just for Credit Bureaus*, IAPP Privacy Academy, Sept. 23, 2008

*Identity Theft and Privacy Rules*, 2008 NACCA Examiner's School, May 8, 2008

*Security Freezes and the Impact on the Credit Reporting System*, Fair Isaac's 2007 InterACT Conference, San Francisco, CA, May 15, 2007

*Data Security and Recommendations of the President's Identity Theft Task Force*, Collection and Recovery Solutions 2007 Conference, Las Vegas, NV, May 3, 2007

*Recent Developments in Data Security*, American Financial Services Association, Law Committee Meeting, January 29, 2007

*Current Topics in Credit Reporting and Credit Scoring*, American Financial Services Association, 8th Annual State Government Affairs Forum, September 28, 2006