# Exhibit B

Rebecca E. Kuehn
February 28, 2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

BONNIE MAGALLON,                        *
                                        *
     Plaintiff,                         *
                                        *
vs.                                     *
                                        *  No. 6:13-cv-01478-SI
ROBERT HALF INTERNATIONAL, INC.,        *
                                        *
     Defendant.                         *
                                        *
                                        *

— — — — — — — — —

VIDEO-RECORDED DEPOSITION OF REBECCA E. KUEHN
February 28, 2024, 10:00 a.m.
Location of Witness:  Hudson Cook, LLP
Pages 1 - 109
(REPORTED REMOTELY)

— — — — — — — — —

* Stenographic Reporter *
Taylor Smith
tjmsmith33@gmail.com     Job No. 6557307-001

Rebecca E. Kuehn
February 28, 2024

```
 1                    A P P E A R A N C E S

 2

    ON BEHALF OF THE PLAINTIFF:
 3
     Mr. John Soumilas
 4   FRANCIS MAILMAN SOUMILAS, P.C.
     1600 Market Street, Suite 2510
 5   Philadelphia, PA 19103
     215-735-8600
 6   jsoumilas@consumerlawfirm.com

 7  ON BEHALF OF THE DEFENDANT:

 8   Evangeline C. Paschal
     HUNTON ANDREWS KURTH LLP
 9   2200 Pennsylvania Avenue, Northwest
     Washington, DC 20037
10   202-419-2174
     epaschal@huntonak.com
11   Counsel for defendant, Robert Half

12   and

13   Mr. Robert T. Quackenboss
     HUNTON ANDREWS KURTH LLP
14   2200 Pennsylvania Avenue, Northwest
     Washington, DC 20037
15   202-955-1950
     rquackenboss@huntonak.com
16   Outside Counsel for defendant, Robert Half

17   and

18   Mr. Kimberly A. Bennion
     Legal Department - Robert Half International, Inc.
19   2884 Sand Hill Road, Suite 200
     Menlo Park, CA 94025
20   650-234-6000
     kim.bennion@roberthalf.com
21   In-House Counsel for Robert Half International, Inc.

22

23

24

25
```

Rebecca E. Kuehn
February 28, 2024

```
1    ALSO PRESENT:

2         Ms. Sarah Crooks, Esq.

3         Mr. Jim Soto - Videographer

4         Ms. Rayne Bennett - Paralegal

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rebecca E. Kuehn
February 28, 2024

```
1                    I N D E X

2   WITNESS

3   REBECCA E. KUEHN

4   EXAMINATION                              PAGE

5   BY MR. SOUMILAS                          6

6   BY MS. PASCHAL                           106

7

8

9                  E X H I B I T S

10  EXHIBIT    DESCRIPTION                   PAGE

11  NO.

12      1     Docket 147                     20

13      2     1/5/24 Expert Report           23

14      3     RHI Policy, "Handling Derogatory  29

15            Results"

16      4     2/2/24 Expert Rebuttal Report  50

17

18

19   INSTRUCTION NOT TO ANSWER:             28:19

20

21

22

23

24

25
```

Rebecca E. Kuehn
February 28, 2024

1

2                P R O C E E D I N G S

3          THE VIDEOGRAPHER:  Good morning.  We are now on

4  the record.

5          Participants should be aware this proceeding is

6  being recorded and as such all conversations held will

7  be recorded unless there is a request and agreement to

8  go off the record.  This is the remote video-recorded

9  deposition of Rebecca Kuehn.

10         Today is Wednesday, the 28th of February, 2024.

11  The time is now approximately 10:00 a.m. Eastern,

12  3:00 p.m. UTC.  We are here in the matter of Magallon

13  versus Robert Half International, Inc.

14         My name is James Soto, remote video technician,

15  on behalf of U.S. Legal Support.  I will now read the

16  statement for remote proceedings into the record.

17         The attorneys participating in this deposition

18  acknowledge the court reporter is not physically present

19  in the deposition room and that she will be reporting

20  this deposition remotely.  They further acknowledge that

21  in lieu of an oath administered in person, she will

22  administer the oath remotely.

23         Parties and their counsel consent to this

24  arrangement and waive any objections to this manner of

25  reporting.  Please indercate -- indicate your agreement

Rebecca E. Kuehn
February 28, 2024

1  by stating your name and your agreement on the record.

2          MR. SOUMILAS:  For the plaintiff, Bonnie

3  Magallon and the certified class, this is John Soumilas,

4  and we agree.

5          MS. PASCHAL:  For the defendant, Robert Half,

6  this is Evangeline Paschal from the law firm of Hunton

7  Andrews Kurth, and we agree.

8          THE VIDEOGRAPHER:  Thank you.

9          Will the court reporter, Taylor Smith, also on

10 behalf of U.S. Legal Support, please enter -- please

11 administer the oath.

12         THE REPORTER:  Good morning, Ms. Kuehn, if I

13 could have you raise your right hand, please.  Thank

14 you.

15         The testimony you are about to give today, do

16 you swear or affirm that it will be the truth, the whole

17 truth, and nothing but the truth?

18         THE WITNESS:  I do.

19         THE REPORTER:  Thank you so much.

20         Counsel?

21                  REBECCA E. KUEHN,

22    having been first duly sworn, testified as follows:

23              E X A M I N A T I O N

24 BY MR. SOUMILAS:

25      Q. Good morning, Ms. Kuehn.

Rebecca E. Kuehn
February 28, 2024

1        A. Good morning.

2        Q. My name is John Soumilas.  I am one of the

3   attorneys for Bonnie Magallon and a certified class in

4   the case of Magallon versus Robert Half International.

5   And through agreement of the party's counsel, I'm here

6   to take your deposition remotely today via Zoom, and

7   that is because you have been identified by Robert

8   Half's counsel as a potential expert testifying --

9   testifying expert for the trial that's scheduled to take

10  place later this year.

11            Do I understand that correct?

12       A. That's correct.

13       Q. Where are you joining us today from, Ms. Kuehn?

14       A. My office in Washington DC.

15       Q. And is anyone there with you at your office

16  today?

17       A. No.

18       Q. Do you have any material with you concerning

19  this case in your office?

20       A. No.

21       Q. Okay.  I know you produced for us in this

22  matter an expert report on behalf of Robert Half dated

23  January 5, 2024, and also a rebuttal expert report dated

24  February 2, 2024.

25            If you want to access those documents to

Rebecca E. Kuehn
February 28, 2024

1  refresh your recollection or just take a look at them,

2  we'll make those available to you on the screen, and

3  give you control to scroll to whatever page you want,

4  but I will ask you to look at those official documents

5  once we mark them as exhibits opposed to any other copy

6  that you might have available to you in your office.

7  Okay?

8      A. Okay.

9      Q. We might look at some other documents today as

10 well, and we'll use the same process of displaying them

11 for everyone on the screen, marking them as exhibits in

12 today's proceeding, and giving you control if you want

13 to scroll within any particular area within the

14 document.

15      Do you understand that?

16      A. Yes.

17      Q. All right.  And, Ms. Kuehn, you've been an

18 expert witness testifying in other matters; correct?

19      A. Correct.

20      Q. And you're also a practicing attorney; am I

21 correct?

22      A. Yes.

23      Q. So you know that today's proceedings are under

24 penalty of perjury, and you took an oath just like the

25 one if we were at trial today in this case in front of a

Rebecca E. Kuehn
February 28, 2024

```
 1    judge and jury.

 2             Do you understand that?

 3         A. Yes.

 4         Q. All right.  Any reason why you can't give me

 5    your best and truthful testimony today?

 6         A. No reason I can think of.

 7         Q. Very well.  Now, you are an active lawyer -- as

 8    I said, you're -- you're licensed currently?

 9         A. Yes.

10         Q. In which jurisdictions are you licensed?

11         A. In the District of Columbia, Maryland, and

12    Virginia.

13         Q. And how long have you been a practicing

14    attorney, Ms. Kuehn?

15         A. Since 1994.

16         Q. I understand that you said you're at your

17    office.  That's at the Hudson Cook law firm in

18    Washington, DC?

19         A. Yes.

20         Q. And how long have you been employed at Hudson

21    Cook?

22         A. For about eight years.

23         Q. And you're a partner there; correct?

24         A. Yes.

25         Q. All right.  I also understand that for purposes
```

Rebecca E. Kuehn
February 28, 2024

1  of this case, you were provided access to all of the

2  materials in the case, including the documents, the

3  pleadings, the parties' briefs, the court's orders, as

4  listed in Exhibit A of your expert report; am I correct?

5       A. Yes.

6       Q. Including the deposition transcripts; correct?

7       A. Yes.

8       Q. Now, I know you said you were provided access

9  to all of the material, but you're aware that this case

10 has a lengthy history, to say the least, over ten years;

11 correct?

12      A. That is correct.

13      Q. And there's quite a lot of material including

14 thousands of pages of documents produced by the

15 defendant in this case.

16           You're aware of that?

17      A. Yes.

18      Q. And there's over 170 docket entries on the

19 court's docket -- some of them quite complex with

20 lengthy briefing and many exhibits.

21           You're aware of that?

22      A. Yes.

23      Q. Did you review all this material in preparing

24 for your assignment in this case, or were you simply

25 provided access to it?

Rebecca E. Kuehn
February 28, 2024

1      A. I was provided access, and I reviewed materials

2  that I determined were relevant to the information I

3  needed to know for the issues I've been asked to testify

4  upon.

5      Q. Would you judge how much of the case file, if

6  you will, did you review?  Was it 10 percent?

7  50 percent?  90 percent?

8      A. I couldn't begin to guess.  My report, though,

9  does identify the particular items that I reviewed and

10  relied upon through citations.

11      Q. Would I be correct in concluding that you

12  reviewed the materials before you started preparing any

13  opinions about the case?

14      A. Yes.

15      Q. When were you first engaged about -- starting

16  to work on this case?

17      A. In March of 2023.

18      Q. And who engaged you?  Was it the defendant,

19  Robert Half International, or one of its attorneys?

20      A. I was contacted by Mr. Quackenboss.

21      Q. So one of the company's lawyers; right?

22      A. Yes.

23      Q. And when in relation to the first contact did

24  you start receiving or getting access to documents in

25  the case?

Rebecca E. Kuehn
February 28, 2024

1        A. It was sometime -- March or April of 2023.  I

2   think there was some issues in getting the full

3   electronic file, but I started getting materials around

4   that time.

5        Q. All right.  Do you bill at an hourly rate for

6   the work you do in this case?

7        A. Yes.

8        Q. And I understand your hourly rate is $835 per

9   hour; is that correct?

10       A. That's correct.

11       Q. Do you bill the law firm or the defendant

12   directly?

13       A. Can't recall who the invoices are sent to, but

14   the bills are sent for the client.

15       Q. And the client would be Robert Half?

16       A. Correct.

17       Q. Do you keep detailed invoices of your time?

18       A. Yes.

19       Q. How much time, approximately, did you take

20   reviewing the materials that were made accessible to you

21   in this case and that you list as Exhibit A to your

22   report?

23       A. In all -- I can't recall specifically, but

24   probably at least ten hours -- five to ten hours in

25   looking at materials.

Rebecca E. Kuehn
February 28, 2024

1        Q. And how much time total in terms of hours did

2   you spend as an expert witness on behalf of Robert Half

3   in this case reviewing materials, preparing the report,

4   preparing for today, anything else you did for them?

5        A. Probably, if I were to estimate, around 25,

6   30 hours.

7        Q. And that would be total?

8        A. Total.  Maybe more than that, because I haven't

9   prepared any invoices for this past month.

10       Q. All right.  Within the last month, did you do

11  anything for the case other than preparing to give

12  testimony today?

13       A. Well, it's February, so my rebuttal report was

14  written on February 2nd, so I finished my rebuttal

15  report on February 2nd.

16       Q. Got it.  So approximately how many hours for

17  the rebuttal report?

18       A. That, can I can't recall.

19       Q. And I take it you prepared to give testimony

20  today?

21       A. Yes.

22       Q. How many hours did you prepare for today?

23       A. I think about five hours total -- reviewing

24  materials, meeting with counsel.

25       Q. And when you say "meeting with couns- --

Rebecca E. Kuehn
February 28, 2024

1  counsel," would that be Ms. Paschal, who is defending

2  the deposition for Robert Half today?

3       A. Yes.

4       Q. Was there anybody else present during those

5  meetings?

6       A. Yes, Mr. Quackenboss.

7       Q. So other than preparing for the deposition

8  today and doing the rebuttal report -- preparing the

9  rebuttal report, did you do any other work for Robert

10  Half in February of this year?

11      A. No.

12      Q. Have you ever done any work in any capacity for

13  Robert Half in the past?

14      A. No.

15      Q. When you accepted this assignment, did you

16  check your firm's records for conflicts?

17      A. Yes.

18      Q. Did you check whether anyone else at your firm

19  had done any type of billable work for Robert Half in

20  the past?

21      A. Yes.

22      Q. And what did you find?

23      A. Did not find any records that anyone had worked

24  for Robert Half in the past.

25      Q. And have you been engaged by counsel,

Rebecca E. Kuehn
February 28, 2024

1    Mr. Quackenboss, for another client of his to do any

2    work in the past?

3         A. No.

4         Q. How about Ms. Paschal, who's here today?

5         A. No.

6         Q. Okay.  So this is the first time you working

7    with them?

8         A. Yes.

9         Q. I just did some quick math on my phone.  It

10   sounds like, given your $835 per hour hourly and the

11   hours you just mentioned to me, would -- a correct

12   estimate is that you spent in the neighborhood of $25-

13   to $30,000 of billable time on this assignment for this

14   case?

15        A. I've always been told not to do math in public,

16   but that sounds about right.

17        Q. Okay.  And, like, Ms. Kuehn, you have the

18   records if we need to go back to review them to -- to

19   get a more detailed accounting; correct?

20        A. Yes.  Yes.

21        Q. All right.  Now, there is quite a bit of

22   material in this case, as I mentioned.  It's a lengthy

23   history.  So I want to go over some of it just to make

24   sure that this is part of the material that you reviewed

25   and that we're on the same page as far as the case is

Rebecca E. Kuehn
February 28, 2024

1  concerned.

2        So you are aware that Ms. Magallon brought a

3  lawsuit against Robert Half alleging that she did not

4  receive from Robert Half timely pre-adverse action

5  notification in connection with a job where she was a

6  candidate for placement; correct?

7      A. Correct.  Correct.

8      Q. Okay.  In fact, Ms. Magallon said not only was

9  the notice not timely, she claims she never got it at

10  all.  Ever.

11        Do you understand that?

12      A. Yes.  Yes.

13      Q. All right.

14        THE WITNESS:  If I may -- I'm sorry.  If I may,

15  there's -- starting to get an echo and feedback.  I

16  don't know if that's something we can address.

17        MR. SOUMILAS:  I'm sorry.  I --

18        THE WITNESS:  It seems to have stopped now.

19  Sorry.

20        MR. SOUMILAS:  I don't know don't know if I was

21  moving papers or something, but sometimes if there's

22  extra microphones on, that happens.  I'll -- I'll try

23  not to fidget.

24  BY MR. SOUMILAS:

25      Q. So going back to the case, you know, I

Rebecca E. Kuehn
February 28, 2024

1   mentioned "pre-adverse action notification."  That's a

2   requirement under the federal law of the Fair Credit

3   Reporting Act, which we also refer to as the FCRA;

4   correct?

5        A. Correct.  When you're using consumer reports in

6   connection with employment decisions.

7        Q. And you are familiar with this area of law

8   under the FCRA, the pre-adverse actions requirements.

9   It's part of your practice for many years; correct?

10        A. Yes.

11        Q. Sometimes we also refer to this pre-adverse

12   action notification as the "b(b)(3)" notice.  You've

13   heard of that?

14        A. That's not a term I generally use, but I

15   understand what you mean.

16        Q. Okay.  And you do understand that it is a

17   requirement that comes under a section of the Fair

18   Credit Reporting Act as Section 1681b(b)(3); correct?

19        A. Correct.

20        Q. All right.  So Ms. Magallon brought this claim

21   saying that she just did not timely receive this notice

22   or -- or receive it at all and that Robert Half was

23   required, in her view, to -- to provide it to her?

24            MS. PASCHAL:  I object to the form.  Objection

25   to form.

Rebecca E. Kuehn
February 28, 2024

```
 1  BY MR. SOUMILAS:

 2       Q. Do you understand that claim in -- in that --

 3  in that regard -- her claim to be as I described it?

 4       A. Sounds consistent with what I read in the

 5  complaint, yes.

 6       Q. Okay.  And you also understand also that

 7  Ms. Magallon brought this claim not just for herself but

 8  for a class of who she believed to be similarly situated

 9  job candidates?

10          MS. PASCHAL:  Objection.  Calls for

11  speculation.

12       A. I understand this is a -- a class action

13  lawsuit.

14  BY MR. SOUMILAS:

15       Q. Okay.  Are you aware that the court in this

16  case issued a order certifying the case as a class

17  action?

18       A. Yes.

19       Q. And finding Ms. Magallon as a typical class

20  member and as the class representative for this class?

21       A. I don't specifically recall the exact language

22  of the opinion, but that sounds accurate.

23       Q. Typically, when you certify a case as a class

24  action, you have to have a class representative;

25  correct?
```

Rebecca E. Kuehn
February 28, 2024

1              MS. PASCHAL:  Objection.  Foundation.

2         A. Not been asked to opine on sort of class

3    certification issues generally, but yes, that's my

4    understanding of what the rules require.

5    BY MR. SOUMILAS:

6         Q. Right.  And you are aware that the court

7    certified this case as a class action years ago; right?

8         A. Yes.

9         Q. Are you aware that the parties had some

10   disagreements as to how many other job candidates should

11   be members of the class?

12        A. Only in a general sense.

13        Q. All right.  Did you review any of the briefing

14   on that subject that the parties filed on the docket in

15   this case on what the proper class population should be?

16        A. I may have scanned through it, but I didn't

17   look at it for that issue.

18        Q. Do you have an understanding that the court

19   made a determination that -- what we've called the

20   "updated" class list of 2,363 individuals should be the

21   class population here?

22        A. I don't recall specifically how many

23   individuals are in the class that was certified.

24        Q. All right.  I -- I'm just going to show you a

25   document that's on the docket that might refresh your

Rebecca E. Kuehn
February 28, 2024

1    re- -- recollection on this issue.

2           MR. SOUMILAS:  We'll call it Kuehn 1 for

3    purposes of today.

4           Ms. Bennett, would you pull up Docket 147 from

5    this case.

6           (Exhibit 1 marked/introduced.)

7    BY MR. SOUMILAS:

8        Q. Ms. Kuehn, have you seen this document before?

9    It said -- off the PACER docket for this case said

10   docket number 147.

11       A. I have not seen this particular document that I

12   recall, but I have reviewed the PACER docket list and

13   would have seen it as part of that.

14       Q. Would you agree with me that, according to this

15   minute entry, the court indicates that all 2,363

16   individuals from the plaintiff's updated class list

17   shall be included in the class list?

18       A. That is what the document says.

19       Q. All right.  Well, if I'm referring to the class

20   today, I'm referring to this population of two hundred

21   -- I'm sorry -- 2,363 job candidates who are on the

22   updated class list.  Okay?

23       A. Okay.

24       Q. Are you aware that, as the case progressed, the

25   defendant filed what's called a "motion for summary

Rebecca E. Kuehn
February 28, 2024

1  judgment arguing that -- that Robert Half did not

2  violate the pre-adverse action requirements of the Fair

3  Credit Reporting Act?

4       A. Yes, I recall that.

5          MR. SOUMILAS:  Ms. Bennett, you can pull this

6  exhibit down.

7  BY MR. SOUMILAS:

8       Q. And you -- are you aware that, again, the court

9  ruled that Robert Half's motion shall be denied in this

10 regard?

11      A. Yes, that's my recollection.

12      Q. And are you also aware that the court did not

13 rule and found that, not only might the case proceed to

14 trial, but that it might pro- -- it may proceed to trial

15 for a willful violation by Robert Half of the

16 pre-adverse action requirements of the FCRA?

17         MS. PASCHAL:  Objection to form.

18      A. My recollection is the court denied summary

19 judgment on that issue.  So, yes, the issue is

20 proceeding to trial.

21 BY MR. SOUMILAS:

22      Q. Including an issue of a willful violation of

23 the FCRA's pre-adverse action requirements; correct?

24      A. That's my recollection, yes.

25      Q. Okay.  As a lawyer and as an expert assigned to

Rebecca E. Kuehn
February 28, 2024

1   this matter, do you disagree with the court's rulings in

2   this case in any respect?  Do you just think that the

3   judge got it wrong somehow?

4        MS. PASCHAL:  Objection.  Compound.

5   BY MR. SOUMILAS:

6        Q. You could answer.

7        A. With respect to the judge's opinion, there were

8   some discussion of the policies and procedures that

9   Robert Half had in place and whether or not they --

10  their process was consistent with those policies and

11  procedures.

12       It's my recollection that was informative to

13  the court as to whether or not to -- whether or not

14  there was a disagreement on an issue of fact for trial.

15  When I reviewed that, I have a different opinion of the

16  policies and procedures and the fact that Robert Half's

17  practices varied from those procedures than that of the

18  judge.  That's what I recall when I read his opinion.

19       Q. Okay.  In fact, your opinion is that Robert

20  Half's practices do not violate the Fair Credit

21  Reporting Act's pre-adverse action requirements;

22  correct?

23       MS. PASCHAL:  Objection.  Calls for ultimate

24  legal conclusion.

25       A. My opinion is that Robert Half's practices, as

Rebecca E. Kuehn
February 28, 2024

1  I have learned from the record in this case, are

2  consistent with industry standards for the provision of

3  a pre-adverse action notice.

4  BY MR. SOUMILAS:

5      Q. Let's pull up your expert report both --

6  January 5, 2024.

7          MR. SOUMILAS:  We'll call it Kuehn 2 for

8  purposes of today.

9          (Exhibit 2 was marked/introduced.)

10         MR. SOUMILAS:  And, Ms. Bennett, I'd like you

11  to go to page 15 of the report once you have it up.

12  BY MR. SOUMILAS:

13     Q. All right.  And, Ms. Kuehn, I'd like to direct

14  your attention to the end of the second full paragraph

15  on page 15, please.

16         MR. SOUMILAS:  I don't think this is the

17  correct page, Ms. Bennett.  Page 15 as -- on the report.

18  That's 16 that you're on.

19  BY MR. SOUMILAS:

20     Q. All right.  May I direct your attention to the

21  last sentence of the second full paragraph -- the one

22  that begins "Further, although."

23         And there at the very end of the paragraph you

24  say, "Thus, even if RHI's" -- which we're using as an

25  abbreviation for Robert Half International -- if it's

Rebecca E. Kuehn
February 28, 2024

1  "practice of deferring the transmittal of the

2  pre-adverse action notice until after legal review was

3  not in accordance with RHI's written policy, it was not

4  a violation of the FCRA itself?"

5         Do you see that?

6      A. Yes.

7      Q. So you believe that the practice that RHI

8  engaged in was not a violation of the FCRA?

9         MS. PASCHAL:  Objection to the extent it calls

10  for ultimate legal conclusion.

11      A. Well, the sentence here is focused on whether

12  or not the fact that the written policy -- which says to

13  send the pre-adverse action immediately.  Whether or not

14  RHI's failure to -- you know, the fact that its practice

15  was different than what the written documentation was,

16  did that constitute a violation of the Fair Credit

17  Reporting Act?

18         And the sentence, which I think speaks for

19  itself, says, basically, even if RHI's practice wasn't

20  to send it immediately but was to send it after legal

21  review, the fact that it didn't comply with its written

22  policy wasn't -- isn't a violation of the FCRA.

23  BY MR. SOUMILAS:

24      Q. Would you say that you disagree with the

25  court's summary judgment decision in this case, which

Rebecca E. Kuehn
February 28, 2024

1  found that that practice -- very practice -- could be a

2  violation of the FCRA, and it could even be a willful

3  violation?

4      A. It's my understanding that the court denied

5  summary judgment on that at -- which requires this issue

6  to be an issue for trial.

7      Q. But if it was not a violation of the FCRA, the

8  court would have granted summary judgment to Robert

9  Half.  Would -- is that not how it works?

10     MS. PASCHAL:  Objection.  Foundation.  It's

11 beyond the scope of what she's being offered for.

12     A. In summary judgment, it's my understanding that

13 the court makes a determination whether there's an issue

14 of fact such that the case should go to trial, and the

15 court found issues of fact based on the variants between

16 Robert Half's procedures and what -- the practice that

17 it actually engaged in for purposes of whether or not to

18 correct summary judgment.

19 BY MR. SOUMILAS:

20     Q. I'm just trying to understand.  Do you agree

21 with the court's decision in this regard, or do you

22 disagree with it?

23     MS. PASCHAL:  Objection.  Beyond the scope of

24 her report.

25     A. Well, I haven't been asked to -- whether or not

Rebecca E. Kuehn
February 28, 2024

1  I agree with a judge.  But the issue here is, does the

2  fact that Robert Half have practice that's at variance

3  with a written policy that it has in place, does that

4  itself equate to a violation of the FCRA?  I -- that's

5  -- that's the point I was making in this paragraph.

6  BY MR. SOUMILAS:

7      Q. Right.  So I know you -- Robert Half hasn't

8  asked you to opine on that.  But I'm trying to

9  understand the underpinnings of your opinion here.  And

10  you are a lawyer.  You've read this material.  You told

11  me you reviewed it.  So I'm trying to understand whether

12  you're in disagreement with the court rulings in this

13  case in some respect.

14      MS. PASCHAL:  Objection.  Beyond the scope of

15  her report.

16      A. Well, without going through the opinion line by

17  line, I can't say what I agree or don't agree with.  I'm

18  just telling you what my opinion here is in the case,

19  which is the fact that Robert Half had a written policy

20  but had some practices that were at variance within

21  where they evolved to basically have this legal review

22  before they decided to send a pre-adverse action notice.

23      The failure to comply with a written policy

24  isn't by itself a violation of the FCRA.

25  BY MR. SOUMILAS:

Rebecca E. Kuehn
February 28, 2024

1      Q. Right.  And you think the practice as it was

2  actually carried through is also not a violation of the

3  FCRA?

4      A. That's correct.  I believe it's consistent with

5  industry standards and practice.

6      Q. All right.  We'll -- we'll get into that --

7  what that means in a moment.

8          But why don't we go back to your preparation to

9  give testimony today?  You said you spent around five

10  hours with counsel?

11         MS. PASCHAL:  Objection.  Mischaracterizes

12  testimony.

13      A. No.  I spent five hours getting prepared.  Some

14  of that was meeting with counsel.

15  BY MR. SOUMILAS:

16      Q. Okay.  When was that, the five hours?

17      A. The five hours were over the last -- the course

18  of the last couple days.

19      Q. And some of it was preparing on your own, and

20  then some of it was meeting with Robert Half's counsel?

21      A. Yes.

22      Q. When did you meet with counsel?

23      A. Monday.

24      Q. How long was that meeting?

25      A. Probably around two and a half hours.

Rebecca E. Kuehn
February 28, 2024

1          Q. Was it in person?  by Zoom?  over the

2     telephone?  How did you do it?

3          A. In person.

4          Q. Was anybody else there?

5          A. Other than myself, Ms. Paschal, and

6     Mr. Quackenboss attended by video.

7          Q. So you said other than you and counsel.  Was

8     there some -- anybody else there?

9          A. No.

10         Q. Okay.  And the rest of the material -- I mean

11    the rest of the time that you spent preparing, you

12    reviewed material?

13         A. Yes.

14         Q. And did you do that by yourself, or did you

15    have assistance from anybody?

16         A. I did that by myself.

17         Q. What material did you review by yourself?

18         MS. PASCHAL:  I'm going to instruct the witness

19    not to -- I'm going to object and instruct the witness

20    to not answer with respect to any materials she reviewed

21    as an outcome of our discussions during preparation.

22    It's protected by work product.

23         MR. SOUMILAS:  Well, okay, then, but -- but --

24    but I thought I laid the foundation, but -- but I'll do

25    it again.

Rebecca E. Kuehn
February 28, 2024

1    BY MR. SOUMILAS:

2         Q. Ms. Kuehn, did I understand you correctly that

3    you reviewed the material before you met with counsel on

4    Monday or after?

5         A. Both.

6         Q. Okay.  How -- how much time before your meeting

7    with counsel?

8         A. I can't specifically recall.

9         Q. All right.  And you just on your own started

10   reviewing some material to prepare for this deposition

11   since you knew it was coming up?

12        A. Yes.

13        Q. What did you review?

14        A. I reviewed my reports.  I reviewed the reports

15   of Plaintiff's experts primarily.

16        Q. Anything else?

17        A. Not that I can recall.

18        Q. I want to show you a document that we'll mark

19   as Kuehn 3 for purposes of today's proceedings.  It was

20   used as an exhibit in the class certification motion in

21   this case, Docket 33-3.  It is an RHI policy.

22             (Exhibit 3 marked/introduced.)

23   BY MR. SOUMILAS:

24        Q. And have you seen this document in preparing

25   for your deposition?  It's called "Handling Derogatory

Rebecca E. Kuehn
February 28, 2024

```
 1  Results."
 2          MS. PASCHAL:  I'm going to object and instruct
 3  the witness not to divulge anything that would reflect
 4  upon what we did as preparation or as a result of our
 5  conversation about preparation.
 6  BY MR. SOUMILAS:
 7          Q. Could you answer the question, Ms. Kuehn?
 8          A. I did not specifically review this document in
 9  preparation for the deposition, but it does appear to be
10  a document that's in the record that I reviewed in
11  preparation of my reports.
12          Q. Okay.
13          MR. SOUMILAS:  We could put it down.
14  BY MR. SOUMILAS:
15          Q. Now, as we said at the get-go, this is a case
16  involving the pre-adverse action requirements of the
17  Fair Credit Reporting Act or FCRA.  Have you ever been
18  an expert witness in a case involving a claim that the
19  pre-adverse action notification of the FCRA was not
20  provided?
21          A. I have not.
22          Q. Then could I take that from your -- from that
23  answer that you've never been recognized as an expert in
24  court by any court in the pre-adverse action notice
25  case?
```

Rebecca E. Kuehn
February 28, 2024

1      A. That's correct.

2      Q. All right.  More broadly, have you been

3  qualified to testify as an expert in court in any type

4  of a case?

5      A. Yes.

6      Q. Okay.  How many times?

7      A. I have been qualified as an expert twice:  one

8  in a confidential arbitration and most recently in

9  federal court in Seattle, Washington.

10     Q. Okay.  And why don't we set the confidential

11  arbitration proceeding aside because it seems that's the

12  type of document -- the type of case that we can't get

13  access to the documents.  But I take it the federal

14  proceeding was in a -- in an open court; right?

15     A. That's correct.

16     Q. What was the -- what was the nature of that

17  case?

18     A. It was a lawsuit against a consumer reporting

19  agency related to accuracy.

20     Q. All right.  Did that case involve medical

21  records?

22     A. A prescription drug history and medical

23  history, yes.

24     Q. It did not involve any type of employment

25  prescreening of -- of job candidates; correct?

Rebecca E. Kuehn
February 28, 2024

1        A. That's correct.

2        Q. Have you ever been qualified by a state or

3   federal court to give your opinion in any type of a

4   case, whether FCRA or not, involving employment

5   practices?

6        A. No.

7        Q. All right.  Other than the case in Seattle

8   involving prescription history and medical records, have

9   you ever been qualified by any court, state or federal,

10  to give your expert opinion in any matter?

11       A. In any court proceeding?  No.

12       Q. Right.  Conversely, have you ever been found by

13  a court, state or federal, to be unqualified as an

14  expert to give your opinion at trial?

15       A. Not to my knowledge.

16       Q. If we go back to your expert report, please.

17  That's Kuehn 2.

18           MR. SOUMILAS:  And if we could, please go to

19  Exhibit B.  It's at the end of the report immediately

20  after Exhibit A.

21  BY MR. SOUMILAS:

22       Q. And there is a list of additional information

23  that you leaned on, including publications by you;

24  correct?

25       A. No, that's not correct.  This is a list of

Rebecca E. Kuehn
February 28, 2024

1   publications I've authored as required by the disclosure

2   rules for expert disclosures.  I didn't say that I

3   leaned on those.  That was your word.

4         Q. Okay.  I'm sorry.  So this additional

5   information, you're just simply telling us your

6   publications.  It's not as if you relied on any of these

7   publications to form your opinions in this case; is that

8   correct?

9         A. That's correct.

10        Q. Okay.  Thank you.  Are any of these

11   publications listed in Exhibit B specific to the

12   pre-adverse action requirements for job screening under

13   the Fair Credit Reporting Act?

14        A. If I can have control of the document.

15        Q. Yes.

16        MR. SOUMILAS:  Ms. Bennett, would you please

17   give the witness control.

18        MS. BENNETT:  You do -- I'm sorry.  Yes, if you

19   just double-click, you'll be able to navigate.

20        THE WITNESS:  Okay.

21        A. The only one -- none of these publications talk

22   about employment with the exception, potentially, of the

23   Year in Review article from 2021.  The FCRA appellate

24   decisions that may be covered in there that might have

25   it.  I don't recall specifically, though.

Rebecca E. Kuehn
February 28, 2024

```
 1  BY MR. SOUMILAS:

 2       Q. All right.  If we go back to Exhibit A of your

 3  report.  It's just a previous page from the one you're

 4  looking at.  That's where you can see materials provided

 5  or available to the expert.

 6            Oh, I'm sorry -- let's see if we can get the

 7  correct exhibit back up there.

 8            MR. SOUMILAS:  It's Exhibit Kuehn 2.  It's the

 9  material provided or available to the expert.  Okay.

10  There we are.

11  BY MR. SOUMILAS:

12       Q. Ms. Kuehn, did I understand your testimony

13  earlier today correctly that you didn't rely on all of

14  these documents in formulating your opinions in this

15  case?  You just had it -- all the documents available to

16  you if you wanted to access them; is that correct?

17       A. That's correct.

18       Q. If I wanted to get at the sources -- the

19  documents that you relied on and information you relied

20  on to form your opinions, would we need to look at your

21  expert report itself and what you cite within that

22  report?

23       A. Yes.  It's my intention when I prepare a report

24  to cite to specific parts of the record that I relied

25  upon or specifically reviewed for my opinion, and so the
```

Rebecca E. Kuehn
February 28, 2024

1  -- those citations are throughout my report.

2      Q. And, inversely, can I conclude that if you

3  didn't cite to a specific source or document or

4  transcript in your report itself, then that did not form

5  the basis of your opinion?

6      A. That would be a reasonable assumption.  I don't

7  want to say definitively because there may have been

8  some materials that I considered and didn't rely on, so

9  I'm just trying to make sure I'm answering you

10  truthfully.

11      Q. It says here, for example, that you had

12  available "All documents produced to the Plaintiffs."

13      I -- I take it you mean produced by Robert Half

14  and its attorneys in this case; correct?

15      A. Yes.

16      Q. So are you aware that there were many thousands

17  of records of potential class members that were turned

18  over during this phase of the case where the parties

19  were disagreeing about what the correct number of class

20  members should be?  Did you review those?

21      A. I did not end up reviewing those documents.

22  They were available if I wanted to, but I did not.

23      Q. Okay.  You do say here in your list that you

24  had interviews with a Kathleen Cattani -- I hope I'm

25  pronouncing that correctly, C-A-T-T-A-N-I -- and a Ted

Rebecca E. Kuehn
February 28, 2024

1    Mawla, M-A-W-L-A, and you have that as December 28,

2    2023.

3            Do you see that?

4        A. Yes.

5        Q. Okay.  I take it both of these interviews were

6    conducted on that day?

7        A. Yes.

8        Q. They were conducted by you?

9        A. Yes.

10       Q. Was it that -- these two folks together or one

11   at a time?

12       A. I interviewed them together.

13       Q. Okay.  And who are these individuals, to your

14   knowledge?

15       A. These are individuals in the legal department

16   at Robert Half who are the types of folks who conduct

17   legal reviews.

18       Q. All right.  Was there anybody else there during

19   your interview?

20       A. Yes, counsel for Robert Half.

21       Q. Who specifically?

22       A. Outside counsel and -- as well as internal

23   counsel.

24       Q. And was this an in-person interview, or was it

25   by -- by Zoom like we're doing today, or telephone?

Rebecca E. Kuehn
February 28, 2024

```
 1        A. By Zoom.

 2        Q. Was there anybody else present on this Zoom

 3   interview?

 4        A. Aside from counsel and Ms. Cattani and

 5   Mr. Mawla, no.

 6        Q. How long did the interview last?

 7        A. I don't specifically recall.  Probably around

 8   an hour.

 9        Q. Did you create a transcript of the interview?

10        A. No.

11        Q. Did you take notes?

12        A. Yes.

13        Q. Did you keep the notes?

14        A. Yes.

15        Q. Beginning with Kathleen Cattani, is she an

16   attorney?

17        A. Yes.

18        Q. She's an in-house attorney at Robert Half?

19        A. Yes.

20        Q. How long has she been working in that capacity

21   for Robert Half?

22           MS. PASCHAL:  Objection.  Foundation.

23        A. I can't specifically recall.  I do recall

24   asking her, and my recollection was for quite a while.

25   BY MR. SOUMILAS:
```

Rebecca E. Kuehn
February 28, 2024

1      Q. Could you pin that down more definitively, what

2  "quite a while" means?

3      A. I believe over ten years for sure, maybe much

4  longer than that, but I can't recall as I'm sitting here

5  today.

6      Q. Was this part of your assignment in this case?

7          MS. PASCHAL:  Objection to form.

8      A. I'm not sure --

9  BY MR. SOUMILAS:

10     Q. Let me try that another way.

11         How did you come about to interview Ms. Cattani

12 and Mr. Mawla as opposed to anybody else or not

13 interviewing anyone at all?

14     A. I had asked in preparation of my report for

15 additional information about the nature of the legal

16 review to understand what factors went into it, what --

17 what the attorneys who reviewed background checks

18 considered when they were doing that process.  And these

19 are the two individuals that I ended up speaking to.

20     Q. Did you have a choice to speak to other

21 individuals also who did the same type of work?

22         MS. PASCHAL:  Objection to form.

23     A. I had asked for some people who had done this

24 review and had been at the company for a period of time

25 so that I could understand what the process was and how

Rebecca E. Kuehn
February 28, 2024

1  it may have evolved.  These are the two people that were

2  identified.

3  BY MR. SOUMILAS:

4       Q. They were identified by counsel?

5       A. Yes.

6       Q. And I take it, then, that Mr. Mawla also is an

7  in-house attorney at Robert Half?

8       A. Yes.

9       Q. And do you have an understanding of how long

10 he's been working for Robert Half in the legal review

11 area?

12      A. I don't specifically recall.  I know we

13 discussed it.  My recollection, though, is that he, too,

14 has had a fairly long tenure at Robert Half.

15      Q. Why did you feel like you needed to -- to speak

16 with these individuals?

17      A. I wanted to get a better understanding of the

18 nature of the legal review, what issues were considered,

19 and what the process entailed.

20      Q. I take it from your answer that, based on the

21 existing factual record in the case, you couldn't answer

22 some questions that you had about the legal review

23 process, so, therefore, you needed to speak with

24 somebody who actually does it?

25      A. My recollection is there's a fair amount of

Rebecca E. Kuehn
February 28, 2024

1    evidence in the record related to the purpose of the

2    legal review generally.  I wanted to have more specific

3    knowledge about what that review consisted of.  I also

4    wanted to talk about experiences in conducting the --

5    the legal review, what the outcomes of that were, and

6    how the process worked from the -- from the legal review

7    perspective.

8         Q. Was this -- did you consider interviewing these

9    folks one at a time instead of together?

10        A. I did, but we -- I think we set this up for

11   efficiency so that I could interview them both at the

12   same time.

13        Q. Did you consider interviewing them outside the

14   presence of outside counsel, the -- the lawyers that are

15   defending this case for Robert Half?

16        A. No, it didn't come up.  They arranged the --

17   counsel and in-house counsel for Robert Half set up the

18   call, so I didn't -- didn't consider that.

19        Q. All right.  We'll get back to that.

20            MR. SOUMILAS:  We can take the exhibit down for

21   now.

22            Actually, no.  You know what?  Let's -- let's

23   keep it up.  I'm sorry.  Let's -- let's keep that

24   exhibit up at the same page, Ms. Bennett.  I'm sorry.

25   BY MR. SOUMILAS:

Rebecca E. Kuehn
February 28, 2024

1      Q. Is this the complete list of all of the

2  materials provided or made available to you, Ms. Kuehn,

3  for this assignment?

4      A. To the best of my knowledge, yes.

5      Q. Okay.  Then could I infer from this list that

6  you did not interview anyone outside of Robert Half

7  about anything?

8      A. Related to this expert report, no.

9      Q. Yes, related to this expert report.

10      A. That's correct.

11      Q. And I take it you also didn't review materials

12  such as pre-adverse action policies from any other job

13  placement agency for purposes of this report?

14      A. That's correct.

15      Q. You didn't review any materials about the

16  policies for pre-adverse action notice from any

17  employers outside of the practices involved here for

18  Robert Half?

19      A. Not specifically in connection with the

20  preparation of this report.

21      Q. And you didn't interview or gather information

22  about how the practices of any other employer or job

23  placement agency may differ from that particular

24  company's written policies with respect to pre-adverse

25  action notice.

Rebecca E. Kuehn
February 28, 2024

1          Would you agree with that?

2     A. Could you restate the first part of that

3 question.  I want to make sure I'm answering accurately.

4     Q. Yeah.  Let me -- let me lay a foundation a

5 little bit.  This might be helpful.

6          Why don't we go back to page 14 of your report?

7          And looking at the first bullet on this page,

8 you note that Robert Half had a written policy that

9 pre-adverse action letters, quote, "must be sent

10 immediately when a background check is returned with a

11 discrepant and/or derogatory result (red or yellow

12 flag)," [as read] closed quotes.

13          Do you see that?

14     A. Yes.

15     MS. PASCHAL:  Objection to not reading it

16 accurately.

17     MR. SOUMILAS:  Oh, I'm -- I'm sorry if I didn't

18 read it accurately.

19 BY MR. SOUMILAS:

20     Q. Well, I think it says, quote, "must be sent

21 immediately" -- it says "pre-adverse action letters,"

22 quote, "must be sent immediately when a background check

23 is returned with discrepant and/or derogatory results"

24 yell- -- "(red or yellow flag)," end quote.

25          Did I read that correctly?

Rebecca E. Kuehn
February 28, 2024

1        A. Yes.

2        Q. Okay.  And, Ms. Kuehn, would you agree with me

3   that one of the issues in this case is that there's a

4   written policy about sending pre-adverse action letters

5   immediately, but you understand the practice of Robert

6   Half is different.  It --  it involves sending these

7   letters after the legal review process?

8        A. Yes, I understand that.

9        Q. Okay.  So what I was trying to get at a moment

10  ago is whether you looked at any other cases from any

11  other employers where they have a written policy that

12  says one thing about pre-adverse action notification,

13  but then the actual practice of how they do it or when

14  they do is different.

15        Did you consider that type of a possible

16  scenario for other employers or employment placing --

17  placement services besides Robert Half?

18        A. And that's why I wanted you to restate your

19  question because I think you asked if I specifically

20  reviewed such policies and procedures in connection with

21  the preparation of this report.  The answer to that

22  question is no, but I have during the course of my

23  experience and working with Fair Credit Reporting Act,

24  and specifically at the FTC -- been occasion to have

25  investigations where these issues have popped up, where

Rebecca E. Kuehn
February 28, 2024

1  written policies haven't been updated to conform to

2  current practice and current practice differs from what

3  written policies state.

4      Q. Okay.  Yeah.  Let's be as precise as we can

5  about this.  In preparing your opinions in this report,

6  did you gather information, interview people, or do

7  anything outside of Robert Half to determine whether

8  other job placement agencies or employers have a

9  differing practice than what their written policy

10 states?

11     A. Specifically job placement reports?  No --

12     Q. Yes.

13     A. -- but I have general knowledge and experience

14 over the years with different types of employers, their

15 written policies, and their practices.

16     Q. Yeah.  I understand that part of your current

17 legal practice is to give advice to clients; correct?

18     A. Correct.

19     Q. And without telling me about specific legal

20 advice you gave to any client, do you think generally it

21 is advisable for companies to follow their written

22 practices -- I'm sorry.  I'll withdraw that.

23         Do you think it is generally advisable for

24 companies to follow their written policies in actual

25 practice?

Rebecca E. Kuehn
February 28, 2024

1          MS. PASCHAL:  Objection to form.  Foundation.

2     Beyond the scope of her expert report.

3          A. In my --

4     BY MR. SOUMILAS:

5          Q. You can answer.

6          A. -- in my advice of -- of clients, try to make

7     sure that written policies conform to what they do.  We

8     often say, "You want to get credit for the work that you

9     do."  There are instances where a poll -- a procedure

10    might change in advance of getting an update to a

11    written policy, or there could be some disconnect, a

12    change in the law, or a change in circumstances that

13    results in a change in practice where the written

14    procedures haven't been updated.  But it is generally my

15    advice to try to make sure you're updating your policies

16    and procedures on a regular basis.

17         Q. Okay.  For purposes of this report in your

18    opinions, again, did you investigate or review any other

19    job placement agency or employer which has this legal

20    review process before sending out a pre-adverse action

21    notice to job candidates?

22         A. Did I look at another company's procedures or

23    practices in connection with this review?

24         Q. Well -- well, not only procedures or practices,

25    but procedures or practices that are similar to Robert

Rebecca E. Kuehn
February 28, 2024

1  Half's whereby there is this legal review process before

2  pre-adverse action notice is sent, and at the conclusion

3  of that process, if there's a non-placement

4  determination, then the notice of the pre-adverse notice

5  is sent?

6       A. Not of a staffing agency, per se, but I have

7  worked with clients who are working on processes to

8  comply with the Fair Chance hiring laws that will be

9  adopted through the country which require a specific

10 review of criminal records before making a preliminary

11 determination.  Laws have been changed to add some

12 additional processes in various jurisdictions.

13      Q. Okay.  So let's just break that down.  First of

14 all, did you review any specific company's practice in

15 this respect in preparing your expert report and

16 opinions in this matter?

17      A. No.

18      Q. And then you just said that, you know, you're

19 familiar with that type of a practice as it relates to

20 the Fair Chance laws; correct?

21      A. Yes.

22      Q. Would you explain what that is, please.

23      A. So over the past number of years, a number of

24 jurisdictions have adopted new requirements with respect

25 to the use of criminal records and similar information

Rebecca E. Kuehn
February 28, 2024

1    in employment and hiring.

2            As part of that process, there's been some

3    additional review and notification which -- where you

4    need to make a preliminary determination whether or not

5    that persons suitable for hiring excluding any

6    consideration of criminal records.

7            Some people call that -- some places call that

8    a "conditional offer."  At that point, you are permitted

9    as an employer to consider the criminal record

10   background, but you must make it an individualized

11   assessment of those records, applying certain factors

12   depending on the jurisdiction; and then after you make

13   that determination, you're required to provide another

14   notice to the consumer-applicant of your preliminary

15   determination allowing them to have a chance to respond

16   to that preliminary determination.

17       Q. Okay.  And I'm sorry.  Did you say these Fair

18   Chance laws are state laws?

19       A. State or local.  There's some regional

20   jurisdictional laws.

21       Q. And you are aware in this case there is no

22   claim under the Fair Chance laws of any state or local

23   government; correct?

24       A. That's correct.

25       Q. All right.  Now, I'm going to go back to where

Rebecca E. Kuehn
February 28, 2024

1    I was heading with respect specifically to the Fair

2    Credit Reporting Act's pre-adverse action notice

3    requirements.

4              Are you aware generally -- not just for

5    purposes of this report -- but generally of any other

6    staffing agency or employer using the same type of

7    practice at Robert Half where it conducts a legal review

8    first, finds a candidate placeable or not placeable

9    through that process, and then sends the pre-adverse

10   action notice under the FCRA?

11        A. Yes, not a staffing agency but other employer.

12        Q. Okay.  Who -- who else engages in that?

13        A. I'm not at liberty to say.  That's in

14   connection with advice.  But I can give you a general

15   description of the -- what the issue was.

16             So as I just described this couple-step process

17   that exists for purposes of complying with these new

18   state and regional Fair Chance housing laws, I have

19   advised a client on how to sort of conform the

20   pre-adverse action notice requirements under the FCRA

21   and also address the Fair Chance housing noti- -- Fair

22   Chance hiring requirements under the various state and

23   local laws.

24        Q. All right.  So this is one client of yours in

25   your legal practice?

Rebecca E. Kuehn
February 28, 2024

1        A. Yes.

2        Q. And you can't tell me who that is?

3        A. That's correct.

4        Q. And the advice you gave them was in connection

5    with, as you said, conforming these Fair Chance law

6    requirements with the federal Fair Credit Reporting Act

7    requirements?

8        A. Correct.

9        Q. Okay.  And -- and this client also has a legal

10    review, which results in a placeable or not placeable

11    determination under their Fair Credit Reporting Act

12    policy?

13        A. Not precisely, no.

14        Q. All right.  So you are not aware of any other

15    client of yours for purposes of the report in this case

16    or in any other capacity which has a pre-adverse action

17    practice identical to Robert Half's, are you?

18        A. I would say that's fair, yes.

19        Q. Okay.  Now, the report that we have up, you

20    prepared under the -- the federal rules for expert

21    reports, understanding that you must express of all your

22    opinions in the report and the basis for them; correct?

23        A. Yes.

24        Q. And, indeed, Exhibit 3 today which is your --

25    I'm sorry.  Exhibit 2, which is your expert report of

Rebecca E. Kuehn
February 28, 2024

1  January 2, 2024 [sic], states all your opinions in this

2  case and the basis for them; correct?

3      A. And my February 2nd rebuttal report.

4      Q. Okay.  So let me -- let's just make sure that

5  that's clear.  You -- you prepared the January 5, 2024,

6  report, and in that report, you stated all of your

7  opinions and the basis for them; correct?

8      A. Correct.

9      Q. And then you were asked by Robert Half to also

10 prepare a rebuttal report to comment, if you will, on

11 your reviews concerning the expert reports of Plaintiff

12 in this case?

13     A. That's correct.

14     Q. Okay.  And then let's make that part of the

15 record.

16         MR. SOUMILAS:  I believe we are up to

17 Exhibit 4.  It is the February 2, 2024, rebuttal report.

18 Let's place that up on the screen, Ms. Bennett, and give

19 the witness control of the document.

20         (Exhibit 4 was marked/introduced.)

21 BY MR. SOUMILAS:

22     Q. All right.  And, Ms. Kuehn, this is the

23 rebuttal report you just referenced; correct?

24     A. I'm just looking at it.

25     Q. Yes.

Rebecca E. Kuehn
February 28, 2024

1      A. Yes.

2      Q. All right.  So between the original report and

3  the expert report -- I'm sorry the original expert

4  report of January 5, 2024, and the rebuttal report of

5  February 2, 2024, those are all of your opinions in this

6  case and the basis for them?

7      A. Yes.

8      Q. All right.  Let's go to your original report of

9  January 5, 2024.

10         MR. SOUMILAS:  And let's go to the first page,

11  please.

12         I'm sorry, the first page of the text, not the

13  -- not the cover page.  The introduction.  There we go.

14  Thank you.

15  BY MR. SOUMILAS:

16      Q. And there at the conclusion of your

17  introduction, you write "my expert opinion is that the

18  process in place at RHI during the class period to

19  provide pre-adverse action notices prior to taking

20  adverse actions was and is consistent with industry

21  standards and practices and otherwise reasonable based

22  on my knowledge of the industry."

23         Did I read that correctly?

24      A. Yes.

25      Q. Okay.  Let's focus on a few of your words

Rebecca E. Kuehn
February 28, 2024

1  there.  You reference "industry standards."  And as an

2  expert, you're aware that this is something -- it's an

3  area in which sometimes lawyers offer expert testimony;

4  correct?

5          A. For industry standards, yes.

6          Q. Yes.  And depending on the industry, which may

7  be at issue in the lawsuit, there are different sources

8  from which the standards of practice emanate.  Would you

9  agree with that?

10         A. As a general principle, yes.

11         Q. Yeah, so if we're talking about the automobile

12 industry, there might be certain standards for brake

13 safety or tires, for example; correct?

14         A. Yes.

15         Q. And if we're talking about medical cases,

16 sometimes there are textbooks on how to perform medical

17 procedures that set the standard for the medical

18 practice, would you agree?

19         A. Yes.

20         Q. When you talk about "standards" in the area of

21 fair credit reporting and pre-adverse action

22 notification, where do the standards come from?  Are

23 they written somewhere?  Where do they originate?

24         A. When I'm referring to "standards," I'm talking

25 about how industry has operated to comply with various

Rebecca E. Kuehn
February 28, 2024

1   requirements of the FCRA.

2          So, for example, if I were talking about

3   reasonable procedures to assure maximum possible

4   accuracy, I would be talking about the practices used by

5   similar consumer reporting agencies, how industry has

6   adopted that.  I often make reference to any guidance

7   that exists, any regulatory guidance, giving sort of

8   direction on how industry should comply.  It's sort of a

9   mix of things.

10         Q. I want to break it down because it's very

11  important for me to understand what you're getting at

12  here.  So I think the first thing, you -- you said a

13  "mix of things," and at least I heard two things.  Maybe

14  there are more.  We'll get in it -- into it.

15         But you started with what actors or businesses

16  within the industry actually do in practice; is that

17  fair to say?

18         A. Yes.

19         Q. So how businesses operate to fulfill certain

20  functions of their business.

21         A. Yes.

22         Q. All right.  And if we're talking about a

23  standard for the entire industry, how do you -- how do

24  you come to that standard?  Is there a book or a manual

25  or a -- some consensus on what most businesses do that I

Rebecca E. Kuehn
February 28, 2024

1  could take a look at to see whether something comes

2  above or below the standard?  You know, where could I

3  find the standard?

4       A. Where I've defined the standard is from looking

5  at a variety of employers.  First, in the context of my

6  work at the Federal Trade Commission and investigating

7  different employers and what policies and procedures and

8  practices they employed.

9       I also have looked at, you know, the evolution

10 of how hiring and the use of criminal records has

11 continued to sort of evolve.  So, for example, I

12 mentioned the EEOC's guidance -- which was issued in

13 2011, I believe -- with respect to how employers should

14 look at and consider criminal records in their hiring

15 processes.

16      So I consider that as sort of something that

17 the industry is looking at when they're deviling --

18 developing their policies and procedures and have seen

19 how companies' policies and procedures have changed over

20 time to address all of these issues.

21      Q. Let's set regulatory guidance aside for a

22 moment.  We're going to get to that next because you

23 also mentioned that as something you're looking at.  But

24 forget about laws and regulations.

25      If I just wanted to see, you know, what is the

Rebecca E. Kuehn
February 28, 2024

1  industry standard with respect to providing pre-adverse

2  action notice to job candidates, where would I look to

3  find the standard?  Where is it written?  Where is it

4  tested?  Where is it reviewed?  Where is it debated?

5  Where is the standard?

6        A. As I mentioned, the standard exists in how

7  companies have developed their policies and procedures

8  to comply.  It all derives from the requirements of the

9  Fair Credit Reporting Act and how companies choose to

10 implement that and their processes for doing that.

11       Q. Is -- it what you call what the industry does

12 in practice your experience with the industry personally

13 in working with clients and having worked with the FTC

14 previously?

15       A. Yes.

16       Q. Okay.  But have you published something that

17 kind of sets the standard with respect to pre-adverse

18 action notification or discusses the standard of

19 employers or background screeners or placement agencies?

20 Anybody involved in the process.

21       A. There have been publications issued out of the

22 Fair -- out of the Federal Trade Commission during the

23 time that I worked there that talked about pre-adverse

24 action notices requirements, requirements -- employers

25 in connection with use of criminal records.

Rebecca E. Kuehn
February 28, 2024

1      Q. When you say "publications out of the Federal

2   Trade Commission," I think in your report you

3   referenced, for example, the 40 years report?

4      A. The 40 years report is one of the

5   publications --

6      Q. Right.  Let's set that aside because I'm going

7   to set that as a regulatory guidance, the legal guidance

8   that's available for the standard here, and we'll get to

9   that in a moment.

10        But forget -- forget what the legal

11   requirements are.  If I just want to know what most

12   employers in the country do with respect to when they

13   send pre-adverse action notice -- how they send it.  Is

14   it by email?  Is it by text?  Is it by U.S. Mail?  You

15   know, whether they have a legal review process before

16   they send it.

17        What they actually do in practice, is that

18   standard written down somewhere that I could take a look

19   at it to see whether RHI's policy is consistent with

20   that standard or below the standard or above the

21   standard?

22      A. I didn't review that type of material in

23   connection with my opinion.  I based my opinion and my

24   understanding of industry standards on my experience

25   both at the Federal Trade Commission and currently.

Rebecca E. Kuehn
February 28, 2024

```
1        Q. Okay.  Now, you -- you would agree with me that
2   there is a legal standard that sets requirements for
3   sending pre-adverse action notices based in, as we said
4   at the beginning, the Fair Credit Reporting Act's
5   pre-adverse action provisions; correct?
6        A. The Fair Credit Reporting Act, yes, sets out
7   the requirement to provide certain information in
8   advance of adverse action in the context of --
9        Q. Right.  And I mentioned at the beginning of
10  this case, I think you said -- I don't know if you refer
11  to it as such -- but I said the 1681b(b)(3) standard.
12           Do you remember me saying that?
13       A. Yes.
14       Q. Is that the legal standard under the Fair
15  Credit Reporting Act for requiring pre-adverse action
16  notification to job applicants under certain conditions?
17       A. Yes.
18       Q. Okay.  And you told me you practice in the area
19  of the Fair Credit Reporting Act and give advice and
20  have handled cases in the past; correct?
21       A. Correct.
22       Q. And you're aware that the -- the federal
23  statute, the FCRA, is interpreted by regulatory agencies
24  that give guidance to businesses as to what to do in
25  certain contexts; correct?
```

Rebecca E. Kuehn
February 28, 2024

1        A. Yes.

2        Q. And the Federal Trade Commission, or FTC, is

3   one such government regulator that set regulatory

4   guidance; correct?

5        A. Yes.

6        Q. In fact, you personally worked on some -- some

7   of that regulatory guidance in preparing the 40 years

8   report that was issued by the Federal Trade Commission

9   some years ago; correct?

10       A. Yes, among other items, yes.

11       Q. Right.  And then in more recent years, I think

12   you note in your report that the CFPB, another

13   government regulator, the Consumer Financial Protection

14   Bureau, also issues legal regulatory guidance to the

15   industry concerning the Fair Credit Reporting Act;

16   correct?

17       A. That's correct.

18       Q. Okay.  And sometimes courts -- law courts also

19   issue opinions that could provide guidance to entities

20   that are regulated by the Fair Credit Reporting Act.

21   Would you agree?

22       A. Yes, the court opinions is how they evaluate

23   the FCRA and interpret it, yes.

24       Q. Okay.  So when you, you know --

25           MS. PASCHAL:  John, can we take a --

Rebecca E. Kuehn
February 28, 2024

```
1            MR. SOUMILAS:  Yeah.

2            MS. PASCHAL:  -- quick break?

3            MR. SOUMILAS:  Yeah, yeah, of course.  This is

4  a -- this is a good time for a break.  Five, ten minutes

5  okay?

6            MS. PASCHAL:  Yeah, that's fine for me.

7            Becky, is that okay for you?

8            THE WITNESS:  Yeah, that works.

9            THE VIDEOGRAPHER:  All right.  We're off the

10 record, 11:20 a.m. Eastern.

11           (Break.)

12           THE VIDEOGRAPHER:  Back on the record, 11:32

13 Eastern.

14 BY MR. SOUMILAS:

15    Q. All right.  Ms. Kuehn, before we took a break,

16 we were going down the road of me trying to understand

17 fully what you mean by the "industry standards" for

18 pre-adverse action notification.  And if I recall your

19 testimony correctly, you said it's a combination of

20 variables you look at such as what the businesses'

21 practices actually are, one.

22           Two, we started getting into the legal

23 requirements of the Fair Credit Reporting Act and the

24 regulators that provide guidance on that law.

25           Is there any other variable as a category you
```

Rebecca E. Kuehn
February 28, 2024

1  look at to -- to determine the standard or pre-adverse

2  action notice besides the actual business practices on

3  the one hand and the legal requirements on the other?

4       A. In this area?  No.  It's primarily

5  understanding what businesses do to comply and how

6  they've implemented those requirements as well as the

7  regulatory guidance.

8       Q. Okay.  And I know we -- we spent some time on

9  the business practices as you personally understand

10 them, and I think you told me that there's no textbook

11 or authoritative treatise that I could look at that

12 actually sets the standard for businesses; correct?

13      A. Outside of regulatory guidance and other

14 similar types of documents, not that I'm aware of.

15      Q. Okay.  Is there any type of a survey or any

16 type of statistical data that actually examines what

17 businesses do with respect to pre-adverse action

18 notification, the timing, the method, the process, and

19 categorizes it in a -- in a data bank someplace that I

20 could take a look at?

21      A. Not that I'm aware of.

22      Q. Okay.  When you were at the FTC for all those

23 years, did the FTC do any type of a study as to what

24 businesses actually do with respect to pre-adverse

25 action notification?

Rebecca E. Kuehn
February 28, 2024

1        A. Not a study, no.

2        Q. Okay.  Are you aware of any publicly available

3   data that says, you know, "We looked at a thousand

4   businesses or 3,000 businesses" or whatever the number,

5   "and this is what we found with respect to how they

6   treat pre-adverse action notification"?

7        A. I'm not aware of any publication like that.

8        Q. Okay.  Flipping back to the legal requirements,

9   we talked a little bit about the regulators which issue

10  guidance under the Fair Credit Reporting Act that might

11  be useful to businesses; correct?

12       A. Yes.

13       Q. And, in fact, you cite quite a bit of that

14  guidance in your expert report.  Would you agree?

15       A. Yes.

16       Q. Let's just look at a couple of those that I

17  think might be instrumental.

18           MR. SOUMILAS:  I'll ask that we pull up your

19  expert report.  That's Kuehn 2.  And this time on

20  page 7.

21  BY MR. SOUMILAS:

22       Q. And there at the bottom of page 7, you see you

23  being with a block -- a block quote that says

24  "[E]mployers, before taking an adverse action based on a

25  consumer report, provide the current or prospective

Rebecca E. Kuehn
February 28, 2024

1  employee with a copy of the report, a description of

2  individual's rights under the FCRA, and a reasonable

3  opportunity to respond to any information that is

4  disputed by the consumer," [as read] etc.

5      A. Yes, I see that.

6      Q. And then if we scroll to the next page where

7  the block quote continues and ends, you have a -- a

8  footnote 18.

9      MR. SOUMILAS:  And why don't we go down to

10 the -- thank you -- to the bottom of page 8.

11 BY MR. SOUMILAS:

12     Q. There you're citing from a senate report

13 concerning amendments to the federal law, the Fair

14 Credit Reporting Act, as to the purpose of pre-adverse

15 action notice; correct?

16     A. That's correct.  This is a senate report that

17 was compiled around the time that the 1996 amendments

18 were being considered.

19     Q. Okay.  And as lawyers, that's not unusual.

20 That sometimes in trying to understand a legal standard,

21 you look at the -- the legislative reports that enact

22 the law and what the purpose of the law is; right?

23     A. That's correct.

24     Q. Yeah.  And then you -- you -- you said that

25 their regulator's typically charged with interpreting

Rebecca E. Kuehn
February 28, 2024

1  and enforcing the law.

2          Let's move forward in your report to page 16.

3          And -- and there -- I think this is your

4  language at the very bottom of that page -- it says "The

5  purpose of the pre-adverse action notice is to provide

6  the candidate with the opportunity to explain the

7  results to the employer before it finalizes its

8  decision," and you have a footnote there as well.

9          MR. SOUMILAS:  Let's go to footnote 33, please.

10  BY MR. SOUMILAS:

11      Q. There you cite to the Federal Trades

12  Commission's report "Background Checks:  What Employers

13  Need to Know" from February 2014; correct?

14      A. That's correct.  I wouldn't characterize it as

15  a report.  It's business guidance.

16      Q. It's business guidance.  So this is part of the

17  regulatory guidance for businesses about pre-adverse

18  action notification; correct?

19      A. That's correct.

20      Q. And, in fact, you have a parenthetical to that

21  guidance that you quote in your footnote.  You say "By

22  giving the person the notice in advance, the person has

23  an opportunity to review the report and explain any

24  negative information," end quote.

25          Do you see that?

Rebecca E. Kuehn
February 28, 2024

1        A. Yes.

2        Q. Okay.  And, again, this is part of the

3   regulatory standard for pre-adverse action notice, at

4   least according to the Federal Trade Commission.

5        A. Yes.

6        Q. And then if we go to another part of your

7   report, page 8, and now I'm going to reference another

8   footnote, footnote 19.  It's another block quote.

9   Again, you cite from the Federal Trade Commission a

10  legal standard for pre-adverse action, and that comes

11  straight out of the 40 years report that you worked on

12  in part with other people at the FTC; correct?

13       A. That's correct.

14       Q. All right.  And, in fact, that block quote that

15  you have associated with footnote 19 ends, quote, "An

16  employer can comply with the pre-adverse action

17  disclosure requirements by sending a copy of the report

18  to the consumer (with the summary of human rights) as

19  soon as it is prepared by the CRA or received by the

20  employer" [as read]; correct?

21       A. That's correct.

22       Q. And the reference to "CRA" there is consumer

23  reporting agency, the company that usually prepares

24  these reports for employers or the users of consumer

25  reports for employment purposes; correct?

Rebecca E. Kuehn
February 28, 2024

1      A. That's correct.

2      Q. Okay.  So, now, that particular quote that an

3  employer can comply with a pre-adverse action disclosure

4  requirement by sending a copy of the report to the

5  consumer with a summary of rights, as soon as it's

6  prepared by the CRA or received by the employer, you

7  agree that this is a proper method of complying with

8  pre-adverse action notice requirements; right?

9      A. Yeah.  The FTC guidance basically says you can

10  comply by doing it that way, yes.

11     Q. All right.  And then if we go back to the

12  Robert Half written policy that we marked as Kuehn 3 in

13  this case, and if we go down further on this first page

14  of adverse --

15         MR. SOUMILAS:  Right there is fine.

16  BY MR. SOUMILAS:

17     Q. -- of Handling Derogatory Results, there's a

18  section, Pre-Adverse Letter Process.

19         It reads that "When background checks are

20  returned discrepant or derogatory, the Fair Credit

21  Reporting Act (FCRA) imposes stringent notification

22  requirements before and after making an adverse

23  employment decision.  The pre-adverse letter" -- and

24  this is in bold within the policy -- "must be sent

25  immediately" -- and then it continues -- "when a

Rebecca E. Kuehn
February 28, 2024

1  background check is returned with discrepant and/or

2  derogatory results" meaning a "(red or yellow flag)."

3          Do you see that?

4      A. I see that.

5      Q. Would you agree that this written policy by RHI

6  to send an pre-adverse reaction letter immediately when

7  a background check is returned with a red or yellow flag

8  is consistent with the FTC standard that you cite on

9  page 8 of your report, that an employer could comply

10  with pre-adverse action requirements by providing the

11  report and a statement of rights as soon as add -- as

12  soon as it is prepared by the CRA or received by the

13  employer?

14      A. Yeah -- it appears -- yes, that would be

15  consistent with the FTC staff report.

16      Q. Are you familiar with any FTC staff report or

17  advice to business or regulatory interpretation that

18  says that compliance may also be achieved if you put the

19  employee in a holding pattern, go through legal review,

20  make a determination that the employee is not placeable,

21  and then send the pre-adverse action notice?

22      A. I'm not aware of specific guidance.  I do know

23  that the FTC has worked with the EEOC on some combined

24  guidance with respect to the different requirements,

25  including the requirement to make it an individualized

Rebecca E. Kuehn
February 28, 2024

1   determination on criminal records.

2       Q. Sure.  Certainly, your report doesn't cite to

3   any specific FTC guidance concerning the FCRA

4   pre-adverse action notice requirements stating that a

5   holding pattern, legal review, and a non-placement

6   determination followed by the sending of the pre-adverse

7   action notice is a proper way of complying with the

8   FCRA's pre-adverse action requirements?

9       A. I'm not aware of any specific FTC statement for

10  that fact pattern; that's correct.

11      Q. All right.  Why don't we go on to -- walking

12  through the Robert Half practice as compared to this

13  written policy.

14          So let's put the written policy down as an

15  exhibit, and let's just go through the actual practice,

16  as you understand it, step by step.  I have some

17  questions among the process as to what your opinions

18  are.

19          Do you have an understanding, Ms. Kuehn, as to

20  what point in the hiring process RHI typically pulled

21  these employment background reports for the candidates,

22  like Ms. Magallon, in the class here?

23      A. Based on my recollection, they would attain

24  background checks either when the applicant disclosed a

25  criminal background record or when the particular

Rebecca E. Kuehn
February 28, 2024

1  position required some form of criminal record

2  background screening.

3      Q. Okay.  And do you have an understanding whether

4  typically these applicants would have made some written

5  application to Robert Half to be placed in a temporary

6  role?

7      A. Temporary or permanent.  Robert Half does

8  placement for both, I understand.

9      Q. Okay.  And do you understand that these

10  candidates in the class would have interviewed with

11  somebody at Robert Half before the background check

12  would be pulled?

13      A. It's my understanding of the process that

14  they -- there was a process of evaluation of the

15  candidate for their qualifications first.  And that may

16  have been part of it.

17      Q. All right.  Do you know whether there would be

18  a particular opportunity for the candidate to be placed

19  at an office or a school or a hospital, what have you,

20  at the time that the background report is pulled?

21      A. It's my understanding that varied.  That it

22  depended on whether they had an active placement they

23  were trying to make or whether they were bringing

24  someone on board for future placements.

25      Q. All right.  And do you understand whether the

Rebecca E. Kuehn
February 28, 2024

1  folks in our class here, like Ms. Magallon and the 2,363

2  other job candidates, had an intent of being placed in a

3  job and to get paid or being placed by the staffing

4  agency with a particular employer?

5        MS. PASCHAL:  Objection.  Calls for

6  speculation.  And foundation.

7        A. I don't recall a specific definition of the

8  class as I'm sitting here.  So I have no -- no answer

9  for your question.  I don't know one way or another.

10 BY MR. SOUMILAS:

11       Q. All right.  Do you know whether the class is

12 comprised of temporary job placements as opposed to

13 permanent?

14       A. I don't recall as I'm sitting here.

15       Q. Now, there is a point where the moment comes

16 that Robert Half is going to run a background report on

17 these candidates, and is it your understanding that for

18 the class at issue here, the reports would be run

19 through GIS, the consumer reporting agency or CRA that's

20 known as GIS?

21       A. That's -- it's mentioning that was their

22 background check vendor at the time of the class period,

23 yes.

24       Q. Okay.  And do you understand that according to

25 either Robert Half's criteria or the -- the company in

Rebecca E. Kuehn
February 28, 2024

1  which the person would be placed to work, there were

2  certain hiring criteria that would be evaluated as part

3  of a background check and be deemed to either be

4  derogatory or to satisfy the job requirements?

5       A. Evaluated by -- I'm trying to make sure I

6  understand your question.

7       Q. With yeah.  So it would be evaluated by GIS and

8  then -- and then there would be a corresponding flag,

9  either a green flag or a red or a yellow flag?

10      A. Yes, I understand that during this class

11 period, they had -- RHI had provided certain criteria to

12 GIS to say, "Let's us know when results of these charac-

13 -- categories come in" and to flag those for RHI.

14      Q. Okay.  And then let's just go back to the

15 written policy for a moment.

16           MR. SOUMILAS:  I think that's Exhibit 3,

17 please.  And go -- let's go to the top.

18 BY MR. SOUMILAS:

19      Q. Do you understand that, at least according to

20 this policy, when -- when there's discrepant or

21 derogatory information on one of these GIS background

22 reports, that would be flagged by putting a red or

23 yellow flag on the report?

24      A. Yes, I understand that.

25      Q. And, conversely, if it's a green flag, then

Rebecca E. Kuehn
February 28, 2024

1  that means no derogatory results, clear sail; right?

2      A. It means no derogatory results.  I can't say

3  "clear sailing" with respect to any hiring decision.

4      Q. Well, let's see what you understand there to

5  be.  If someone comes back through this process -- now

6  we run the background report and it comes back with a

7  green flag on the one hand, did you understand that

8  there were any impediments or any problems with that

9  candidate being placed in a job right away?

10     A. I can't speak to every individual circumstance.

11 It would mean that the background check doesn't propo-

12  -- doesn't impose a sort of disqualification for that

13 employment opportunity.

14     Q. Okay.  Could we agree that if it's a red or

15 yellow flag, it could create a disqualification, and

16 therefore, those candidates are put aside on a holding

17 pattern?

18        MS. PASCHAL:  Objection.  Foundation.

19     A. It's my understanding that if -- if there were

20 these types of results returned, that would result in

21 the background check being sent to legal for review

22 before the consumer could be placed in a particular

23 opportunity.

24 BY MR. SOUMILAS:

25     Q. In your report, you call this, like, a hold --

Rebecca E. Kuehn
February 28, 2024

1   a "holding pattern," don't you?

2        A. Yes, it's my understanding that -- I think the

3   company had referred to it that way as well.

4        Q. Okay.  And who makes that decision as to

5   whether the candidate should be placed in a holding

6   pattern because of the red or yellow flag or has a green

7   flag and, therefore, doesn't need to be placed in a

8   holding pattern?

9        A. My understanding of RHI's process is that if a

10  report came back with results that were -- you know,

11  basically with a criminal background check, we're really

12  probably talking about whatever they came back as

13  results, so yellow or green -- yellow or red flag or

14  with discrepant or potentially derogatory results, those

15  reports were sent to legal for review to determine

16  whether the information that was included in that report

17  was, in fact, disqualifying for the position.

18       Q. Is -- is it your understanding that RHI would

19  make that decision and send red or yellow flags on

20  background reports to legal review and then to be placed

21  in this holding pattern?

22       A. Yes, you went in and out --

23       Q. Did GIS make the decision?  Did somebody else

24  make the decision?  I'm trying to figure out what your

25  understanding is, whether GIS made that decision, RHI

Rebecca E. Kuehn
February 28, 2024

```
 1  made that decision, somebody else.  Who made the
 2  decision to -- to put red or yellow flags in a holding
 3  pattern and to put them through legal review?
 4      A. It was RHI's process to send any reports that
 5  contained results to legal for review.
 6      Q. Okay.  So that was built into the process, if
 7  you will, that determination?
 8      A. That's part of the process.
 9      Q. Okay.  Do you consider the determination to
10  place a red or yellow job candidate on hold adverse to
11  the interests of that candidate?
12          MS. PASCHAL:  Objection.  Foundation.  Calls
13  for a conclusion beyond the scope of her report.
14      A. It is my understanding that it's part of the
15  process in reviewing the background check reports.  And
16  similar to other employers, you -- you wait for the
17  background check to be cleared before you can place the
18  consumer in a particular position, whether that's a
19  direct hire or through an agency like this.
20  BY MR. SOUMILAS:
21      Q. Yeah.  I'm just trying to understand whether,
22  in your opinion, making that determination to place
23  someone in the holding pattern because of the red or
24  yellow flag at ARR -- RHI -- do you think that's adverse
25  to the interests of the job candidate?
```

Rebecca E. Kuehn
February 28, 2024

1          MS. PASCHAL:  Same objections.  Beyond the

2    scope of her opinion.  She's not asked to opine on that.

3          MR. SOUMILAS:  Yeah, so you didn't ask her to

4    opine on that.

5    BY MR. SOUMILAS:

6          Q. But I'm asking you, your judgment as a lawyer

7    and someone who looked at this case and knows what an

8    adverse action is, is there any adverse action by

9    placing people on this hold and putting them into legal

10   review?

11         MS. PASCHAL:  Same objection.  It's beyond the

12   scope of her expert designation.

13   BY MR. SOUMILAS:

14         Q. You can answer it.

15         A. In my personal experience and my understanding

16   of the facts, no, because it was just part of the review

17   of the process -- of the background check process.

18         Q. Would you agree with me that, as a practical

19   matter, people who are put on hold and put through the

20   legal review process cannot be placed in a job right

21   away?

22         MS. PASCHAL:  Objection.  Foundation.

23         A. That's my understanding of the process, that

24   the -- that process has to work through and they have to

25   complete their review.

Rebecca E. Kuehn
February 28, 2024

1   BY MR. SOUMILAS:

2       Q. Is it your understanding that people in the

3   class who were placed in the hold and legal review

4   process would not be getting paid by RHI or the ultimate

5   employer for the job under consideration --

6           MS. PASCHAL:  Same objection.

7   BY MR. SOUMILAS:

8       Q. -- during this holding period?

9           MS. PASCHAL:  Same objection.  Foundation.

10  Beyond the scope of what she's being designated as an

11  expert for.

12      A. Well, again, I wasn't asked to opine on this,

13  but the fact that someone hasn't been put in a job and

14  started work on a particular day, yes, there's a delay

15  that they're not going to get paid until they start

16  work.

17  BY MR. SOUMILAS:

18      Q. Right.  So at this point, I'm asking you your

19  understanding of the process as to actual practice/work.

20  I don't even think I asked your opinion.

21          Do you think that these job candidates who are

22  placed on hold receive salary during the hold period, or

23  do they go unpaid as the process through the legal

24  review goes forward?

25          MS. PASCHAL:  Objection.  Foundation.  Calls

Rebecca E. Kuehn
February 28, 2024

1  for speculation.  Beyond the scope of what she's being

2  designated for.

3      A. I don't have a specific knowledge about whether

4  people were paid while they were on hold or not.

5  BY MR. SOUMILAS:

6      Q. So as part of examining this case and -- and

7  forming your expert opinion, you did not consider

8  whether candidates with red or yellow flags on hold were

9  getting paid or not?

10     A. That's correct.

11     Q. Okay.  And did you have an understanding as to

12 whether those candidates who would be placed on the hold

13 because of the red or yellow flag would be told by RHI

14 that there's potentially disqualifying information on

15 their background report?

16         MS. PASCHAL:  Same objection.  Calls for

17 speculation.  Lack of foundation.  And beyond the scope

18 of her expert designation.

19     A. As a factual matter, it's my understanding from

20 the folks who conduct the legal review that as part of

21 their legal review they would often reach out to the

22 candidates if they were working through particular

23 issues or trying to understand particular background --

24 criminal record background results.

25 BY MR. SOUMILAS:

Rebecca E. Kuehn
February 28, 2024

1    Q. Okay.  And this last answer when you say that

2  the "folks" -- those are the people you interviewed for

3  your report, Kathleen Cattani and Ted Mawla?

4    A. Yes.

5    Q. All right.  And during this -- these occasions

6  where they would sometimes reach out to those people for

7  a discussion -- some of these people for a discussion --

8  would you agree with me that, under the practice of RHI,

9  these people would not have a cop -- a copy of the

10  background report with the discrepant information

11  provided to them by RHI in advance of any such

12  discussion?

13    MS. PASCHAL:  Objection.  Foundation.  Calls

14  for speculation.

15    A. I don't know what the legal reviewers would

16  have done in the context of any particular consultation

17  with the applicants at that point, so I don't know that

18  for certain.

19  BY MR. SOUMILAS:

20    Q. Right.  But do you understand that the practice

21  was to send the pre-adverse action notice and a copy of

22  the report only at the conclusion of the legal review

23  process when someone was found not placeable at the --

24  at the end of a hold, if you will?

25    A. Once the legal review had determined that the

Rebecca E. Kuehn
February 28, 2024

1    records that were reflected in the background check were

2    disqualifying, then they were directed to the

3    pre-adverse action notice, which consists of a copy of

4    the report and a summary of rights.

5         Q. Okay.  And when you say they would be sent that

6    information at the end of the -- the process, are you

7    saying that they're supposed to be sent that

8    information, or you know for a fact they were sent that

9    information?

10        A. The process at the RHI, based on the testimony

11   that I reviewed, is that at the conclusion of the legal

12   review process, legal directs -- says, "Yes, this is a

13   person who should receive a pre-adverse action notice,"

14   and then the -- the notice is sent.

15        Q. So you're saying here under oath today that at

16   the conclusion of the legal review process if a

17   not-placement determination is made, RHI will always

18   send a pre-adverse action notice to those candidates?

19           MS. PASCHAL:  Objection.  Calls for

20   speculation.

21        A. That is its practice.  It's my understanding in

22   this case, of course, that the plaintiff asserts she

23   never received a pre-adverse action notice.

24   BY MR. SOUMILAS:

25        Q. Do you know how many of the --

Rebecca E. Kuehn
February 28, 2024

```
1          MS. PASCHAL:  Objection.  I don't think the

2   witness was finished giving her answer.

3          MR. SOUMILAS:  Oh, I'm sorry.  Was there more

4   to that answer?

5          THE WITNESS:  Yes, sir, there was.

6          MR. SOUMILAS:  Oh, go ahead.

7      A. Plaintiff, you know, asserts that she didn't

8   receive the notice, so there may have been instances

9   where, despite the practice and the process, notices

10  might not have been sent.  But I can't tell you that one

11  way or the other.

12  BY MR. SOUMILAS:

13     Q. Did you conduct any research as to how many of

14  the 2,363 class members here were actually sent a

15  pre-adverse action notice after they were found not

16  placeable at the end of the legal review?

17     A. I did not.

18     Q. Okay.  Did you look at any data from this case

19  as to how frequently RHI has a record of sending a

20  pre-adverse action notice to job candidates with a red

21  or yellow flag who are found not placeable at the end of

22  legal review?

23     A. I did not.

24     Q. Okay.  Give me a second, please.

25         MR. SOUMILAS:  Would you scroll further down in
```

Rebecca E. Kuehn
February 28, 2024

1  this document, Ms. Bennett.  Hold on.  Just a little

2  slower.  I'm sorry.  Put it -- could you put this

3  document down for a moment.  Oh, I'm sorry.  Let's go

4  back to that policy document again.

5  BY MR. SOUMILAS,

6      Q. And, Ms. Kuehn, I want to direct your attention

7  to this section underneath the portion of the policy

8  that says "pre-adverse letter must be sent immediately,"

9  and then it has a number of items listed by number and

10 letter underneath that.

11       Do you see it?

12     A. I do.

13     Q. And it says -- number 1 is that the -- what the

14 candidate must be sent is the pre-adverse action letter

15 under 1.a; then 1.b., a copy of the report; and c. is a

16 copy of the summary of consumer rights.

17       Do you see that?

18     A. I do.

19     Q. And then the very next I -- action item is that

20 the company's supposed to scan a copy of these documents

21 to be sent into the LiveLink database.

22       You see that?

23     A. I do.

24     Q. And that's not unusual that a company would

25 keep a copy of important legal notices that it sends to

Rebecca E. Kuehn
February 28, 2024

1  candidates as part of its records; correct?

2       A. That's correct.  Different companies have

3  different procedures for doing that.  But some sort of

4  record to double-check what they've done.

5       Q. Okay.  Now --

6            MR. SOUMILAS:  Let's put this document down.

7  BY MR. SOUMILAS:

8       Q. Would -- would you consider it adverse to the

9  interest of these job candidates in our class if they do

10 not have a copy of their background report with a red or

11 yellow flag on it during the time of legal review?

12           MS. PASCHAL:  Objection.  Foundation,

13 speculation, and beyond the scope of the testimony she's

14 been designated to give.

15      A. Yeah, I don't have an opinion on that.

16 BY MR. SOUMILAS:

17      Q. One way or the other, you just don't have an

18 opinion?

19      A. I -- I don't.  As I said, I don't know about

20 the specific nature of any discussion between the legal

21 reviewers and any candidates, what information may have

22 been shared.  So whether or not someone's disadvantaged

23 by not having a specific copy of a background check, I

24 wouldn't have any understanding of that.

25      Q. Okay.  And would your answer be the same with

Rebecca E. Kuehn
February 28, 2024

1    respect to the statement of FCRA rights that's supposed

2    to be sent out along with a pre-adverse action notice,

3    that you don't have an opinion as to whether or not

4    having those rights in hand during the legal review is

5    adversely im- -- is adverse -- adversely affecting the

6    job candidates in our class?

7         A. I have no opinion of that.

8         Q. Okay.  Would you agree with me that this

9    statement of FCRA writes/provides that candidates may

10   take up a dispute with a background screener who

11   actually prepared the report?

12        MS. PASCHAL:  Objection.  Beyond the scope of

13   what her testimony is being offered for.

14        A. Yes, the summary of rights includes within it a

15   description of the consumer's right to dispute

16   inaccurate or incomplete results.

17   BY MR. SOUMILAS:

18        Q. Right.  So if the consumer believes that

19   something on the report is either inaccurate or not

20   complete, they have a right under the FCRA to take that

21   issue up with the background screener.  In this case, it

22   would be GIS; correct?

23        A. Yes, that's what the FCRA provides.

24        Q. But during RHI's legal review process, if the

25   practice is followed as it should, the job candidates

Rebecca E. Kuehn
February 28, 2024

1  would not have a copy of the report and would not have a

2  statement of their rights to make any such dispute.

3  They might not even know who to make the dispute with or

4  who the background screener is.  Would you agree?

5           MS. PASCHAL:  Objection.  Foundation, calls

6  speculation, and beyond the scope of what her testimony

7  is being offered for.

8       A. I wouldn't have any knowledge of what they had

9  in their hands at that time.

10          I do know the process requires that following

11  legal review, consumers are sent -- are to be sent their

12  pre-adverse action notice, which consists of a copy of

13  the report and a summary of rights and that consumers,

14  you know, can dispute it and also reach out to RHI

15  during that period.

16          Based on the folks I interviewed from the legal

17  department, they have made changes and determinations

18  based on those subsequent disputes as well.

19  BY MR. SOUMILAS:

20      Q. Do you see any harm with providing these job

21  candidates a copy of the background report with

22  discrepant or derogatory information on it and a

23  statement of their rights to dispute during the legal

24  review process?

25          MS. PASCHAL:  Objection.  Form.

Rebecca E. Kuehn
February 28, 2024

1   BY MR. SOUMILAS:

2        Q. Is there any harm --

3          MS. PASCHAL:  Objection.  Foundation.  And

4   beyond the scope of what she -- her testimony's being

5   offered for.

6        A. It's my understanding that RHI wanted to do

7   their legal review so they could determine whether the

8   potential criminal records that came back were, in fact,

9   disqualifying.

10         They -- in part of the choice to send the

11  notice after that was to only send it to the consumers

12  who were really going to be affected by their background

13  check report in the hiring process is -- you know, I

14  think employers can take different approaches depending

15  on their hiring practices, you know, whether they want

16  to just send one every time negative results come back,

17  as you were talking about earlier, or whether they want

18  to -- first, is it, in fact, a disqualifying report

19  before they send out the adverse action notice.

20  BY MR. SOUMILAS:

21       Q. Okay.  You said that your understanding is that

22  sometimes during the legal review process, some lawyer

23  from RHI may reach out to a candidate with questions

24  about the background check; right?

25       A. Yes, it could be the lawyer or someone from the

Rebecca E. Kuehn
February 28, 2024

1  local office who's working with the candidate at the --

2  at the legal department's request.

3      Q. Right.  And if the practice as it's supposed to

4  operate is followed, that candidate wouldn't have a copy

5  of the background report during this conversation that

6  might take place.

7          MS. PASCHAL:  Objection.  Asked and answered,

8  calls for speculation, and foundation.

9      A. They may or may not.  I have no idea if they've

10 gotten a copy of the report in connection with those

11 discussions or otherwise.

12 BY MR. SOUMILAS:

13     Q. When you say "may or may not," but you also

14 have an opinion that the pre-adverse action notification

15 and report goes out only at the end of that process

16 after a non-placement determination.

17         So why would you think -- where did they get a

18 copy of this report from?

19         MS. PASCHAL:  Objection.  Calls for

20 speculation.

21     A. And -- and you asked me definitively whether

22 they didn't have it.  And I don't know with respect to

23 any particular discussions or follow-up from the offices

24 at the direction of legal whether information was shared

25 with any particular applicant.

Rebecca E. Kuehn
February 28, 2024

1   BY MR. SOUMILAS:

2       Q. Okay.  Let's move on in the process.

3           It -- it sounds like the legal review process

4   takes some time, considers information.  It might

5   involve talking to the candidate.  It might not.  And at

6   the end of the process, the -- the practice is for

7   determination to be made by RHI whether the candidate is

8   placeable or not placeable.

9           Would you -- is that your understanding of the

10  -- the practice?

11          MS. PASCHAL:  Objection.  Compound.

12      A. It's my understanding at the completion of

13  review, they make a determination whether or not the

14  consumer -- the -- the applicant is placeable based on

15  their background check.

16  BY MR. SOUMILAS:

17      Q. Okay.  Do you consider a not-placeable

18  determination by RHI's legal review team to be adverse

19  action?

20          MS. PASCHAL:  Objection.  Foundation, calls for

21  speculation, and it's beyond the scope for which her

22  testimony is being offered.

23      A. It's my understanding that at that point

24  there's a determination to send it to the consumer,

25  their pre-adverse action notice, and that the

Rebecca E. Kuehn
February 28, 2024

1  determination is held for ten days to allow the consumer

2  time to reach back to RHI or to the background screening

3  company.

4  BY MR. SOUMILAS:

5      Q. What determination is held for the ten days?

6      A. The final decision on behalf of the consumer

7  that they, you know, won't get a job.

8      Q. Okay.  So when you say it's "held for ten

9  days," as in it's made in a not-placeable determination

10  and then held for ten days?

11      A. They -- they have decided that the consumer,

12  based on the background check, is not placeable.  They

13  do not take adverse action for another ten days to allow

14  the consumer time to receive the notice and to respond

15  if they want to.

16      Q. Okay.  Do you consider the not-placeable

17  determination by the RHI legal team itself to be a

18  decision adverse to the interest of the consumer, the

19  job candidates in this case?

20      MS. PASCHAL:  Objection.  Foundation, calls for

21  speculation, and beyond the scope of what she's being

22  offered for as an expert.

23      A. It is a -- it is a determination that they

24  intend to take adverse action, and that triggers the

25  responsibility of the adverse action notice.

Rebecca E. Kuehn
February 28, 2024

1    BY MR. SOUMILAS:

2        Q. Okay.  You -- you know how often red or yellow

3    flag candidates result in a not-placeable determination?

4        A. I do not have any specific data on that.

5        Q. Okay.  Are you aware that Ms. Magallon, the

6    lead plaintiff in this case, was found not placeable?

7        A. That's my understanding.

8        Q. Okay.  And is it your understanding that she

9    wasn't hired for that job that she was being considered

10   for?

11           MS. PASCHAL:  Objection to form.  Vague.

12       A. It -- it --

13   BY MR. SOUMILAS:

14       Q. Let me ask it a little tighter.  But -- because

15   of the red flag on her background -- her GIS background

16   report and the not-placeable finding, at that time she

17   was not placed in that job?

18           MS. PASCHAL:  Same objection.

19       A. Following legal review, yes, that's my

20   understanding.

21   BY MR. SOUMILAS:

22       Q. And are you -- and are you aware that the

23   class, by definition, is 100 percent com- -- comprised

24   of job candidates who were found not placeable?

25           MS. PASCHAL:  Objection.  Foundation.

Rebecca E. Kuehn
February 28, 2024

1    A. As I mentioned, I don't recall the specific

2  definition of the class, so I can't answer your

3  question.

4  BY MR. SOUMILAS:

5    Q. Okay.  Do you know whether any of the class

6  members who were found not placeable after legal review

7  were nevertheless placed in the aja- -- exact job for

8  which they had applied and which led to the background

9  report with the red or yellow flag in the first

10  instance?

11    A. I have no knowledge one way or the other.

12    Q. Do you know whether that was ever done with any

13  of the job candidates?  Did you look at any data on

14  that?

15    A. I did not look at any data on that; however,

16  based on my discussions with the personnel who conduct

17  the legal review, there were consumers who had red- or

18  yellow-flagged background checks who after legal review

19  were determined not to be -- not that those decis- --

20  the information was not disqualifying for position.

21        And, also, I specifically asked whether the

22  legal re- -- folks whether or not following a

23  pre-adverse action notice they'd ever been presented

24  with information that led to a change in that decision,

25  whether to hire.  And they both indicated that there

Rebecca E. Kuehn
February 28, 2024

1   were situations like that, where the consumer had either

2   provided additional information or had in -- instituted

3   a dispute with the consumer reporting agency, that the

4   record didn't belong to them or whatever circumstances

5   or that there were subsequent expungements or things

6   like that.

7        Q. And when you say your discussions with these

8   "folks," are you again referring to Kathleen Cattani and

9   Ted Mawla, who you interviewed on December 28th, 2023?

10       A. Yes.

11       Q. Okay.  Now, of course, if people go through

12   this legal review and are found to be placeable, would

13   you agree with me that those people are not in our

14   class?

15       MS. PASCHAL:  Objection.  Foundation.  Goes

16   beyond the scope of what she's being asked to give

17   expert testimony on.

18       A. As I mentioned, I don't recall the definition

19   of the class, so I can't answer that question.

20   BY MR. SOUMILAS:

21       Q. But you said you did review the court's class

22   certification decision?

23       A. I did.

24       Q. Okay.  And do you have a general understanding

25   that there is a definition, usually, for certified

Rebecca E. Kuehn
February 28, 2024

1  classes?

2        A. I do, Mr. Soumilas, but I don't remember the

3  precise definition here.

4        Q. Okay.  No problem.  The -- now, we -- we

5  discussed the practice as it differs from the written

6  policy, and there's this attorney review period and a

7  hold, right, and then you said at the end of this when

8  there is a not-placeable determination, the company

9  would then send the pre-adverse action letter and a copy

10 of the reported statement of rights; correct?

11       A. That's correct.

12       Q. And then after that letter is supposed to be

13 sent, is there another review process that takes place

14 according to the evidence that you reviewed -- a -- a

15 second legal review process or an add -- some different

16 type of process?

17       A. It's my understanding that if, during that

18 ten-day period prior to the adverse action notice being

19 sent, a consumer comes forward and has some issue with

20 respect to the background check, there have been

21 opportunities for consumers to bring in additional

22 information or dispute with GIS and that that

23 determination -- preliminary determination as reflected

24 in the pre-adverse action notice may be overturned.

25       Q. How many times for the composition of our class

Rebecca E. Kuehn
February 28, 2024

1  has that not-placeable determination been overturned in

2  the next ten days?

3          MS. PASCHAL:  Objection.  Foundation.  Beyond

4  the scope of what she was asked to opine on.

5          A. I do not know that.

6  BY MR. SOUMILAS:

7          Q. Have you seen a single one get overturned where

8  you have documentation in this case, in this case file?

9          A. I haven't looked for it.  I based my -- my

10  recollection of this on my interviews with the folks in

11  the legal department.

12          Q. All right.  Now, and you're assuming that upon

13  the not-placeable finding at the conclusion of a hold,

14  then the pre-adverse action letter and report is

15  supposed to be sent by the company to these candidates;

16  correct?

17          A. Yes.

18          Q. Okay.  And at least according to the written

19  policy, there's supposed to be a scan of that

20  pre-adverse action letter and package maintained by the

21  company?

22          A. Based on the written policy, yes.

23          Q. And have you taken a look as to whether, in

24  fact, for the class population here or for anybody found

25  not placeable, RHI always sends to those candidates a

Rebecca E. Kuehn
February 28, 2024

1   pre-adverse action letter and package?

2          MS. PASCHAL:  Objection.  It goes beyond the

3   scope of her testimonial designation.

4      A. Are you -- are you asking questions about the

5   recordkeeping, or are you asking about the practice?

6   BY MR. SOUMILAS:

7      Q. I'm asking about your review of material in

8   forming your opinions, whether you looked at whether

9   those pre-adverse action letters, in fact, go out to job

10  candidates once they're filed -- once they're found to

11  be not placeable at the end of legal review.

12         MS. PASCHAL:  Objection.  Assumes facts not in

13  evidence.  Foundation.  Calls for speculation.

14         MR. SOUMILAS:  All this?  Okay.

15  BY MR. SOUMILAS:

16     Q. Go ahead.  You can answer.

17     A. It's my understanding that the recordkeeping

18  practices, as I mention in my report and acknowledge in

19  my report, were not entirely consistent at RHI, and so

20  they don't have a record every time that a pre-adverse

21  action notice was sent.

22     Q. Do you know whether they have a record half of

23  the time where a pre-adverse action notice was supposed

24  to be sent after a not-placeable determination and legal

25  review?

Rebecca E. Kuehn
February 28, 2024

1        A. I don't --

2            MS. PASCHAL:  Objection.  Calls for

3    speculation.

4        A. Sorry.  I do not know that.

5    BY MR. SOUMILAS:

6        Q. Do they have it even 20 percent of the time?

7            MS. PASCHAL:  Objection.  Asked and answered.

8        A. I do not know that.

9    BY MR. SOUMILAS:

10       Q. Would your opinion that RHI's practices are not

11   a violation of the FCRA change if you knew that even at

12   the end of the legal review process when there's a

13   not-placeable finding, even then, 90 percent of the time

14   RHI does not send the pre-adverse action letter to those

15   candidates, like it didn't in Ms. Magallon's case?

16           MS. PASCHAL:  Objection.  Misstates the opinion

17   in her report.  Objection.  Foundation and beyond the

18   scope what she's been designated for.

19       A. I have no knowledge that they didn't send a

20   report in 90 percent of the circumstances.  That's not a

21   fact I'm aware of that's in the evidence.

22   BY MR. SOUMILAS:

23       Q. Okay.  Would it change your opinion if

24   hypothetically that was the evidence?

25       A. If there was evidence that a company had a

Rebecca E. Kuehn
February 28, 2024

1  procedure to send out a report but then didn't actually

2  follow it 90 percent of the time?

3      Q. Yes.

4      A. If that's the assumption, then that means their

5  practice is not in accordance with the Fair Credit

6  Reporting Act.

7      Q. And would you agree with me that as part of

8  this process not only a pre-adverse action letter is to

9  be sent but a final adverse action letter?

10      A. Yes.  In employment, you're required to provide

11  both a pre-adverse action notice as well as an adverse

12  action notice once the -- the decision is final.

13      Q. All right.  And is it your understanding that

14  RHI's practice was to send that letter ten days after

15  the not-placement determination and the purported

16  sending of the pre-adverse action letter?

17      A. That's my understanding.

18      Q. Okay.  And do you know as a matter of fact

19  whether for the class population here RHI sent -- sent

20  all of them adverse action letters?

21          MS. PASCHAL:  Objection.  Goes beyond the scope

22  of what her testimony's been designated for.

23      A. I do not.

24  BY MR. SOUMILAS:

25      Q. Is it your understanding that the adverse

Rebecca E. Kuehn
February 28, 2024

1  action letter is always supposed to be sent to the

2  candidate ten days after the pre-adverse action letter?

3          MS. PASCHAL:  Same objection.  Beyond the scope

4  of her designated testimony.

5      A. Are you asking about RHI's process?  Because

6  different employers have different timing requirements

7  with respect to their adverse action notices.

8  BY MR. SOUMILAS:

9      Q. Yes.  Yes.  I'm asking about RHI.

10         Is it RHI's process to send those adverse

11  action letters ten days after the pre-adverse action

12  letters?

13         MS. PASCHAL:  Same objection.

14     A. It's my understanding that was the process

15  during the time relevant to the class action complaint.

16  BY MR. SOUMILAS:

17     Q. All right.  Now, would, in your view, RHI be

18  violating the Fair Credit Reporting Act's pre-adverse

19  action requirements, if it actually followed its written

20  policy?

21         MS. PASCHAL:  Objection.  Calls for legal

22  conclusion.  Beyond the scope of what her expert

23  testimony is being offered for.

24     A. No.  It would not violate the FCRA for them to

25  follow the written procedure.

Rebecca E. Kuehn
February 28, 2024

1  BY MR. SOUMILAS:

2      Q. Now, you are aware, aren't you Ms. Kuehn, that

3  the Fair Credit Reporting Act or FCRA has other adverse

4  action notice requirements in different contexts such as

5  mortgages and car loans and credit cards; right?

6      A. Correct.

7      Q. And in those other contexts, if a bank, let's

8  say, turns someone down for a mortgage because of their

9  consumer report, they're supposed to send an adverse

10  action notice to the applicant informing them they were

11  denied credit and it had to do with their consumer

12  report and a company from which the report originated;

13  right?

14      A. Those are some of the requirements, yes.

15      Q. But in those other contexts, in fact, in all

16  the other contexts where the FCRA requires adverse

17  action notice, it does not also require pre-adverse

18  action notice?

19      A. That's correct.  Pre-adverse action is a unique

20  requirement when consumer reports are used in the

21  context of employment decisions.

22      Q. So would you take from that that -- that the

23  unique context of employment decisions, that there are

24  supposed to be some opportunity for the potentially

25  adverse decision not to take place and for the candidate

Rebecca E. Kuehn
February 28, 2024

1  to be able to not be the subject of adverse action?

2        A. Assuming I'm following your question, it's my

3  understanding that the purpose of a pre-adverse action

4  notice is to provide the consumer with an opportunity

5  once they get the results of the report with their

6  employer.  They also have an opportunity to dispute that

7  with the consumer reporting agency, but that may -- that

8  process may or may not conclude within any time period

9  prior to taking adverse action.

10       Q. Okay.  But this opportunity that you referenced

11 and that's in the FTC commentary that you cite is

12 intended so that there is a possibility, at least, that

13 there won't be any adverse action with respect to the

14 job candidate.  Whereas if you compare it to the credit

15 applicant, they're not afforded this opportunity.

16 You're either qualified for the mortgage, or you don't,

17 and you don't get some chance to reverse the decision or

18 to discuss it with a bank.

19           Is that a fair summary?

20       A. Yeah.  Although I will say in a mortgage

21 context -- I just want to be precise -- in the mortgage

22 context, consumers are afforded an opportunity to get

23 their credit score very early in the process.  It's one

24 of the requirements under the FCRA.  And so often there

25 may be some discussion there if something seems to be

Rebecca E. Kuehn
February 28, 2024

1  "discrepant" -- to use the word that we've been using in

2  this -- in this case.

3      Q. And --

4      A. And -- and I would note, again, even though

5  it's not specifically in the FCRA, the CFPB has kind of

6  indicated its desire to have more of a pre-adverse

7  action process in the tenant screening context as they

8  did in a recent enforcement case.

9      Q. Well, that's good to know.

10      But this opportunity that definitely exists

11  within the face of the statute for employment under the

12  FCRA, you would agree with me is in place to have a

13  certain effect, which is to prevent the adverse action

14  from happening?

15      A. It's to provide the consumer with the

16  opportunity, based on the materials I reviewed from FTC

17  guidance and others and the senate report, for example.

18  Though, there is an understanding that sometimes the

19  information is disqualifying no matter what the consumer

20  says.

21      Q. But the purpose of that opportunity is to

22  prevent the adverse action.  Could we agree to that?

23      MS. PASCHAL:  Objection.  Asked and answered.

24      A. It is to give the consumer an opportunity to

25  have a discussion with the employer about the results.

Rebecca E. Kuehn
February 28, 2024

1   BY MR. SOUMILAS:

2       Q. And -- and sometimes that discussion doesn't

3   even have to be a dispute.  It could just -- could be an

4   explanation, like, "Yeah.  The information is correct,

5   but let me explain it to you.  It might not really

6   affect my ability to -- to do this job"; is that

7   correct?

8       A. I would agree with that.

9       Q. And, then, obviously, if the consumer has a

10  copy of the report and the identity of the background

11  screener, they also have a -- a second opportunity to

12  actually dispute any information that's inaccurate or

13  incomplete and get it removed from that background

14  report?

15      MS. PASCHAL:  Objection.  Compound and also

16  foundation.  Calls for speculation.

17  BY MR. SOUMILAS:

18      Q. Would you agree that that's also part of the

19  opportunity provided by the pre-adverse action notice

20  requirements and employment screening?

21      A. Yes.  Although, consumers don't have to wait to

22  get a copy of their report to dispute information in

23  their report.

24      Q. Of course, you work in -- with consumer

25  reporting agencies; right?

Rebecca E. Kuehn
February 28, 2024

1        A. Yes.

2        Q. And you know that sometimes not all of the

3    information in a particular consumer report sent to a

4    third party is identical with what may be on the file

5    with a particular consumer reporting agency?

6        A. I suppose in the abstract that may be true.

7    I'm -- I'm not sure of the kinds of facts.  If you're

8    talking about "I've sent a report.  Now information has

9    changed, so any information I have in my file" --

10            Let's use the credit reporting system as an

11    example.  You've paid something off or a balance has

12    been reduced, the information in the file may be

13    different than what was produced in a report two weeks

14    ago, for example.

15        Q. No, that's not what I'm talking about.  Let's

16    stick to the example you gave, though.

17            So I'm talking about a credit report where on

18    the same day I ask for a copy of my report from, say,

19    TransUnion, and the same day TransUnion sold my report

20    to a third party, but the information that's disclosed

21    to me at home upon my request is not identical to that

22    particular report sold to a third party because of a

23    misfile or some other error in their report as its

24    prepared and delivered to a third party.

25            That happens; right?

Rebecca E. Kuehn
February 28, 2024

1      A. That does happen.

2      Q. The fact that I might be proactive enough to

3  get a copy of my consumer report ahead of time is no

4  guarantee that I'm going to be looking at the same thing

5  as a third party is looking at in my consumer report?

6      A. Yes.  But that's not the example that I was

7  trying to explain.

8           So what I was mentioning is if a consumer,

9  let's say, for example, is discussing an opportunity and

10  the employer says, "I've got a background check here

11  that says you've been convicted of a felony in

12  Illinois."

13           And the consumer says, "Well, That's not

14  right."

15           They have the opportunity to pick up the phone

16  then and call the background screening company who

17  prepared that report and dispute those results without

18  requiring them to get a copy of that report.

19           That's what I was trying to explain.

20      Q. Okay.  But in the -- that scenario that you

21  gave, the background report would have already been

22  prepared and delivered to the employer?

23      A. That -- that's correct.  What I was speaking

24  about is the situation that the legal folks had

25  mentioned where they review a report and there's

Rebecca E. Kuehn
February 28, 2024

1  additional information or they want to talk to the

2  consumer about it and seek information -- additional

3  information, more information.

4      Q. All right.  And then, again, when you're

5  referring to "legal folks," it's Ms. Cattani and

6  Mr. Mawla, who you interviewed on December 28th, 2023?

7      A. That's correct.

8      Q. But you agree with me that companies like GIS,

9  they don't have files of consumers in advance of

10  preparing an employment background report; correct?

11      A. Some background -- sorry, there's an echo.

12          Some background screening companies do.  Some

13  don't.  It depends on how they construct their reports.

14      Q. Do you know whether GIS does?

15      A. It's my understanding that GIS obtains

16  information in connection with the preparation of a

17  specific report when it's requested to do so.

18      Q. Right.  So if -- let's say I'm a job candidate

19  for RHI and I went to GIS proactively on my own, and I

20  said, you know, "I want to see my background report

21  before I even apply.  I'm -- I'm a little worried, and I

22  want to make sure everything is okay."  There wouldn't

23  be any background report prepared for me to see; right?

24      A. I don't know that one way or the other, sir.

25      Q. Okay.  Do you think that GIS has background

Rebecca E. Kuehn
February 28, 2024

```
 1  reports pre-prepared for applicants before it actually

 2  puts them together and delivers them to customers like

 3  RHI?

 4       A. I --

 5          MS. PASCHAL:  Objection.  Calls for

 6  speculation.  And foundation.

 7       A. I have no knowledge of GIS's disclosure

 8  procedures, whether they obtain information upon a

 9  consumer's request or not.  Different companies request

10  different things.

11  BY MR. SOUMILAS:

12       Q. All right.  With respect to the -- Ms. Magallon

13  and the class here, do you know whether any of them had

14  actual copies of their GIS reports from any source by

15  the time RHI made the determination to put them into

16  legal review?

17       A. I have no knowledge one way or the other.

18       Q. Do you have any knowledge as to whether

19  Ms. Magallon or any member of the class had seen a copy

20  of their GIS report at any point from the beginning

21  through the end of the legal review process when they

22  were found not placeable?

23       A. I have no knowledge one way or the other.

24       Q. All right.

25          MR. SOUMILAS:  Let's take a -- another short
```

Rebecca E. Kuehn
February 28, 2024

1  break at the point.  Let's go off the record.

2        THE VIDEOGRAPHER:  All right.  We are off the

3  record, 12:39 Eastern.

4        (Break.)

5        THE VIDEOGRAPHER:  Back on the record, 12:50

6  Eastern.

7        MR. SOUMILAS:  All right, Ms. Kuehn, thanks for

8  the opportunity to review my notes.  I -- I think that's

9  enough for one day.  I -- I don't have anything further.

10  I'm prepared to close the record.

11        I would like Exhibits Kuehn 1 through 4

12  attached to this transcript, please.

13        MS. PASCHAL:  Thank you, Counsel.  I have a

14  couple follow-ups.  Could we go off the record for

15  another two minutes, and I think I could do a very quick

16  follow-up, if you will indulge me for two minutes.

17        MR. SOUMILAS:  Sure.

18        MS. PASCHAL:  Okay.  Thank you.

19        THE VIDEOGRAPHER:  Off the record, 12:51

20  Eastern.

21        (Break.)

22        THE VIDEOGRAPHER:  Back on the record, 12:54

23  Eastern.

24

25

Rebecca E. Kuehn
February 28, 2024

```
 1              E X A M I N A T I O N

 2   BY MS. PASCHAL:

 3        Q. Hello, Ms. Kuehn.  I just had a few questions

 4   about the questions that Mr. Soumilas asked you.

 5           Ms. Kuehn, did you receive a document request

 6   or subpoena in connection with your testimony today?

 7        A. I did not.

 8        Q. You were asked some questions about what's

 9   called a "class" that was put together in this case.

10           Do you remember those questions?

11        A. I do.

12        Q. Was that process of putting together the class

13   relevant in any way to your opinions in your reports?

14        A. It was not.

15        Q. You were also asked -- or Mr. Soumilas

16   referenced materials that were exchanged between the

17   parties as part of the process of compiling the class.

18           Do you remember those questions?

19        A. I do.

20        Q. With materials that go to who's in the class or

21   not -- not in the class affect the opinions that you

22   expressed in your reports?

23        A. They would not.

24        Q. You were asked at one point to assume that

25   Robert Half did not send out the pre-adverse action
```

Rebecca E. Kuehn
February 28, 2024

1  package 90 percent of the time, and if so, would that

2  practice comply with FCRA?

3        Do you remember that question?

4      A. Yes.

5      Q. Did you see anything in the materials you

6  reviewed indicating that Robert Half did not send out

7  pre-adverse action packages 90 percent of the time?

8      A. I did not.

9      Q. Do you have any reason, even beyond the

10  materials that you reviewed, to think that Robert Half

11  did not send out materials 90 percent of the time?

12        MR. SOUMILAS:  Objection to the form.

13        You could answer it.

14      A. I do not.

15        MS. PASCHAL:  Those are all the questions I

16  have at this time.

17        Thank you, Ms. Kuehn.

18        MR. SOUMILAS:  All right.  Well, let's close

19  this record.  Thank you, everybody.

20        MS. PASCHAL:  Just one -- one thing.  I'm

21  sorry, John.  I want to instruct the witness for reading

22  and signing the deposition after receiving a copy.

23        MR. SOUMILAS:  All right.  Sounds good.

24        THE VIDEOGRAPHER:  All right.  So this

25  concludes today's deposition.  We're off the record,

Rebecca E. Kuehn
February 28, 2024

1    12:57 Eastern, 5:57 p.m. UTC.  Thank you.

2              (Deposition concluded at 12:57 Eastern.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebecca E. Kuehn
February 28, 2024

CERTIFICATE OF REPORTER

1

2

3

4          I, Taylor Smith, Notary Public of the

5   Commonwealth of Virginia, do hereby certify that the

6   witness whose testimony appears in the foregoing

7   deposition was duly sworn by me.

8          I further certify that the examination was

9   recorded stenographically by me via videoconferencing

10  platform and that this transcript is a true record of

11  the proceedings.

12          I further certify that I am neither counsel

13  for, related to, nor employed by any of the parties, nor

14  financially or otherwise interested in the outcome of

15  the action.

16       Certified to by me this 9th of March, 2024.

17

18       _____

19                    Notary public in and for

20                    the Commonwealth of Virginia

21                    My commission expires

22                    December 31, 2026

23

24

25

Rebecca E. Kuehn
February 28, 2024

### Exhibits

EX 0001 Rebecca E.
 Kuehn 022824
 4:12 20:6
EX 0002 Rebecca E.
 Kuehn 022824
 4:13 23:9
 49:25
EX 0003 Rebecca E.
 Kuehn 022824
 4:14 29:22
 49:24 70:16
EX 0004 Rebecca E.
 Kuehn 022824
 4:16 50:17,
 20

---

### $

$25-
 15:12
$30,000
 15:13
$835
 12:8 15:10

---

### 1

1
 4:12 20:2,6
 80:13 105:11
1.a
 80:15
1.b
 80:15
1/5/24
 4:13
10
 11:6
100

88:23
106
 4:6
10:00
 5:11
11:20
 59:10
11:32
 59:12
12:39
 105:3
12:50
 105:5
12:51
 105:19
12:54
 105:22
12:57
 108:1,2
14
 42:6
147
 4:12 20:4,10
15
 23:11,15,17
16
 23:18 63:2
1681b(b)(3)
 17:18 57:11
170
 10:18
18
 62:8
19
 64:8,15
1994
 9:15
1996
 62:17

---

### 2

2
 4:13 7:24
 23:7,9 32:17
 34:8 49:25

50:1,17 51:5
 61:19
2,363
 19:20 20:15,
 21 69:1
 79:14
2/2/24
 4:16
20
 4:12 94:6
2011
 54:13
2014
 63:13
2021
 33:23
2023
 11:17 12:1
 36:2 90:9
 103:6
2024
 5:10 7:23,24
 23:6 50:1,5,
 17 51:4,5,9
23
 4:13
25
 13:5
28
 36:1
28:19
 4:19
28th
 5:10 90:9
 103:6
29
 4:14
2nd
 13:14,15
 50:3

---

### 3

3
 4:14 29:19,
 22 49:24
 65:12 70:16

3,000
 61:4
30
 13:6
33
 63:9
33-3
 29:21
3:00
 5:12

---

### 4

4
 4:16 50:17,
 20 105:11
40
 56:3,4 58:7
 64:11

---

### 5

5
 7:23 23:6
 50:5 51:4,9
50
 4:16 11:7
5:57
 108:1

---

### 6

6
 4:5

---

### 7

7
 61:20,22

---

### 8

8
 62:10 64:7
 66:9

Rebecca E. Kuehn
February 28, 2024

**9**

**90**
  11:7 94:13,
  20 95:2
  107:1,7,11

**A**

**a.m.**
  5:11 59:10
**abbreviation**
  23:25
**ability**
  100:6
**abstract**
  101:6
**accepted**
  14:15
**access**
  7:25 10:1,8,
  25 11:1,24
  31:13 34:16
**accessible**
  12:20
**accordance**
  24:3 95:5
**accounting**
  15:19
**accuracy**
  31:19 53:4
**accurate**
  18:22
**accurately**
  42:3,16,18
**achieved**
  66:18
**acknowledge**
  5:18,20
  93:18
**Act**
  17:3,18 21:3
  24:17 30:17
  33:13 43:23
  49:6,11 55:9

57:6,15,19
58:15,20
59:23 61:10
62:14 65:21
95:6 97:3
**Act's**
  22:21 48:2
  57:4 96:18
**action**
  16:4 17:1,12
  18:12,17,24
  19:7 21:2,
  16,23 22:21
  23:3 24:2,13
  26:22 30:16,
  19,24 33:12
  41:12,16,25
  42:9,21
  43:4,12
  45:20 46:2
  48:2,10,20
  49:16 51:19
  52:21 55:2,
  18,24 56:13
  57:3,5,8,15
  59:18 60:2,
  17,25 61:6,
  24 62:15
  63:5,18
  64:3,10,16
  65:3,8
  66:10,21
  67:4,7,8
  74:8 77:21
  78:3,13,18,
  23 79:15,20
  80:14,19
  82:2 83:12
  84:19 85:14
  86:19,25
  87:13,24,25
  89:23 91:9,
  18,24 92:14,
  20 93:1,9,
  21,23 94:14
  95:8,9,11
  12,16,20
  96:1,2,7,11,

15,19 97:4,
10,17,18,19
98:1,3,9,13
99:7,13,22
100:19
106:25 107:7
**actions**
  17:8 51:20
**active**
  9:7 68:22
**actors**
  53:15
**actual**
  43:13 44:24
  60:2 67:15
  75:19 104:14
**add**
  46:11 66:11
  91:15
**additional**
  32:22 33:4
  38:15 46:12
  47:3 90:2
  91:21 103:1,
  2
**address**
  16:16 48:21
  54:20
**administer**
  5:22 6:11
**administered**
  5:21
**adopted**
  46:9,24 53:6
**advance**
  45:10 57:8
  63:22 77:11
  103:9
**adverse**
  51:20 57:8
  61:24 65:14,
  22 73:10,24
  74:8 81:8
  82:5 84:19
  86:18 87:13,
  18,24,25
  91:18 95:9,

11,20,25
96:7,10
97:3,9,16,25
98:1,9,13
99:13,22
**adversely**
  82:5
**advice**
  44:17,20
  45:6,15
  48:14 49:4
  57:19 66:17
**advisable**
  44:21,23
**advised**
  48:19
**affect**
  100:6 106:21
**affected**
  84:12
**affecting**
  82:5
**affirm**
  6:16
**afforded**
  98:15,22
**agencies**
  44:8 53:5
  55:19 57:23
  100:25
**agency**
  31:19 41:13,
  23 45:19
  46:6 48:6,11
  64:23 69:4,
  19 73:19
  90:3 98:7
  101:5
**agree**
  6:4,7 20:14
  25:20 26:1,
  17 42:1 43:2
  52:9,18 57:1
  58:21 61:14
  65:7 66:5
  71:14 74:18
  77:8 82:8

Rebecca E. Kuehn
February 28, 2024

83:4 90:13
95:7 99:12,
22 100:8,18
103:8
**agreement**
5:7,25 6:1
7:5
**ahead**
79:6 93:16
102:3
**aja-**
89:7
**alleging**
16:3
**allowing**
47:15
**amendments**
62:13,17
**amount**
39:25
**and/or**
42:11,23
66:1
**Andrews**
6:7
**answering**
35:9 42:3
**appears**
66:14
**appellate**
33:23
**applicant**
67:24 85:25
86:14 97:10
98:15
**applicants**
57:16 68:4
77:17 104:1
**application**
68:5
**applied**
89:8
**apply**
103:21
**applying**
47:11

**approaches**
84:14
**approximately**
5:11 12:19
13:16
**April**
12:1
**arbitration**
31:8,11
**area**
8:13 17:7
39:11 52:3,
20 57:18
60:4
**arguing**
21:1
**ARR**
73:24
**arranged**
40:16
**arrangement**
5:24
**article**
33:23
**asserts**
78:22 79:7
**assessment**
47:11
**assigned**
21:25
**assignment**
10:24 14:15
15:13 38:6
41:3
**assistance**
28:15
**assume**
106:24
**Assumes**
93:12
**assuming**
92:12 98:2
**assumption**
35:6 95:4
**assure**
53:3

**attached**
105:12
**attain**
67:23
**attended**
28:6
**attention**
23:14,20
80:6
**attorney**
8:20 9:14
37:16,18
39:7 91:6
**attorneys**
5:17 7:3
11:19 35:14
38:17
**authored**
33:1
**authoritative**
60:11
**automobile**
52:11
**aware**
5:5 10:9,16,
21 16:2
18:15 19:6,9
20:24 21:8,
12 35:16
47:21 48:4
49:14 52:2
57:22 60:14,
21 61:2,7
66:22 67:9
88:5,22
94:21 97:2

---

**B**

---

**b(b)(3)**
17:12
**back**
15:18 16:25
27:8 32:16
34:2,7 40:19
42:6 47:25
59:12 61:8

65:11 70:14
71:5,6
72:10,12
80:4 84:8,16
87:2 105:5,
22
**background**
38:17 42:10,
22 47:10
55:19 63:12
65:19 66:1,7
67:21,24,25
68:2,11,20
69:16,22
70:3,21
71:6,11,21
72:11,20
73:15,17
74:17 76:15,
23,24 77:10
78:1 81:10,
23 82:10,21
83:4,21
84:12,24
85:5 86:15
87:2,12
88:15 89:8,
18 91:20
100:10,13
102:10,16,21
103:10,11,
12,20,23,25
**balance**
101:11
**bank**
60:19 97:7
98:18
**based**
25:15 39:20
51:21 56:23
57:3 61:24
67:23 78:10
83:16,18
86:14 87:12
89:16 92:9,
22 99:16
**basically**
24:19 26:21

Rebecca E. Kuehn
February 28, 2024

65:9 72:11

**basis**
35:5 45:16
49:22 50:2,7
51:6

**Becky**
59:7

**begin**
11:8

**beginning**
37:15 57:4,9
104:20

**begins**
23:22

**behalf**
5:15 6:10
7:22 13:2
87:6

**believed**
18:8

**believes**
82:18

**belong**
90:4

**Bennett**
20:4 21:5
23:10,17
33:16,18
40:24 50:18
80:1

**bill**
12:5,11

**billable**
14:19 15:13

**bills**
12:14

**bit**
15:21 42:5
61:9,13

**block**
61:23 62:7
64:8,14

**board**
68:24

**bold**
65:24

**Bonnie**
6:2 7:3

**book**
53:24

**bottom**
61:22 62:10
63:4

**brake**
52:12

**break**
46:13 53:10
59:2,4,11,15
105:1,4,21

**briefing**
10:20 19:13

**briefs**
10:3

**bring**
91:21

**bringing**
68:23

**broadly**
31:2

**brought**
16:2 17:20
18:7

**built**
73:6

**bullet**
42:7

**Bureau**
58:14

**business**
53:20 60:2,9
63:15,16
66:17

**businesses**
53:15,19,25
57:24 60:5,
12,17,24
61:4,11
63:17

**businesses'**
59:20

---

**C**

---

**C-A-T-T-A-N-I**
35:25

**call**
20:2 23:7
40:18 47:7
55:11 71:25
102:16

**called**
19:19 20:25
29:25 106:9

**calls**
18:10 22:23
24:9 69:5
73:12 75:25
76:16 77:13
78:19 83:5
85:8,19
86:20 87:20
93:13 94:2
96:21 100:16
104:5

**candidate**
16:6 48:8
63:6 68:15,
18 71:9 72:5
73:10,11,25
80:14 84:23
85:1,4 86:5,
7 96:2 97:25
98:14 103:18

**candidates**
18:9 19:10
20:21 31:25
45:21 55:2
67:21 68:10
69:2,17
71:16 75:21
76:8,12,22
78:18 79:20
81:1,9,21
82:6,9,25
83:21 87:19
88:3,24
89:13 92:15,
25 93:10

94:15

**capacity**
14:12 37:20
49:16

**car**
97:5

**cards**
97:5

**carried**
27:2

**case**
7:4,19 8:25
10:1,2,9,15,
24 11:5,13,
16,25 12:6,
21 13:3,11
15:14,22,25
16:25 18:16,
23 19:7,15
20:5,9,24
21:13 22:2
23:1 24:25
25:14 26:13,
18 29:21
30:15,18,25
31:4,12,17,
20 32:4,7
33:7 34:15
35:14,18
38:6 39:21
40:15 43:3
47:21 49:15
50:2,12 51:6
57:10 65:13
74:7 76:6
78:22 79:18
82:21 87:19
88:6 92:8
94:15 99:2,8
106:9

**cases**
43:10 52:15
57:20

**categories**
70:13

**categorizes**
60:19

Rebecca E. Kuehn
February 28, 2024

**category**
  59:25
**Cattani**
  35:24 37:4,
  15 38:11
  77:3 90:8
  103:5
**certification**
  19:3 29:20
  90:22
**certified**
  6:3 7:3
  19:7,23
  90:25
**certify**
  18:23
**certifying**
  18:16
**CFPB**
  58:12 99:5
**chance**
  46:8,20
  47:15,18,22
  48:18,21,22
  49:5 98:17
**change**
  45:10,12,13
  89:24 94:11,
  23
**changed**
  46:11 54:19
  101:9
**charac-**
  70:12
**characterize**
  63:14
**charged**
  62:25
**check**
  14:16,18
  42:10,22
  66:1,7 68:11
  69:22 70:3
  71:11,21
  72:11 73:15,
  17 74:17
  78:1 81:23

84:13,24
86:15 87:12
91:20 102:10
**checks**
  38:17 63:12
  65:19 67:24
  89:18
**choice**
  38:20 84:10
**choose**
  55:9
**circumstance**
  71:10
**circumstances**
  45:12 90:4
  94:20
**citations**
  11:10 35:1
**cite**
  34:21,24
  35:3 61:13
  63:11 64:9
  66:8 67:2
  98:11
**citing**
  62:12
**claim**
  17:20 18:2,
  3,7 30:18
  47:22
**claims**
  16:9
**class**
  6:3 7:3
  18:8,12,16,
  19,20,23,24
  19:2,7,11,
  15,20,21,23
  20:16,17,19,
  22 29:20
  35:17,19
  51:18 67:22
  68:10 69:1,
  8,11,18,22
  70:10 75:3
  79:14 81:9
  82:6 88:23

89:2,5
90:14,19,21
91:25 92:24
95:19 96:15
104:13,19
106:9,12,17,
20,21
**classes**
  91:1
**clear**
  50:5 71:1,3
**cleared**
  73:17
**client**
  12:14,15
  15:1 44:20
  48:19,24
  49:9,15
**clients**
  44:17 45:6
  46:7 55:13
**close**
  105:10
  107:18
**closed**
  42:12
**Columbia**
  9:11
**com-**
  88:23
**combination**
  59:19
**combined**
  66:23
**comment**
  50:10
**commentary**
  98:11
**Commission**
  54:6 55:22
  56:2,25
  58:2,8 64:4,
  9
**Commission's**
  63:12
**companies**
  44:21,24

55:7,9 81:2
103:8,12
104:9
**companies'**
  54:19
**company**
  38:24 64:23
  69:25 72:3
  80:24 87:3
  91:8 92:15,
  21 94:25
  97:12 102:16
**company's**
  11:21 41:24
  45:22 46:14
  80:20
**compare**
  98:14
**compared**
  67:12
**compiled**
  62:17
**compiling**
  106:17
**complaint**
  18:5 96:15
**complete**
  41:1 74:25
  82:20
**completion**
  86:12
**complex**
  10:19
**compliance**
  66:18
**comply**
  24:21 26:23
  46:8 52:25
  53:8 55:8
  60:5 64:16
  65:3,10 66:9
  107:2
**complying**
  48:17 65:7
  67:7
**composition**
  91:25

Rebecca E. Kuehn
February 28, 2024

Compound
 22:4 86:11
 100:15
comprised
 69:12 88:23
concerned
 16:1
conclude
 35:2 98:8
concluded
 108:2
concludes
 107:25
concluding
 11:11
conclusion
 22:24 24:10
 46:2 51:16
 73:13 77:22
 78:11,16
 92:13 96:22
conditional
 47:8
conditions
 57:16
conduct
 36:16 76:20
 79:13 89:16
conducted
 36:6,8
conducting
 40:4
conducts
 48:7
confidential
 31:8,10
conflicts
 14:16
conform
 44:1 45:7
 48:19
conforming
 49:5
connection
 16:5 17:6
 41:19 43:20
 45:23 48:14

49:4 55:25
56:23 85:10
103:16 106:6
consensus
 53:25
consent
 5:23
consideration
 47:6 75:5
considered
 35:8 38:18
 39:18 62:18
 88:9
considers
 86:4
consisted
 40:3
consistent
 18:4 22:10
 23:2 27:4
 51:20 56:19
 66:8,15
 93:19
consists
 78:3 83:12
constitute
 24:16
construct
 103:13
consultation
 77:16
consumer
 17:5 31:18
 53:5 58:13
 61:25 62:4
 64:18,22,24
 65:5 69:19
 71:22 73:18
 80:16 82:18
 86:14,24
 87:1,6,11,
 14,18 90:1,3
 91:19 97:9,
 11,20 98:4,7
 99:15,19,24
 100:9,24
 101:3,5

102:3,5,8,13
103:2
consumer's
 82:15 104:9
consumer-
applicant
 47:14
consumers
 83:11,13
 84:11 89:17
 91:21 98:22
 100:21 103:9
contact
 11:23
contacted
 11:20
contained
 73:5
context
 54:5 57:8
 77:16 97:21,
 23 98:21,22
 99:7
contexts
 57:25 97:4,
 7,15,16
continued
 54:11
continues
 62:7 65:25
control
 8:3,12
 33:14,17
 50:19
conversation
 30:5 85:5
conversations
 5:6
conversely
 32:12 70:25
convicted
 102:11
Cook
 9:17,21
cop
 77:9

copies
 104:14
copy
 8:5 62:1
 64:17 65:4
 77:9,21 78:3
 80:15,16,20,
 25 81:10,23
 83:1,12,21
 85:4,10,18
 91:9 100:10,
 22 101:18
 102:3,18
 104:19
 107:22
correct
 7:11,12
 8:18,19,21
 9:23 10:4,6,
 11,12 11:11
 12:9,10,16
 15:11,19
 16:6,7 17:4,
 5,9,18,19
 18:25 21:23
 22:22 23:17
 25:18 27:4
 31:1,15,25
 32:1,24,25
 33:8,9 34:7,
 16,17 35:14,
 19 41:10,14
 44:17,18
 46:20 47:23,
 24 49:3,8,22
 50:2,7,8,13,
 23 52:4,13
 57:5,20,21,
 25 58:4,9,
 16,17 60:12
 61:11 62:15,
 16,23 63:13,
 14,18,19
 64:12,13,20,
 21,25 65:1
 67:10 76:10
 81:1,2 82:22
 91:10,11

Rebecca E. Kuehn
February 28, 2024

92:16 97:6,
19 100:4,7
102:23
103:7,10
**correctly**
29:2 34:13
35:25 42:25
51:23 59:19
**couns-**
13:25
**counsel**
5:23 6:20
7:5,8 13:24
14:1,25
27:10,14,20,
22 28:7
29:3,7
36:20,22,23
37:4 39:4
40:14,17
105:13
**country**
46:9 56:12
**couple**
27:18 61:16
105:14
**couple-step**
48:16
**court**
5:18 6:9
18:15 19:6,
18 20:15
21:8,12,18
22:13 25:4,
8,13,15
26:12 30:24
31:3,9,14
32:3,9,11,13
58:22
**court's**
10:3,19 22:1
24:25 25:21
90:21
**courts**
58:18
**cover**
51:13

**covered**
33:24
**CRA**
64:19,22
65:6 66:12
69:19
**create**
37:9 71:15
**credit**
17:2,18 21:3
22:20 24:16
30:17 33:13
43:23 45:8
48:2 49:6,11
52:21 55:9
57:4,6,15,19
58:15,20
59:23 61:10
62:14 65:20
95:5 96:18
97:3,5,11
98:14,23
101:10,17
**criminal**
46:10,25
47:6,9
54:10,14
55:25 67:1,
25 68:1
72:11 76:24
84:8
**criteria**
69:25 70:2,
11
**current**
44:2,16
61:25
**customers**
104:2

---

**D**

**data**
60:16,19
61:3 79:18
88:4 89:13,
15

**database**
80:21
**dated**
7:22,23
**day**
36:6 75:14
101:18,19
105:9
**days**
27:18 87:1,
5,9,10,13
92:2 95:14
96:2,11
**DC**
7:14 9:18
**debated**
55:4
**December**
36:1 90:9
103:6
**decided**
26:22 87:11
**decis-**
89:19
**decision**
24:25 25:21
63:8 65:23
71:3 72:4,
19,23,24,25
73:1,2 87:6,
18 89:24
90:22 95:12
97:25 98:17
**decisions**
17:6 33:24
97:21,23
**deemed**
70:3
**defendant**
6:5 10:15
11:18 12:11
20:25
**defending**
14:1 40:15
**deferring**
24:1

**defined**
54:4
**definition**
69:7 88:23
89:2 90:18,
25 91:3
**definitively**
35:7 38:1
85:21
**delay**
75:14
**delivered**
101:24
102:22
**delivers**
104:2
**denied**
21:9,18 25:4
97:11
**department**
36:15 83:17
92:11
**department's**
85:2
**depended**
68:22
**depending**
47:12 52:6
84:14
**depends**
103:13
**deposition**
5:9,17,19,20
7:6 10:6
14:2,7
29:10,25
30:9 107:22,
25 108:2
**derives**
55:8
**derogatory**
4:14 29:25
42:11,23
65:17,20
66:2 70:4,21
71:1,2 72:14
83:22

Rebecca E. Kuehn
February 28, 2024

description
    4:10 48:15
    62:1 82:15
designated
    75:10 76:2
    81:14 94:18
    95:22 96:4
designation
    74:12 76:18
    93:3
desire
    99:6
detailed
    12:17 15:19
determination
    19:19 25:13
    46:4,11
    47:4,13,15,
    16 49:11
    66:20 67:1,6
    73:7,9,22
    78:17 85:16
    86:7,13,18,
    24 87:1,5,9,
    17,23 88:3
    91:8,23 92:1
    93:24 95:15
    104:15
determination
s
    83:17
determine
    44:7 60:1
    72:15 84:7
determined
    11:2 77:25
    89:19
developed
    55:7
developing
    54:18
deviling
    54:17
differ
    41:23
differing
    44:9

differs
    44:2 91:5
direct
    23:13,20
    73:19 80:6
directed
    78:2
direction
    53:8 85:24
directly
    12:12
directs
    78:12
disadvantaged
    81:22
disagree
    22:1 24:24
    25:22
disagreeing
    35:19
disagreement
    22:14 26:12
disagreements
    19:10
disclosed
    67:24 101:20
disclosure
    33:1 64:17
    65:3 104:7
disclosures
    33:2
disconnect
    45:11
discrepant
    42:11,23
    65:20 66:1
    70:20 72:14
    77:10 83:22
    99:1
discuss
    98:18
discussed
    39:13 91:5
discusses
    55:18
discussing
    102:9

discussion
    22:8 77:7,12
    81:20 98:25
    99:25 100:2
discussions
    28:21 85:11,
    23 89:16
    90:7
displaying
    8:10
dispute
    82:10,15
    83:2,3,14,23
    90:3 91:22
    98:6 100:3,
    12,22 102:17
disputed
    62:4
disputes
    83:18
disqualificat
ion
    71:12,15
disqualifying
    72:17 76:14
    78:2 84:9,18
    89:20 99:19
District
    9:11
divulge
    30:3
docket
    4:12 10:18,
    19 19:14,25
    20:4,9,10,12
    29:21
document
    8:14 19:25
    20:8,11,18
    29:18,24
    30:8,10
    31:12 33:14
    35:3 50:19
    80:1,3,4
    81:6 106:5
documentation
    24:15 92:8

documents
    7:25 8:4,9
    10:2,14
    11:24 31:13
    34:14,15,19
    35:12,21
    60:14 80:20
double-check
    81:4
double-click
    33:19
drug
    31:22
duly
    6:22

    E

E]mployers
    61:24
earlier
    34:13 84:17
early
    98:23
Eastern
    5:11 59:10,
    13 105:3,6,
    20,23 108:1,
    2
echo
    16:15 103:11
EEOC
    66:23
EEOC's
    54:12
effect
    99:13
efficiency
    40:11
electronic
    12:3
email
    56:14
emanate
    52:8
employed
    9:20 54:8

Rebecca E. Kuehn
February 28, 2024

**employee**
62:1 66:19,
20
**employer**
41:22 45:19
47:9 48:6,11
63:7 64:16,
20 65:3,6
66:9,13 69:4
75:5 98:6
99:25
102:10,22
**employers**
41:17 43:11,
16 44:8,14
54:5,7,13
55:19,24
56:12 63:12
64:24 73:16
84:14 96:6
**employment**
17:6 31:24
32:4 33:22
43:16 47:1
64:25 65:23
67:21 71:13
95:10 97:21,
23 99:11
100:20
103:10
**enact**
62:21
**end**
23:14,23
32:19 35:21
42:24 63:24
77:24 78:6
79:16,21
85:15 86:6
91:7 93:11
94:12 104:21
**ended**
38:19
**ends**
62:7 64:15
**enforcement**
99:8

**enforcing**
63:1
**engaged**
11:15,18
14:25 24:8
25:17
**engages**
48:12
**entailed**
39:19
**enter**
6:10
**entire**
53:23
**entities**
58:19
**entries**
10:18
**entry**
20:15
**equate**
26:4
**error**
101:23
**estimate**
13:5 15:12
**evaluate**
58:22
**evaluated**
70:2,5,7
**evaluation**
68:14
**Evangeline**
6:6
**evidence**
40:1 91:14
93:13 94:21,
24,25
**evolution**
54:9
**evolve**
54:11
**evolved**
26:21 39:1
**exact**
18:21 89:7

**EXAMINATION**
4:4
**examines**
60:16
**examining**
76:6
**exception**
33:22
**exchanged**
106:16
**excluding**
47:5
**exhibit**
4:10 10:4
12:21 20:6
21:6 23:9
29:20,22
32:19,20
33:11 34:2,
7,8 40:20,24
49:24,25
50:17,20
67:15 70:16
**exhibits**
8:5,11 10:20
105:11
**existing**
39:21
**exists**
48:17 53:7
55:6 99:10
**experience**
43:23 44:13
55:12 56:24
74:15
**experiences**
40:4
**expert**
4:13,16 7:8,
9,22,23 8:18
10:4 13:2
21:25 23:5
30:18,23
31:3,7
32:10,14,16
33:2 34:5,9,
21 41:8,9

45:2 46:15
49:20,25
50:11 51:3,
17 52:2,3
61:14,19
74:12 75:11
76:7,18
87:22 90:17
96:22
**experts**
29:15
**explain**
46:22 63:6,
23 100:5
102:7,19
**explanation**
100:4
**express**
49:21
**expressed**
106:22
**expungements**
90:5
**extent**
24:9
**extra**
16:22

---

**F**

**face**
99:11
**fact**
16:8 22:14,
16,19 24:12,
14,21 25:14,
15 26:2,19
58:6 61:13
63:20 64:14
67:10 72:17
75:13 78:8
84:8,18
92:24 93:9
94:21 95:18
97:15 102:2
**factors**
38:16 47:11

Rebecca E. Kuehn
February 28, 2024

facts
    74:16 93:12
    101:7
factual
    39:21 76:19
failure
    24:14 26:23
fair
    17:2,17 21:2
    22:20 24:16
    30:17 33:13
    39:25 43:23
    46:8,20
    47:17,22
    48:1,18,21
    49:5,6,11,18
    52:21 53:17
    55:9,22
    57:4,6,14,19
    58:15,20
    59:23 61:10
    62:13 65:20
    95:5 96:18
    97:3 98:19
fairly
    39:14
familiar
    17:7 46:19
    66:16
FCRA
    17:3,8 21:16
    24:4,8,22
    25:2,7 26:4,
    24 27:3
    30:17,19
    32:4 33:23
    48:10,20
    53:1 57:23
    58:23 62:2
    65:21 67:3
    82:1,9,20,23
    94:11 96:24
    97:3,16
    98:24 99:5,
    12 107:2
FCRA's
    21:23 67:8

February
    5:10 7:24
    13:13,14,15
    14:10 50:3,
    17 51:5
    63:13
federal
    17:2 31:9,13
    32:3,9,13
    49:6,20 54:6
    55:22 56:1,
    25 57:22
    58:2,8 62:13
    63:11 64:4,9
feedback
    16:15
feel
    39:15
felony
    102:11
fidget
    16:23
figure
    72:24
file
    11:5 12:3
    92:8 101:4,
    9,12
filed
    19:14 20:25
    93:10
files
    103:9
final
    87:6 95:9,12
finalizes
    63:7
Financial
    58:13
find
    14:22,23
    54:3 55:3
finding
    18:19 88:16
    92:13 94:13
finds
    48:8

fine
    59:6 65:15
finished
    13:14 79:2
firm
    6:6 9:17
    12:11 14:18
firm's
    14:16
flag
    42:12,24
    66:2,7 70:8,
    9,13,23,25
    71:7,15
    72:6,7,13
    73:24 76:13
    79:21 81:11
    88:3,15 89:9
flagged
    70:22
flags
    72:19 73:2
    76:8
Flipping
    61:8
focus
    51:25
focused
    24:11
folks
    36:10,16
    40:9 69:1
    76:20 77:2
    83:16 89:22
    90:8 92:10
    102:24 103:5
follow
    44:21,24
    95:2 96:25
follow-up
    85:23 105:16
follow-ups
    105:14
footnote
    62:8 63:8,9,
    21 64:8,15

forget
    54:24 56:10
form
    17:24,25
    21:17 33:7
    34:20 35:4
    38:7,22 45:1
    68:1 83:25
    88:11 107:12
forming
    76:7 93:8
formulating
    34:14
forward
    63:2 75:24
    91:19
found
    21:13 25:1,
    15 32:12
    61:5 77:23
    79:15,21
    88:6,24 89:6
    90:12 92:24
    93:10 104:22
foundation
    19:1 25:10
    28:24 37:22
    42:4 45:1
    69:6 71:18
    73:12 74:22
    75:9,25
    76:17 77:13
    81:12 83:5
    84:3 85:8
    86:20 87:20
    88:25 90:15
    92:3 93:13
    94:17 100:16
    104:6
frequently
    79:19
front
    8:25
FTC
    43:24 55:13
    58:2 60:22,
    23 64:12
    65:9 66:8,

Rebecca E. Kuehn
February 28, 2024

15,16,23
67:3,9 98:11
99:16
**fulfill**
53:19
**full**
12:2 23:14,
21
**fully**
59:17
**functions**
53:20
**future**
68:24

---

**G**

**gather**
41:21 44:6
**gave**
44:20 49:4
101:16
102:21
**general**
19:12 44:13
48:14 52:10
90:24
**generally**
17:14 19:3
40:2 44:20,
23 45:14
48:4,5
**get-go**
30:15
**GIS**
69:19,20
70:7,12,21
72:23,25
82:22 88:15
91:22 103:8,
14,15,19,25
104:14,20
**GIS's**
104:7
**give**
6:15 8:3 9:4
13:11,19

27:9 32:3,
10,14 33:17
44:17 48:14
50:18 57:19,
24 79:24
81:14 90:16
99:24
**giving**
8:12 53:7
63:22 79:2
**good**
5:3 6:12,25
7:1 59:4
99:9 107:23
**government**
47:23 58:3,
13
**granted**
25:8
**green**
70:9,25 71:7
72:6,13
**guarantee**
102:4
**guess**
11:8
**guidance**
53:6,7
54:12,21
56:7 57:24
58:4,7,14,19
59:24 60:7,
13 61:10,14
63:15,16,17,
21 65:9
66:22,24
67:3 99:17

---

**H**

**half**
5:13 6:5
7:4,22 11:19
12:15 13:2
14:2,10,13,
19,24 16:3,4
17:22 21:1,

15 22:9
23:25 25:9
26:2,7,19
27:25 35:13
36:16,20
37:18,21
39:7,10,14
40:15,17
41:6,18 42:8
43:6,17 44:7
48:7 50:9
65:12 67:12
68:5,7,11
69:16 93:22
106:25
107:6,10
**Half's**
7:8 21:9
22:16,20,25
25:16 27:20
46:1 49:17
69:25
**hand**
6:13 60:3
71:7 82:4
**handled**
57:20
**Handling**
4:14 29:25
65:17
**hands**
83:9
**happen**
102:1
**happening**
99:14
**harm**
83:20 84:2
**heading**
48:1
**heard**
17:13 53:13
**held**
5:6 87:1,5,
8,10
**helpful**
42:5

**hire**
73:19 89:25
**hired**
88:9
**hiring**
46:8 47:1,5
48:22 54:10,
14 67:20
70:2 71:3
84:13,15
**history**
10:10 15:23
31:22,23
32:8
**hold**
71:25 73:10
74:9,19
75:3,22
76:4,8,12
77:24 80:1
91:7 92:13
**holding**
66:19 67:5
71:16 72:1,
5,8,21 73:2,
23 75:8
**home**
101:21
**hope**
35:24
**hospital**
68:19
**hour**
12:9 15:10
37:8
**hourly**
12:5,8 15:10
**hours**
12:24 13:1,
6,16,22,23
15:11 27:10,
13,16,17,25
**housing**
48:18,21
**Hudson**
9:17,20

Rebecca E. Kuehn
February 28, 2024

human
  64:18
hundred
  20:20
Hunton
  6:6
hypothetically
  94:24

I

idea
  85:9
identical
  49:17 101:4,
  21
identified
  7:7 39:2,4
identify
  11:9
identity
  100:10
Illinois
  102:12
im-
  82:5
immediately
  24:13,20
  32:19 42:10,
  21,22 43:5
  65:25 66:6
  80:8
impediments
  71:8
implement
  55:10
implemented
  60:6
important
  53:11 80:25
impose
  71:12
imposes
  65:21
in-house

37:18 39:7
40:17
in-person
  36:24
inaccurate
  82:16,19
  100:12
included
  20:17 72:16
includes
  82:14
including
  10:2,6,13
  21:22 32:23
  66:25
incomplete
  82:16 100:13
indercate
  5:25
indicating
  107:6
individual
  71:10
individual's
  62:2
individualized
  47:10 66:25
individuals
  19:20,23
  20:16 36:13,
  15 38:19,21
  39:16
indulge
  105:16
industry
  23:2 27:5
  51:20,22
  52:1,5,6,12,
  25 53:5,8,
  16,23 54:17
  55:1,11,12
  56:24 58:15
  59:17
infer
  41:5

information
  11:2 32:22
  33:5 34:19
  38:15 41:21
  44:6 46:25
  57:7 62:3
  63:24 70:21
  72:16 76:14
  77:10 78:6,
  8,9 81:21
  83:22 85:24
  86:4 89:20,
  24 90:2
  91:22 99:19
  100:4,12,22
  101:3,8,9,
  12,20 103:1,
  2,3,16 104:8
informative
  22:12
informing
  97:10
instance
  89:10
instances
  45:9 79:8
instituted
  90:2
instruct
  28:18,19
  30:2 107:21
INSTRUCTION
  4:19
instrumental
  61:17
intend
  87:24
intended
  98:12
intent
  69:2
intention
  34:23
interest
  81:9 87:18
interests
  73:11,25

internal
  36:22
International
  5:13 7:4
  11:19 23:25
interpret
  58:23
interpretation
  66:17
interpreted
  57:23
interpreting
  62:25
interview
  36:19,24
  37:3,6,9
  38:11 40:11
  41:6,21 44:6
interviewed
  36:12 68:10
  77:2 83:16
  90:9 103:6
interviewing
  38:13 40:8,
  13
interviews
  35:24 36:5
  92:10
introduction
  51:13,17
inversely
  35:2
investigate
  45:18
investigating
  54:6
investigations
  43:25
invoices
  12:13,17
  13:9
involve
  31:20,24
  86:5

Rebecca E. Kuehn
February 28, 2024

involved
  41:17 55:20
involves
  43:6
involving
  30:16,18
  32:4,8
issue
  19:17 20:1
  21:19,22
  22:14 25:5,
  6,13 26:1
  48:15 52:7
  58:19 61:9
  69:18 82:21
  91:19
issued
  18:16 54:12
  55:21 58:8
issues
  11:3 12:2
  19:3 25:15
  39:18 43:3,
  25 54:20
  58:14 76:23
item
  80:19
items
  11:9 58:10
  80:9

          J

James
  5:14
January
  7:23 23:6
  50:1,5 51:4,
  9
job
  16:5 18:9
  19:10 20:21
  31:25 33:12
  41:12,22
  44:8,11
  45:19,21
  55:2 57:16

69:2,3,12
70:4 71:9
73:10,25
74:20 75:5,
13,21 79:20
81:9 82:6,25
83:20 87:7,
19 88:9,17,
24 89:7,13
93:9 98:14
100:6 103:18
John
  6:3 7:2
  58:25 107:21
joining
  7:13
judge
  9:1 11:5
  22:3,18 26:1
judge's
  22:7
judgment
  21:1,19
  24:25 25:5,
  8,12,18 74:6
jurisdiction
  47:12
jurisdictiona
l
  47:20
jurisdictions
  9:10 46:12,
  24
jury
  9:1

          K

Kathleen
  35:24 37:15
  77:3 90:8
kind
  55:17 99:5
kinds
  101:7
knew
  29:11 94:11

knowledge
  32:15 36:14
  40:3 41:4
  44:13 51:22
  76:3 83:8
  89:11 94:19
  104:7,17,18,
  23
Kuehn
  4:3 5:9
  6:12,21,25
  7:13 8:17
  9:14 15:17
  20:2,8 23:7,
  13 29:2,19
  30:7 32:17
  34:8,12 41:2
  43:2 50:22
  59:15 61:19
  65:12 67:19
  80:6 97:2
  105:7,11
  106:3,5
  107:17
Kurth
  6:7

          L

Lack
  76:17
laid
  28:24
language
  18:21 63:4
law
  6:6 9:17
  12:11 17:2,7
  45:12 49:5
  58:18 59:24
  62:13,22
  63:1
laws
  46:8,11,20
  47:18,20,22
  48:18,23
  54:24

lawsuit
  16:3 18:13
  31:18 52:7
lawyer
  9:7 21:25
  26:10 74:6
  84:22,25
lawyers
  11:21 40:14
  52:3 62:19
lay
  42:4
lead
  88:6
leaned
  32:23 33:3
learned
  23:1
led
  89:8,24
legal
  5:15 6:10
  22:24 24:2,
  10,20 26:21
  36:15,17
  38:15 39:10,
  18,22 40:2,
  5,6 43:7
  44:17,19
  45:19 46:1
  48:7,25 49:9
  56:7,10,15
  57:2,14
  58:14 59:22
  60:3 61:8
  62:20 64:10
  66:19 67:5
  71:21 72:15,
  20 73:3,5
  74:9,20
  75:3,23
  76:20,21
  77:15,22,25
  78:11,12,16
  79:16,22
  80:25 81:11,
  20 82:4,24
  83:11,16,23

Rebecca E. Kuehn
February 28, 2024

84:7,22
85:2,24
86:3,18
87:17 88:19
89:6,17,18,
22 90:12
91:15 92:11
93:11,24
94:12 96:21
102:24 103:5
104:16,21
**legislative**
62:21
**lengthy**
10:10,20
15:22
**letter**
65:18,23
66:6 80:8,
10,14 91:9,
12 92:14,20
93:1 94:14
95:8,9,14,16
96:1,2
**letters**
42:9,21
43:4,7 93:9
95:20 96:11,
12
**liberty**
48:13
**licensed**
9:8,10
**lieu**
5:21
**list**
12:21 19:20
20:12,16,17,
22 32:22,25
35:23 41:1,5
**listed**
10:4 33:11
80:9
**Livelink**
80:21
**loans**
97:5

**local**
47:19,22
48:23 85:1
**long**
9:13,20
27:24 37:6,
20 39:9,14
**longer**
38:4
**looked**
43:10 54:9
61:3 74:7
92:9 93:8
**lot**
10:13

———————————

**M**

**M-A-W-L-A**
36:1
**made**
12:20 19:19
41:2 68:4
72:25 73:1
78:17 83:17
86:7 87:9
104:15
**Magallon**
5:12 6:3
7:3,4 16:2,8
17:20 18:7,
19 67:22
69:1 88:5
104:12,19
**Magallon's**
94:15
**Mail**
56:14
**maintained**
92:20
**make**
8:2 15:23
35:9 42:3
45:6,15
47:4,10,12
50:4,14 53:6
66:20,25

68:23 70:5
72:19,23,24
83:2,3 86:13
103:22
**makes**
25:13 72:4
**making**
26:5 46:10
65:22 73:22
**manner**
5:24
**manual**
53:24
**March**
11:17 12:1
**mark**
8:5 29:18
**marked**
65:12
**marked/**
**introduced**
20:6 23:9
29:22 50:20
**marking**
8:11
**Maryland**
9:11
**material**
7:18 10:9,
13,23 15:22,
24 26:10
28:10,12,17
29:3,10 34:9
56:22 93:7
**materials**
10:2 11:1,12
12:3,20,25
13:3,24
28:20 34:4
35:8 41:2,
11,15 99:16
106:16,20
107:5,10,11
**math**
15:9,15
**matter**
5:12 7:22

22:1 32:10
46:16 74:19
76:19 95:18
99:19
**matters**
8:18
**Mawla**
36:1 37:5
38:12 39:6
77:3 90:9
103:6
**maximum**
53:3
**meaning**
66:2
**means**
27:7 38:2
71:1,2 95:4
**medical**
31:20,22
32:8 52:15,
16,17
**meet**
27:22
**meeting**
13:24,25
27:14,20,24
29:6
**meetings**
14:5
**member**
18:20 104:19
**members**
19:11 35:17,
20 79:14
89:6
**mention**
93:18
**mentioned**
15:11,22
17:1 54:12,
23 55:6 57:9
89:1 90:18
102:25
**mentioning**
69:21 102:8

Rebecca E. Kuehn
February 28, 2024

met
  29:3
method
  60:18 65:7
microphones
  16:22
minute
  20:15
minutes
  59:4 105:15,
  16
Mischaracteri
zes
  27:11
misfile
  101:23
Misstates
  94:16
mix
  53:9,13
moment
  27:7 43:9
  54:22 56:9
  69:15 70:15
  80:3
Monday
  27:23 29:4
month
  13:9,10
morning
  5:3 6:12,25
  7:1
mortgage
  97:8 98:16,
  20,21
mortgages
  97:5
motion
  20:25 21:9
  29:20
move
  63:2 86:2
moving
  16:21

**N**

nature
  31:16 38:15
  39:18 81:20
navigate
  33:19
needed
  11:3 39:15,
  23
negative
  63:24 84:16
neighborhood
  15:12
non-placement
  46:3 67:5
  85:16
not-placeable
  86:17 87:9,
  16 88:3,16
  91:8 92:1,13
  93:24 94:13
not-placement
  78:17 95:15
note
  42:8 58:12
  99:4
notes
  37:11,13
  105:8
noti-
  48:21
notice
  16:9 17:12,
  21 23:3 24:2
  26:22 30:24
  41:16,25
  45:21 46:2,4
  47:14 48:2,
  10,20 55:2
  56:13 60:2
  62:15 63:5,
  22 64:3 65:8
  66:21 67:4,7
  77:21 78:3,
  13,14,18,23

  79:8,15,20
  82:2 83:12
  84:11,19
  86:25 87:14,
  25 89:23
  91:18,24
  93:21,23
  95:11,12
  97:4,10,17,
  18 98:4
  100:19
notices
  51:19 55:24
  57:3 79:9
  80:25 96:7
notification
  16:5 17:1,12
  30:19 43:12
  47:3 52:22
  55:18 57:16
  59:18 60:18,
  25 61:6
  63:18 65:21
  85:14
number
  20:10 35:19
  46:23 61:4
  80:9,13

**O**

oath
  5:21,22 6:11
  8:24 78:15
object
  17:24 28:19
  30:2
objection
  17:24 18:10
  19:1 21:17
  22:4,23 24:9
  25:10,23
  26:14 27:11
  37:22 38:7,
  22 42:15
  45:1 69:5
  71:18 73:12
  74:11,22

  75:6,9,25
  76:16 77:13
  78:19 79:1
  81:12 82:12
  83:5,25 84:3
  85:7,19
  86:11,20
  87:20 88:11,
  18,25 90:15
  92:3 93:2,12
  94:2,7,16,17
  95:21 96:3,
  13,21 99:23
  100:15 104:5
  107:12
objections
  5:24 74:1
obtain
  104:8
obtains
  103:15
occasion
  43:24
occasions
  77:5
offer
  47:8 52:3
offered
  25:11 82:13
  83:7 84:5
  86:22 87:22
  96:23
office
  7:14,15,19
  8:6 9:17
  68:19 85:1
offices
  85:23
official
  8:4
open
  31:14
operate
  53:19 85:4
operated
  52:25

Rebecca E. Kuehn
February 28, 2024

opine
  19:2 26:8
  74:2,4 75:12
  92:4
opinion
  18:22 22:7,
  15,18,19,25
  26:9,16,18
  32:3,10,14
  34:25 35:5
  51:17 56:23
  73:22 74:2
  75:20 76:7
  81:15,18
  82:3,7 85:14
  94:10,16,23
opinions
  11:13 33:7
  34:14,20
  44:5 45:18
  46:16 49:22
  50:1,7 51:5
  58:19,22
  67:17 93:8
  106:13,21
opportunities
  91:21
opportunity
  62:3 63:6,23
  68:18 71:13,
  23 97:24
  98:4,6,10,
  15,22 99:10,
  16,21,24
  100:11,19
  102:9,15
  105:8
opposed
  8:5 38:12
  69:12
order
  18:16
orders
  10:3
original
  51:2,3,8
originate
  52:23

originated
  97:12
outcome
  28:21
outcomes
  40:5
overturned
  91:24 92:1,7

_____

            P

p.m.
  5:12 108:1
PACER
  20:9,12
package
  92:20 93:1
  107:1
packages
  107:7
pages
  10:14
paid
  69:3 75:4,15
  76:4,9
  101:11
papers
  16:21
paragraph
  23:14,21,23
  26:5
parenthetical
  63:20
part
  15:24 17:9
  20:13 38:6
  42:2 44:16
  47:2 50:14
  63:16 64:2,
  6,12 68:16
  70:2 73:8,14
  74:16 76:6,
  20 81:1
  84:10 95:7
  100:18
  106:17

Participants
  5:5
participating
  5:17
parties
  5:23 19:9,14
  35:18 106:17
parties'
  10:3
partner
  9:23
parts
  34:24
party
  101:4,20,22,
  24 102:5
party's
  7:5
Paschal
  4:6 6:5,6
  14:1 15:4
  17:24 18:10
  19:1 21:17
  22:4,23 24:9
  25:10,23
  26:14 27:11
  28:5,18 30:2
  37:22 38:7,
  22 42:15
  45:1 58:25
  59:2,6 69:5
  71:18 73:12
  74:1,11,22
  75:6,9,25
  76:16 77:13
  78:19 79:1
  81:12 82:12
  83:5,25 84:3
  85:7,19
  86:11,20
  87:20 88:11,
  18,25 90:15
  92:3 93:2,12
  94:2,7,16
  95:21 96:3,
  13,21 99:23
  100:15 104:5
  105:13,18

106:2
  107:15,20
past
  13:9 14:13,
  20,24 15:2
  46:23 57:20
pattern
  66:19 67:5,
  10 71:17
  72:1,6,8,21
  73:3,23
penalty
  8:24
people
  38:23 39:1
  44:6 47:7
  64:12 74:9,
  19 75:2 76:4
  77:2,6,7,9
  90:11,13
percent
  11:6,7 88:23
  94:6,13,20
  95:2 107:1,
  7,11
perform
  52:16
period
  38:24 51:18
  69:22 70:11
  75:8,22
  83:15 91:6,
  18 98:8
perjury
  8:24
permanent
  68:7 69:13
permitted
  47:8
person
  5:21 28:1,3
  63:22 70:1
  78:13
personal
  74:15
personally
  55:12 58:6

60:9
**personnel**
89:16
**persons**
47:5
**perspective**
40:7
**phase**
35:18
**phone**
15:9 102:15
**physically**
5:18
**pick**
102:15
**pin**
38:1
**place**
7:10 22:9
26:3 50:18
51:18 73:10,
17,22 85:6
91:13 97:25
99:12
**placeable**
48:8 49:10
66:20 77:23
79:16,21
86:8,14
87:12 88:6,
24 89:6
90:12 92:25
93:11 104:22
**placement**
16:6 41:13,
23 43:17
44:8,11
45:19 55:19
68:8,22
**placements**
68:24 69:12
**places**
47:7
**placing**
43:16 74:9
**plaintiff**
6:2 50:11

78:22 79:7
88:6
**plaintiff's**
20:16 29:15
**Plaintiffs**
35:12
**pleadings**
10:3
**point**
26:5 47:8
67:20 69:15
75:18 77:17
86:23 104:20
105:1 106:24
**policies**
22:8,10,16
41:12,16,24
43:20 44:1,
3,15,24
45:7,15
54:7,18,19
55:7
**policy**
4:14 24:3,
12,22 26:3,
19,23 29:21
42:8 43:4,11
44:9 45:11
49:12 56:19
65:12,24
66:5 67:13,
14 70:15,20
80:4,7 91:6
92:19,22
96:20
**poll**
45:9
**popped**
43:25
**population**
19:15,21
20:20 92:24
95:19
**portion**
80:7
**position**
68:1 72:17

73:18 89:20
**possibility**
98:12
**potential**
7:8 35:17
84:8
**potentially**
33:22 72:14
76:14 97:24
**practical**
74:18
**practice**
17:9 24:1,7,
14,19 25:1,
16 26:2
27:1,5 43:5,
13 44:2,9,
17,25 45:13
46:14,19
48:7,25
49:17 52:8,
18 53:16
55:12 56:17
57:18 67:12,
15 77:8,20
78:21 79:9
82:25 85:3
86:6,10 91:5
93:5 95:5,14
107:2
**practice/work**
75:19
**practices**
22:17,20,25
26:20 32:5
41:17,22
44:15,22
45:23,24,25
51:21 53:4
54:8 59:21
60:2,9 84:15
93:18 94:10
**practicing**
8:20 9:13
**pre-adverse**
16:4 17:1,8,
11 21:2,16,
23 22:21

23:3 24:2,13
26:22 30:16,
19,24 33:12
41:12,16,24
42:9,21
43:4,12
45:20 46:2,4
48:2,9,20
49:16 51:19
52:21 55:1,
17,23 56:13
57:3,5,15
59:18 60:1,
17,24 61:6
62:14 63:5,
17 64:3,10,
16 65:3,8,
18,23 66:6,
10,21 67:4,
6,8 77:21
78:3,13,18,
23 79:15,20
80:8,14 82:2
83:12 85:14
86:25 89:23
91:9,24
92:14,20
93:1,9,20,23
94:14 95:8,
11,16 96:2,
11,18 97:17,
19 98:3 99:6
100:19
106:25 107:7
**pre-prepared**
104:1
**precise**
44:4 91:3
98:21
**precisely**
49:13
**preliminary**
46:10 47:4,
14,16 91:23
**preparation**
27:8 28:21
30:4,5,9,11
38:14 41:20

Rebecca E. Kuehn
February 28, 2024

prepare
  43:21 103:16
prepare
  13:22 29:10
  34:23 50:10
prepared
  13:9,19
  27:13 49:20
  50:5 64:19
  65:6 66:12
  82:11 101:24
  102:17,22
  103:23
  105:10
prepares
  64:23
preparing
  10:23 11:12
  13:3,4,11
  14:7,8 27:19
  28:11 29:24
  44:5 46:15
  58:7 103:10
prescreening
  31:25
prescription
  31:22 32:8
presence
  40:14
present
  5:18 14:4
  37:2
presented
  89:23
prevent
  99:13,22
previous
  34:3
previously
  55:14
primarily
  29:15 60:4
principle
  52:10
prior
  51:19 91:18
  98:9

pro-
  21:14
proactive
  102:2
proactively
  103:19
problem
  91:4
problems
  71:8
procedure
  45:9 95:1
  96:25
procedures
  22:8,11,16,
  17 25:16
  43:20 45:14,
  16,22,24,25
  52:17 53:3
  54:7,18,19
  55:7 81:3
  104:8
proceed
  21:13,14
proceeding
  5:5 8:12
  21:20 31:11,
  14 32:11
proceedings
  5:16 8:23
  29:19
process
  8:10 22:10
  38:18,25
  39:19,23
  40:6 43:7
  45:20 46:1,3
  47:2 48:9,16
  51:18 55:20
  56:15 60:18
  65:18 67:17,
  20 68:13,14
  71:5 72:9
  73:4,6,8,15
  74:17,20,23,
  24 75:4,19,
  23 77:23
  78:6,10,12,

  16 79:9
  82:24 83:10,
  24 84:13,22
  85:15 86:2,
  3,6 91:13,
  15,16 94:12
  95:8 96:5,
  10,14 98:8,
  23 99:7
  104:21
  106:12,17
processes
  46:7,12
  54:15 55:10
produced
  7:21 10:14
  35:12,13
  101:13
product
  28:22
progressed
  20:24
pronouncing
  35:25
proper
  19:15 65:7
  67:7
propo-
  71:11
prospective
  61:25
protected
  28:22
Protection
  58:13
provide
  17:23 47:13
  51:19 57:7
  58:19 59:24
  61:25 63:5
  95:10 98:4
  99:15
provided
  10:1,8,25
  11:1 30:20
  34:4,9 41:2
  70:11 77:11

  90:2 100:19
providing
  55:1 66:10
  83:20
provision
  23:2
provisions
  57:5
public
  15:15
publication
  61:7
publications
  32:23 33:1,
  6,7,11,21
  55:21 56:1,5
publicly
  61:2
published
  55:16
pull
  20:4 21:5
  23:5 61:18
pulled
  67:20 68:12,
  20
purported
  95:15
purpose
  40:1 62:14,
  22 63:5 98:3
  99:21
purposes
  9:25 20:3
  23:8 25:17
  29:19 41:13
  45:17 48:5,
  17 49:15
  64:25
put
  30:13 66:18
  67:14 71:16
  73:2,3 74:19
  75:13 80:2
  81:6 104:15
  106:9

Rebecca E. Kuehn
February 28, 2024

puts
    104:2
putting
    70:22 74:9
    106:12

---

Q

Quackenboss
    11:20 14:6
    15:1 28:6
qualification
s
    68:15
qualified
    31:3,7 32:2,
    9 98:16
question
    30:7 42:3
    43:19,22
    69:9 70:6
    89:3 90:19
    98:2 107:3
questions
    39:22 67:17
    84:23 93:4
    106:3,4,8,
    10,18 107:15
quick
    15:9 59:2
    105:15
quote
    42:9,20,22,
    24 61:23
    62:7 63:21,
    24 64:8,14,
    15 65:2
quotes
    42:12

---

R

raise
    6:13
rate
    12:5,8

re-
    20:1 89:22
reach
    76:21 77:6
    83:14 84:23
    87:2
reaction
    66:6
read
    5:15 18:4
    22:18 26:10
    42:12,18,25
    51:23 62:4
    64:20
reading
    42:15 107:21
reads
    65:19
reason
    9:4,6 107:9
reasonable
    35:6 51:21
    53:3 62:2
Rebecca
    4:3 5:9 6:21
rebuttal
    4:16 7:23
    13:13,14,17
    14:8,9 50:3,
    10,17,23
    51:4
recall
    12:13,23
    13:18 18:21
    19:22 20:12
    21:4 22:18
    29:8,17
    33:25 37:7,
    23 38:4
    39:12 59:18
    69:7,14 89:1
    90:18
receive
    16:4 17:21,
    22 75:22
    78:13 79:8
    87:14 106:5

received
    64:19 65:6
    66:12 78:23
receiving
    11:24 107:22
recent
    58:11 99:8
recently
    31:8
recognized
    30:23
recollection
    8:1 20:1
    21:11,18,24
    22:12 37:24
    39:13,25
    67:23 92:10
record
    5:4,8,16 6:1
    23:1 30:10
    34:24 39:21
    40:1 47:9
    50:15 59:10,
    12 67:25
    68:1 76:24
    79:19 81:4
    90:4 93:20,
    22 105:1,3,
    5,10,14,19,
    22 107:19,25
recorded
    5:6,7
recordkeeping
    93:5,17
records
    14:16,23
    15:18 31:21
    32:8 35:17
    46:10,25
    47:6,11
    54:10,14
    55:25 67:1
    78:1 81:1
    84:8
red
    42:11,24
    66:2,7 70:9,
    22 71:14

72:6,13,19
    73:2,10,23
    76:8,13
    79:20 81:10
    88:2,15 89:9
red-
    89:17
reduced
    101:12
refer
    17:3,11
    57:10
reference
    52:1 53:6
    64:7,22
referenced
    50:23 56:3
    98:10 106:16
referred
    72:3
referring
    20:19,20
    52:24 90:8
    103:5
reflect
    30:3
reflected
    78:1 91:23
refresh
    8:1 19:25
regard
    18:3 21:10
    25:21
regional
    47:19 48:18
regular
    45:16
regulated
    58:20
regulations
    54:24
regulator
    58:3,13
regulator's
    62:25
regulators
    59:24 61:9

Rebecca E. Kuehn
February 28, 2024

**regulatory**
  53:7 54:21
  56:7 57:23
  58:3,7,14
  60:7,13
  63:17 64:3
  66:17
**related**
  31:19 40:1
  41:8,9
**relates**
  46:19
**relation**
  11:23
**relevant**
  11:2 96:15
  106:13
**relied**
  11:10 33:6
  34:19,24
**rely**
  34:13 35:8
**remember**
  57:12 91:2
  106:10,18
  107:3
**remote**
  5:8,14,16
**remotely**
  5:20,22 7:6
**removed**
  100:13
**report**
  4:13,16
  7:22,23 10:4
  11:8 12:22
  13:3,13,15,
  17 14:8,9
  23:5,11,17
  25:24 26:15
  32:16,19
  34:3,21,22,
  23 35:1,4
  38:14 41:8,
  9,13,20 42:6
  43:21 44:5
  45:2,17

46:15 48:5
49:15,19,22,
25 50:3,6,
10,17,23
51:2,3,4,8
56:2,3,4
58:8,12
61:14,19,25
62:1,12,16
63:2,12,15,
23 64:7,11,
17 65:4
66:9,11,15,
16 67:2
68:20 69:16
70:23 71:6,
25 72:10,16
73:13 76:15
77:3,10,22
78:4 80:15
81:10 82:11,
19 83:1,13,
21 84:13,18
85:5,10,15,
18 88:16
89:9 92:14
93:18,19
94:17,20
95:1 97:9,12
98:5 99:17
100:10,14,
22,23 101:3,
8,13,17,18,
19,22,23
102:3,5,17,
18,21,25
103:10,17,
20,23 104:20
**reported**
  91:10
**reporter**
  5:18 6:9,12,
  19
**reporting**
  5:19,25
  17:3,18 21:3
  22:21 24:17
  30:17 31:18

33:13 43:23
48:2 49:6,11
52:21 53:5
55:9 57:4,6,
15,19 58:15,
20 59:23
61:10 62:14
64:23 65:21
69:19 90:3
95:6 96:18
97:3 98:7
100:25
101:5,10
**reports**
  17:5 29:14
  30:11 44:11
  49:21 50:11
  62:21 64:24,
  25 67:21
  69:18 70:22
  72:15,20
  73:4,15
  97:20 103:13
  104:1,14
  106:13,22
**representativ
e**
  18:20,24
**request**
  5:7 85:2
  101:21 104:9
  106:5
**requested**
  103:17
**require**
  19:4 46:9
  97:17
**required**
  17:23 33:1
  47:13 68:1
  95:10
**requirement**
  17:2,17 57:7
  65:4 66:25
  97:20
**requirements**
  17:8 21:2,
  16,23 22:21

30:16 33:12
46:24 48:3,
20,22 49:6,7
53:1 55:8,24
56:11 57:2
59:23 60:3,6
61:8 64:17
65:8,22
66:10,24
67:4,8 70:4
96:6,19
97:4,14
98:24 100:20
**requires**
  25:5 83:10
  97:16
**requiring**
  57:15 102:18
**research**
  79:13
**respect**
  22:2,7 26:13
  28:20 41:24
  46:15,24
  48:1 54:13
  55:1,17
  56:12 60:17,
  24 61:5
  66:24 71:3
  82:1 85:22
  91:20 96:7
  98:13 104:12
**respond**
  47:15 62:3
  87:14
**responsibilit
y**
  87:25
**rest**
  28:10,11
**restate**
  42:2 43:18
**result**
  30:4 42:11
  71:20 88:3
**results**
  4:15 30:1
  42:23 45:13

Rebecca E. Kuehn
February 28, 2024

49:10 63:7
65:17 66:2
70:12 71:1,
2,20 72:10,
13,14 73:5
76:24 82:16
84:16 98:5
99:25 102:17

**returned**
42:10,23
65:20 66:1,7
71:20

**reverse**
98:17

**review**
10:23 11:6
15:18 19:13
24:2,21
26:21 28:17
29:13 30:8
33:23 35:20
38:16,24
39:10,18,22
40:2,3,5,6
41:11,15
43:7 45:18,
20,23 46:1,
10,14 47:3
48:7 49:10
56:15,22
63:23 66:19
67:5 71:21
72:15,20
73:3,5
74:10,16,20,
25 75:3,24
76:20,21
77:22,25
78:12,16
79:16,22
81:11 82:4,
24 83:11,24
84:7,22
86:3,13,18
88:19 89:6,
17,18 90:12,
21 91:6,13,
15 93:7,11,

25 94:12
102:25
104:16,21
105:8

**reviewed**
11:1,9,12
15:24 20:12
22:15 26:11
28:12,20
29:3,14
30:10 34:25
38:17 43:20
55:4 78:11
91:14 99:16
107:6,10

**reviewers**
77:15 81:21

**reviewing**
12:20 13:3,
23 29:10
35:21 73:15

**reviews**
36:17 50:11

**RHI**
4:14 24:7
29:21 51:18
66:5 67:20
70:11,13
72:18,25
73:24 75:4
76:13 77:8,
11 78:10,17
79:19 83:14
84:6,23 86:7
87:2,17
92:25 93:19
94:14 95:19
96:9,17
103:19
104:3,15

**RHI's**
23:24 24:3,
14,19 56:19
72:9 73:4
82:24 86:18
94:10 95:14
96:5,10

**rights**
62:2 64:18
65:5 66:11
78:4 80:16
82:1,4,14
83:2,13,23
91:10

**road**
59:16

**Robert**
5:13 6:5
7:4,7,22
11:19 12:15
13:2 14:2,9,
13,19,24
16:3,4 17:22
21:1,9,15
22:9,16,19,
25 23:25
25:8,16
26:2,7,19
27:20 35:13
36:16,20
37:18,21
39:7,10,14
40:15,17
41:6,18 42:8
43:5,17 44:7
45:25 48:7
49:17 50:9
65:12 67:12
68:5,7,11
69:16,25
106:25
107:6,10

**role**
68:6

**room**
5:19

**rule**
21:13

**ruled**
21:9

**rules**
19:4 33:2
49:20

**rulings**
22:1 26:12

**run**
69:16,18
71:6

---

**S**

**safety**
52:13

**sail**
71:1

**sailing**
71:3

**salary**
75:22

**satisfy**
70:4

**scan**
80:20 92:19

**scanned**
19:16

**scenario**
43:16 102:20

**scheduled**
7:9

**school**
68:19

**scope**
25:11,23
26:14 45:2
73:13 74:2,
12 75:10
76:1,17
81:13 82:12
83:6 84:4
86:21 87:21
90:16 92:4
93:3 94:18
95:21 96:3,
22

**score**
98:23

**screen**
8:2,11 50:18

**screener**
82:10,21
83:4 100:11

Rebecca E. Kuehn
February 28, 2024

screeners
  55:19
screening
  33:12 68:2
  87:2 99:7
  100:20
  102:16
  103:12
scroll
  8:3,13 62:6
  79:25
Seattle
  31:9 32:7
section
  17:17,18
  65:18 80:7
seek
  103:2
senate
  62:12,16
  99:17
send
  24:13,20
  26:22 56:13,
  16 66:6,21
  72:19 73:4
  77:21 78:18
  84:10,11,16,
  19 86:24
  91:9 94:14,
  19 95:1,14
  96:10 97:9
  106:25
  107:6,11
sending
  43:4,6 45:20
  57:3 64:17
  65:4 67:6
  79:19 95:16
sends
  48:9 80:25
  92:25
sense
  19:12
sentence
  23:21 24:11,
  18

services
  43:17
set
  31:10 40:10,
  17 52:17
  54:21 56:6,7
  58:3
sets
  55:17 57:2,6
  60:12
shared
  81:22 85:24
short
  104:25
show
  19:24 29:18
sic
  50:1
signing
  107:22
similar
  45:25 46:25
  53:5 60:14
  73:16
similarly
  18:8
simply
  10:24 33:5
single
  92:7
sir
  79:5 103:24
sitting
  38:4 69:8,14
situated
  18:8
situation
  102:24
situations
  90:1
slower
  80:2
Smith
  6:9
sold
  101:19,22

someone's
  81:22
someplace
  60:19
sort
  19:2 48:19
  53:7,8
  54:11,16
  71:12 81:3
Soto
  5:14
Soumilas
  4:5 6:2,3,24
  7:2 16:17,
  20,24 18:1,
  14 19:5
  20:2,7 21:5,
  7,21 22:5
  23:4,7,10,
  12,16,19
  24:23 25:19
  26:6,25
  27:15 28:23
  29:1,23
  30:6,13,14
  32:18,21
  33:16 34:1,
  8,11 37:25
  38:9 39:3
  40:20,25
  42:17,19
  45:4 50:16,
  21 51:10,15
  59:1,3,14
  61:18,21
  62:9,11
  63:9,10
  65:15,16
  69:10 70:16,
  18 71:24
  73:20 74:3,
  5,13 75:1,7,
  17 76:5,25
  77:19 78:24
  79:3,6,12,25
  80:5 81:6,7,
  16 82:17
  83:19 84:1,

  20 85:12
  86:1,16 87:4
  88:1,13,21
  89:4 90:20
  91:2 92:6
  93:6,14,15
  94:5,9,22
  95:24 96:8,
  16 97:1
  100:1,17
  104:11,25
  105:7,17
  106:4,15
  107:12,18,23
sounds
  15:10,16
  18:4,22 86:3
  107:23
source
  35:3 104:14
sources
  34:18 52:7
speak
  38:20 39:15,
  23 71:10
speaking
  38:19 102:23
speaks
  24:18
specific
  33:11 34:24
  35:3 40:2
  44:19 46:9,
  14 66:22
  67:3,9 69:7
  76:3 81:20,
  23 88:4 89:1
  103:17
specifically
  12:23 18:21
  19:22 29:8
  30:8 33:25
  34:25 36:21
  37:7,23
  39:12 41:19
  43:19,24
  44:11 48:12
  89:21 99:5

Rebecca E. Kuehn
February 28, 2024

speculation
  18:11 69:6
  76:1,17
  77:14 78:20
  81:13 83:6
  85:8,20
  86:21 87:21
  93:13 94:3
  100:16 104:6
spend
  13:2
spent
  15:12 27:9,
  13 28:11
  60:8
staff
  66:15,16
staffing
  46:6 48:6,11
  69:3
standard
  52:17 53:23,
  24 54:2,3,4
  55:1,3,5,6,
  17,18 56:8,
  18,20,21
  57:2,11,14
  60:1,12
  62:20 64:3,
  10 66:8
standards
  23:2 27:5
  51:21 52:1,
  5,8,12,20,
  22,24 56:24
  59:17
start
  11:24 75:15
started
  11:12 12:3
  29:9 53:15
  59:22 75:14
starting
  11:15 16:15
state
  32:2,9,13
  44:3 47:18,
  19,22 48:18,

22
stated
  50:6
statement
  5:16 66:11
  67:9 82:1,9
  83:2,23
  91:10
states
  44:10 50:1
stating
  6:1 67:4
statistical
  60:16
statute
  57:23 99:11
step
  67:16
stick
  101:16
stopped
  16:18
straight
  64:11
stringent
  65:21
study
  60:23 61:1
subject
  19:14 98:1
subpoena
  106:6
subsequent
  83:18 90:5
suitable
  47:5
summary
  20:25 21:18
  24:25 25:5,
  8,12,18
  64:18 65:5
  78:4 80:16
  82:14 83:13
  98:19
Support
  5:15 6:10

suppose
  101:6
supposed
  78:7 80:20
  82:1 85:3
  91:12 92:15,
  19 93:23
  96:1 97:9,24
survey
  60:15
swear
  6:16
sworn
  6:22
system
  101:10

  ――――――
        T
  ――――――

takes
  86:4 91:13
taking
  51:19 61:24
  98:9
talk
  33:21 40:4
  52:20 103:1
talked
  55:23 61:9
talking
  52:11,15,24
  53:2,4,22
  72:12 84:17
  86:5 101:8,
  15,17
Taylor
  6:9
team
  86:18 87:17
technician
  5:14
Ted
  35:25 77:3
  90:9
telephone
  28:2 36:25

telling
  26:18 33:5
  44:19
temporary
  68:5,7 69:12
ten
  10:10 12:24
  38:3 59:4
  87:1,5,8,10,
  13 92:2
  95:14 96:2,
  11
ten-day
  91:18
tenant
  99:7
tenure
  39:14
term
  17:14
terms
  13:1
tested
  55:4
testified
  6:22
testify
  11:3 31:3
testifying
  7:8,9 8:18
testimonial
  93:3
testimony
  6:15 9:5
  13:12,19
  27:9,12
  34:12 52:3
  59:19 78:10
  81:13 82:13
  83:6 86:22
  90:17 96:4,
  23 106:6
testimony's
  84:4 95:22
text
  51:12 56:14

Rebecca E. Kuehn
February 28, 2024

**textbook**
  60:10
**textbooks**
  52:16
**thing**
  43:12 53:12
  102:4 107:20
**things**
  53:9,13 90:5
  104:10
**thought**
  28:24
**thousand**
  61:3
**thousands**
  10:14 35:16
**tighter**
  88:14
**time**
  5:11 12:4,
  17,19 13:1
  15:6,13
  28:11 29:6
  36:11 38:24
  40:9,12
  54:20 55:23
  59:4 60:8
  61:19 62:17
  68:20 69:22
  81:11 83:9
  84:16 86:4
  87:2,14
  88:16 93:20,
  23 94:6,13
  95:2 96:15
  98:8 102:3
  104:15
  107:1,7,11,
  16
**timely**
  16:4,9 17:21
**times**
  31:6 91:25
**timing**
  60:18 96:6
**tires**
  52:13

**today**
  5:10 6:15
  7:6,13,16
  8:9,25 9:5
  13:4,12,20,
  22 14:2,8
  15:4 20:3,20
  23:8 27:9
  34:13 36:25
  38:5 49:24
  78:15 106:6
**today's**
  8:12,23
  29:19 107:25
**told**
  15:15 26:10
  57:18 60:10
  76:13
**top**
  70:17
**total**
  13:1,7,8,23
**Trade**
  54:6 55:22
  56:2,25
  58:2,8 64:4,
  9
**Trades**
  63:11
**transcript**
  35:4 37:9
  105:12
**transcripts**
  10:6
**transmittal**
  24:1
**Transunion**
  101:19
**treat**
  61:6
**treatise**
  60:11
**trial**
  7:9 8:25
  21:14,20
  22:14 25:6,
  14 32:14

**triggers**
  87:24
**true**
  101:6
**truth**
  6:16,17
**truthful**
  9:5
**truthfully**
  35:10
**turned**
  35:17
**turns**
  97:8
**type**
  14:19 31:3,
  12,24 32:3
  38:21 43:15
  46:19 48:6
  56:22 60:15,
  16,23 91:16
**types**
  36:16 44:14
  60:14 71:20
**typical**
  18:19
**typically**
  18:23 62:25
  67:20 68:4

---

**U**

**U.S.**
  5:15 6:10
  56:14
**ultimate**
  22:23 24:10
  75:4
**underneath**
  80:7,10
**underpinnings**
  26:9
**understand**
  7:11 8:15
  9:2,16,25
  12:8 16:11
  17:15,16

  18:2,6,12
  25:20 26:9,
  11 29:2
  34:12 38:16,
  25 43:5,8
  44:16 53:11
  59:16 60:9
  62:20 67:16
  68:8,9,25
  69:24 70:6,
  10,19,24
  71:4,7 73:21
  76:23 77:20
**understanding**
  19:4,18
  25:4,12
  39:9,17
  49:21 56:24
  60:5 67:19
  68:3,13,21
  69:17 71:19
  72:2,9,18,25
  73:14 74:15,
  23 75:2,19
  76:11,19
  78:21 81:24
  84:6,21
  86:9,12,23
  88:7,8,20
  90:24 91:17
  93:17 95:13,
  17,25 96:14
  98:3 99:18
  103:15
**unique**
  97:19,23
**unpaid**
  75:23
**unqualified**
  32:13
**unusual**
  62:19 80:24
**update**
  45:10
**updated**
  19:20 20:16,
  22 44:1
  45:14

Rebecca E. Kuehn
February 28, 2024

**updating**
45:15
**users**
64:24
**UTC**
5:12 108:1

---

**V**

**Vague**
88:11
**variable**
59:25
**variables**
59:20
**variance**
26:2,20
**variants**
25:15
**varied**
22:17 68:21
**variety**
54:5
**vendor**
69:22
**versus**
5:13 7:4
**video**
5:14 28:6
**video-recorded**
5:8
**view**
17:23 96:17
**violate**
21:2 22:20
96:24
**violating**
96:18
**violation**
21:15,22
24:4,8,16,22
25:2,3,7
26:4,24 27:2
94:11
**Virginia**

9:12

---

**W**

**wait**
73:16 100:21
**waive**
5:24
**walking**
67:11
**wanted**
34:16,18
35:22 39:17
40:2,4 43:18
54:25 84:6
**Washington**
7:14 9:18
31:9
**Wednesday**
5:10
**weeks**
101:13
**willful**
21:15,22
25:2
**withdraw**
44:22
**word**
33:3 99:1
**words**
51:25
**work**
11:16 12:6
14:9,12,19
15:2 28:22
38:21 45:8
54:6 70:1
74:24 75:14,
16 100:24
**worked**
14:23 40:6
46:7 55:13,
23 58:6
64:11 66:23
**working**
15:6 37:20
39:10 43:23

46:7 55:13
76:22 85:1
**works**
25:9 59:8
**worried**
103:21
**write**
51:17
**writes/
provides**
82:9
**written**
13:14 24:3,
12,15,21
26:3,19,23
41:24 42:8
43:4,11
44:1,3,9,15,
21,24 45:7,
11,13 52:23
55:3 56:18
65:12 66:5
67:13,14
68:4 70:15
91:5 92:18,
22 96:19,25
**wrong**
22:3

---

**Y**

**year**
7:10 14:10
33:23
**years**
9:22 10:10
17:9 19:7
38:3 44:14
46:23 56:3,4
58:7,9,11
60:23 64:11
**yell-**
42:24
**yellow**
42:11,24
66:2,7 70:9,
23 71:15

72:6,13,19
73:2,10,24
76:8,13
79:21 81:11
88:2 89:9
**yellow-
flagged**
89:18

---

**Z**

**Zoom**
7:6 28:1
36:25 37:1,2