# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**BONNIE MAGALLON**, on behalf of herself
and all others similarly situated,

        Plaintiff,

    v.

**ROBERT HALF INTERNATIONAL, INC.**,

        Defendant.

Case No. 6:13-cv-1478-SI

**OPINION AND ORDER**

Robert S. Sola, ROBERT S. SOLA, PC, 1500 SW First Avenue, Suite 800, Portland, OR 97201; and
James A. Francis, John Soumilas, and Lauren K.W. Brennan, FRANCIS MAILMAN SOUMILAS PC,
1600 Market Street, Suite 2510, Philadelphia, PA 19103. Of Attorneys for Plaintiff.

Sarah J. Crooks, PERKINS COIE LLP, 1120 NW Couch Street, Tenth Floor, Portland, OR 97209;
Alexander J. Bau, PERKINS COIE LLP, 1201 Third Avenue, Suite 4900, Seattle, WA 98101;
Robert T. Quackenboss, Kevin J. White, and Evangeline C. Paschal, HUNTON ANDREWS
KURTH LLP, 2200 Pennsylvania Avenue NW, Washington, DC 20037; and Roland M. Juarez,
HUNTON ANDREWS KURTH LLP, 550 South Hope Street, Suite 2000, Los Angeles, CA 90071.
Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      In this certified consumer class action, class representative Bonnie Magallon alleges that

Robert Half International, Inc. (RHI) violated the Fair Credit Reporting Act (FCRA), 15 U.S.C.

§ 1681, *et seq*. The Court certified a class with the following definition:

> All natural persons residing in the United States (including
> territories and other political subdivisions) who:
>
> (i) applied for temporary employment placement through RHI;

(ii) about whom RHI obtained a consumer report for employment purposes from the General Information Services, Inc., from August 22, 2008, until the present;

(iii) the consumer report contained either a "red flag" or a "yellow flag"; and

(iv) RHI determined the applicant was "not placeable."

Through subsequent litigation and agreement of the parties, the class period has been narrowed to October 1, 2010, through November 30, 2017.[1] The parties have stipulated that "[t]he class as defined by the court in this case is comprised of 2,363 class members." ECF 262 at 2.

This Opinion and Order addresses the parties' motions to exclude or limit the testimony of four expert witnesses. Plaintiff is the proponent of two of these witnesses, and RHI is the proponent of the other two. The Court has reviewed the parties' briefing and held evidentiary hearings with all four witnesses. As explained below, the Court grants in part and denies in part the pending motions to exclude or limit the proffered expert testimony.

## STANDARDS

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert I*), 509 U.S. 579 (1993), and its progeny. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[1] The class definition also excludes any individuals who signed RHI's arbitration acknowledgment form and did not opt out of the arbitration agreement within 30 days. The parties have excluded all such individuals from the class list.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular . . . field." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Thus, a witness may be qualified as an expert upon demonstrating at least a "*minimal foundation* of knowledge, skill, and experience." *Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting with emphasis *Thomas*, 42 F.3d at 1269).

When determining the admissibility of expert testimony, a district court's role under Rule 702 is not to be a "fact finder" but a "gatekeeper." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks omitted). To fulfill its role as gatekeeper, a district court must "ensure that the testimony is both relevant and reliable" before it deems such testimony admissible. *United States v. Valencia-Lopez*, 971 F.3d 891, 898-99 (9th Cir. 2020) (cleaned up). A court's gatekeeping role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702). By acting as a gatekeeper for all proffered expert testimony, a court "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Courts "must ensure that the proposed expert testimony is relevant to the task at hand," which is sometimes referred to as the "fit" requirement. *Daubert II*, 43 F.3d at 1315 (quotation marks omitted). Although the "[t]he relevancy bar is low," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014), to be sufficiently relevant, the expert opinion evidence must "logically advance[] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315; *see also Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (cleaned up)). Rule 702 also requires opinion evidence to be "helpful" to the trier of fact, which is another way of describing a "relevance inquiry." *Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1265 (9th Cir. 2023). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert I*, 509 U.S. at 591 (quotation marks omitted). Further, "[u]nder Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009).

The Ninth Circuit has "repeatedly affirmed that 'an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.'" *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter*, 373 F.3d at 1016) (emphasis in *Hangarter*). Accordingly, the Ninth Circuit has affirmed the exclusion of expert testimony when the testimony was intended to instruct the jury about whether the conduct at issue violated a statute, explaining that "[s]uch testimony would, in effect, instruct the jury regarding how it should decide the key question whether [the defendant] violated a statute and thus acted improperly." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008). The "prohibition of opinion testimony on an ultimate issue of law recognizes that,

when an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Diaz*, 876 F.3d at 1197 (quotation marks omitted) (emphasis in original).

Despite that general prohibition, Rule 704(a) provides that an "opinion is not objectionable just because it embraces an ultimate issue." *See also Hangarter*, 373 F.3d at 1016 ("It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." (alteration in *Hangarter*) (quotation marks omitted)). The following example, provided by the Advisory Committee on Evidence Rules, demonstrates how the categorical bar on expert opinions as to legal conclusions, as recognized by the Ninth Circuit in the cases cited above, is consistent with Rule 704(a): "[Under Rule 704(a)], the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." Fed. R. Evid. 704(a) advisory committee's note to 1972 amendment. Whereas the first question directly asks for "testimony on an ultimate issue of law," *see Nationwide Transp.*, 523 F.3d at 1059, the second asks for opinions that merely "embrace" that ultimate issue, *see* Fed. R. Civ. P. 704(a).

Turning to the reliability requirement, "[t]he question of reliability probes whether the reasoning or methodology underlying the testimony" is valid. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (quotation marks omitted). To aid a court's evaluation of reliability, the Supreme Court in *Daubert I* "identified four factors that may bear on the analysis: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory

enjoys general acceptance in the applicable scientific community." *Id.* (citing *Daubert I*, 509 U.S. at 593-94).

"Concerning the reliability of non-scientific testimony," however, "the '*Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.'" *Hangarter*, 373 F.3d at 1017 (emphasis in *Hangarter*) (quoting *Mukhtar*, 299 F.3d at 1169). The Supreme Court also has confirmed that the *Daubert I* factors are "meant to be helpful, not definitive," and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tires*, 526 U.S. at 150, 151. "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)); *see also United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) (stating that the Supreme Court and the Ninth Circuit have "refrained from offering any prescription regarding how the many different kinds of expertise might be evaluated by trial courts" (cleaned up)).

"[E]xpert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. "It is the proponent of the expert who has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the expert's proposed testimony must be established by a preponderance of the evidence in accordance with Rule 104(a). *See Daubert I*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483

U.S. 171, 175-76 (1987)). The party presenting the expert must show that the expert's findings are based on sound principles and, if applicable, that they are capable of independent validation. *Daubert II*, 43 F.3d at 1316.

## BACKGROUND

### A. Legal Framework

On behalf of the certified class, Plaintiff alleges that RHI, an employment agency, willfully violated FCRA by failing to provide the statutorily mandated pre-adverse action notice before rejecting her application for temporary employment with an RHI client.

FCRA's pre-adverse action notice requirement provides:

> [When] using a consumer report for *employment purposes*, *before* taking any *adverse action* based in whole or in part on the report, the person *intending to take such adverse action* shall provide to the consumer to whom the report relates—
>
> (i) a copy of the report; and
>
> (ii) a description in writing of the rights of the consumer under this subchapter . . . .

15 U.S.C. § 1681b(b)(3)(A) (emphases added). This provision is sometimes referred to simply as "§ 1681b(b)(3)."

FCRA also provides that "[t]he term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment[,] or retention as an employee." *Id.* § 1681a(h). Thus, when a person applies for a job, either directly with a prospective employer or indirectly with an employment, or staffing agency (like RHI), and the prospective employer or the employment agency uses a consumer report (which can include a criminal history background investigation, *see id.* § 1681a(d)(1)), the employer or agency must provide both a copy of the report and a written statement of rights (collectively, the pre-adverse action notice) to the applicant *before*

taking any "adverse action" based in whole or in part on the report. Failure to do so violates § 1681b(b)(3), and, if done willfully, can give rise either to actual damages or statutory damages. *Id.* § 1681n(a).

Two related questions are critical to the § 1681b(b)(3) analysis. The first asks, what is an "adverse action"? The second asks, when does an adverse action occur? Concerning the first inquiry, FCRA defines "adverse action" to include "a denial of employment or *any other decision* for employment purposes *that adversely affects* any current or prospective employee." *Id.* § 1681a(k)(1)(B)(ii) (emphases added). Relevant to the pending lawsuit, an "adverse action" is *any* decision relating to the hiring process that *adversely affects* a prospective employee (like Magallon and the other class members). Thus, if RHI makes a decision relating to the hiring process that adversely affects Magallon (and the other class members in a similar fashion) *before* it sends a pre-adverse action notice to those applicants, RHI has violated FCRA.

Concerning the second inquiry, which asks *when* an adverse action occurs, the Federal Trade Commission (FTC), the agency with primary enforcement authority for FCRA, offers the following guidance for employers seeking to comply with their FCRA obligations: "An employer can comply with the pre-adverse action disclosure requirement by sending a copy of the report to the consumer (with the summary of consumer rights) *as soon as it is prepared* by the [credit reporting agency] or received by the employer."[2] It does not necessarily follow from this guidance, however, that an employer who *fails* to send a copy of the report as soon as it is prepared by the credit reporting agency or received by the employer has violated FCRA. Thus,

---

[2] FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* 52-53 (July 2011) (emphasis added), https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

the FTC's guidance may provide helpful context for this inquiry, but it does not provide a dispositive answer about *when* an adverse action occurs under the law.

Courts have used varying approaches when evaluating the required timing of the pre-adverse action notice and whether an employer has complied with the pre-adverse action notice requirement under FCRA. For example, some district courts have construed FCRA's definition of "adverse action" to exclude situations in which an employer merely makes a tentative decision (also referred to as an "internal" decision) related to current or prospective employees. Under this construction, an employer is not required to send a pre-adverse action notice before the employer makes the tentative (or internal) decision to take an adverse action.

The starting point for this line of "internal" decision cases is *Obabueki v. International Business Machines Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y 2001), *aff'd*, 319 F.3d 87 (2d Cir. 2003). There, the plaintiff had received a conditional offer of employment from a prospective direct employer, subject to a successful background check. *Id.* at 376. When the plaintiff's background report revealed a prior criminal conviction, members of the employer's human resources department met and decided to withdraw the plaintiff's conditional offer.[3] *Id.* at 377. Only after this internal decision had been reached did the employer send a pre-adverse action notice to the plaintiff. *Id.* After receiving the pre-adverse action notice, the plaintiff attempted to explain the conviction but was unsuccessful. *Id.* at 378. Seven days after the employer's internal meeting and five days after sending the pre-adverse action notice, the employer sent another letter to the plaintiff formally withdrawing the conditional offer of employment. *See id.* at 377-78.

---

[3] The employer asserted that the decision to withdraw the plaintiff's conditional offer of employment was based on the plaintiff's failure timely to disclose his previous conviction.

The plaintiff sued, asserting, *inter alia*, a claim against the employer for violating § 1681b(b)(3). The plaintiff contended that the employer took an adverse action when the employer's human resources department met to review the background report and decided to withdraw the conditional offer of employment. *Id.* at 391. Because the employer had not sent the pre-adverse action notice *before* that internal meeting occurred, the plaintiff argued, the employer had violated the pre-adverse action notice requirement under FCRA. *Id.* The district court disagreed, holding that an "internal decision to rescind an offer [of employment] is not an adverse action" under the relevant provisions of FCRA and that the employer did not violate the statute by failing to send a pre-adverse action notice before that internal decision was made. *Id.* at 391-92. According to the district court, because the internal decision, by itself, "had no impact on" the plaintiff, it therefore did not constitute an adverse action. *Id.* at 392; *see also* 15 U.S.C. § 1681a(k)(1)(B)(ii) (stating that an adverse action includes "any . . . decision for employment purposes that *adversely affects* any current or prospective employee" (emphasis added)).

The district court further explained that the plaintiff did not suffer any adverse effect, and therefore did not suffer an adverse action, until the employer withdrew the offer of employment. The district court supported this conclusion by noting that the text of FCRA "expressly allows for the formation of an intent to take adverse action before complying with Section 1681b(b)(3)." *Id.*; *see also* 15 U.S.C. § 1681b(b)(3)(A) ("before taking any adverse action based in whole or in part on the report, the person *intending to take* such adverse action shall provide to the consumer . . ." (emphasis added)).

Thus, under this analysis, which this Court finds persuasive, a tentative (or internal) decision by an employer (or in this case, a staffing agency) to take an adverse action is insufficient, *by itself*, to constitute an "adverse employment action," if there is no adverse affect

on an applicant. The relevant question for this lawsuit, therefore, is whether RHI has done
something *beyond* merely make a tentative decision that did not cause Magallon (or any class
member) to suffer an "adverse effect." In other words, the relevant question is whether RHI did
something that adversely affected Magallon (and the other similarly situated class members)
before RHI provided the pre-adverse action notice to Magallon (and the other class members). If
so, RHI violated § 1681b(b)(3); if not, it has not. Before exploring that question further,
however, a more thorough understanding of RHI's hiring practices may be helpful.

## B.  RHI's Hiring Practices

RHI places professional-level and quasi-professional applicants for employment in
temporary and permanent jobs throughout the United States by matching applicants with RHI
clients that are employers seeking to fill a short-term or long-term position. RHI requires, at least
under certain conditions, applicants for temporary employment to consent to a background
investigation before RHI will consider them for placement. During the relevant period, RHI,
after receiving consent from an applicant, obtained a background report for that applicant from
General Information Services, Inc. (GIS), a third-party credit reporting agency. Using hiring
criteria provided by RHI, GIS graded applicants' background reports with green, yellow, or red
"flags" before returning the reports to RHI. A report that was graded with a green flag meant that
the applicant was generally eligible for immediate placement by RHI. A report graded with a
yellow or red flag contained derogatory remarks that might preclude the applicant's placement.
RHI's practice was to consider applicants with yellow- or red-flagged reports as not yet eligible
for immediate placement.

In addition, RHI's internal policy, as described in a document dated April 9, 2013,
provided that a pre-adverse action notice "must be sent immediately" to an applicant if that
applicant's background report is marked with a yellow or red flag. RHI, however, did not comply

with its own internal policy. Instead, as alleged by Plaintiff, RHI would first send all reports containing either yellow flags or red flags to its legal department for further review to determine whether to issue pre-adverse action notices. According to Plaintiff, this process would take up to two weeks to complete. If, after this review, RHI's legal department determined that the derogatory remarks on an applicant's background report (which caused the yellow or red flags) disqualified that applicant from being placed for employment by RHI, RHI would then designate that applicant as "not placeable." After RHI designated an applicant as "not placeable," RHI would then send, or direct GIS to send, a pre-adverse action notice to that applicant. As discussed below, Plaintiff contends that this designation as "not placeable" constitutes an "adverse action."

The pre-adverse action notice consists of three documents: (1) a pre-adverse action letter that outlines the actions that an applicant must follow if the applicant wants to dispute the report's findings; (2) a copy of the applicant's background report; and (3) a summary of the applicant's rights under FCRA. RHI's stated policy requires RHI to refrain from making an adverse employment decision regarding the applicant for 10 days after transmittal of the pre-adverse action notice to allow the applicant time to dispute the completeness or accuracy of the background report, if the applicant wanted to do that. If the applicant timely disputed the background report, then either RHI or GIS could begin a dispute resolution process. Depending on the result of that process, an applicant may or may not be placed in other temporary jobs in the future. According to RHI, if the applicant did not timely raise a dispute, RHI's "not placeable" determination became the final decision of RHI.

## C. Plaintiff's Theory of "Adverse Action"

Plaintiff contends that RHI took an adverse action against applicants for placement in temporary employment when RHI designated those applicants as "not placeable" following

individualized review by RHI's legal department. Under this theory, RHI's "not placeable" designation is an adverse action under FCRA because it is a decision for employment purposes that adversely affects the applicants who are deemed ineligible for placement by RHI and, therefore, not placed by RHI in any jobs. According to Plaintiff, FCRA requires RHI to send a pre-adverse action notice to the affected applicant meaningfully before making this "not placeable" determination.

RHI disputes Plaintiff's theory, arguing that the initial "not placeable" designation is not an adverse action under FCRA. According to RHI, the initial "not placeable" determination constitutes only a tentative (or purely internal) decision that does not adversely affect an applicant and, thus, merely triggers RHI's obligation to send the applicant a pre-adverse action notice before making a decision that would adversely affect the applicant. Thus, RHI contends the only adverse action is the final step described above, when the "not placeable" determination, made at the conclusion of the legal review process, becomes a final decision after the expiration of the 10-day waiting period.

Based on the circumstances of this case, a jury must decide whether RHI's designation of applicants as "not placeable" following legal review constitutes an adverse action within the meaning of § 1681b(b)(3). The jury's determination about whether this action constitutes an adverse action serves as the threshold inquiry for later questions about whether RHI acted willfully and, if so, what amount of statutory damages, if any, should be awarded to each class member.

## DISCUSSION

### A.    The Parties' Respective FCRA Experts

Both parties offer at trial expert witnesses to opine on FCRA-related matters, and each party moves to exclude or limit the other's FCRA expert testimony on various grounds. RHI has

retained Rebecca E. Kuehn to offer her expert opinion on RHI's processes for providing

applicants with pre-adverse action notices. Plaintiff has retained Evan Hendricks, who also

opines on the nature and requirements of FCRA and RHI's employment screening procedures.

The Court held an evidentiary hearing in which these two experts testified concurrently on the

matters raised in the parties' respective motions.

Both Ms. Kuehn[4] and Mr. Hendricks are sufficiently qualified to offer expert testimony

in this matter. Ms. Kuehn has more than two decades of experience advising companies,

consumers, lawmakers, and other industry participants on matters related to consumer privacy

and fair credit reporting laws and FCRA compliance. ECF 198-2 at 3. Ms. Kuehn has worked as

an Assistant Director in the Division of Privacy and Identity Protection at the FTC, and during

her tenure there she led the FCRA program and oversaw the FTC's enforcement, outreach, and

rulemaking activities in that area. *Id.* at 4. Mr. Hendricks is a privacy expert who has testified on

numerous occasions before Congress and the FTC on consumer reporting and privacy issues. *See*

ECF 203-7 at 17-21. Mr. Hendricks has worked as a privacy consultant to the U.S. Postal Service

and the U.S. Social Security Administration and has extensive experience in a variety of FCRA

matters. *Id.* at 17.

Ms. Kuehn and Mr. Hendricks each include statements in their respective reports about

whether RHI's procedures for providing pre-adverse action notices did or did not comply with

FCRA. Each party moves to exclude the other's expert from testifying about legal conclusions.

District courts routinely exclude expert testimony that purports to apply the law to the facts of

the case. *See, e.g.*, *Navarro v. Hamilton*, 2019 WL 351873, at *3 (C.D. Cal. Jan. 28, 2019)

(holding that an expert may testify "regarding the standards that ordinarily apply to commercial

---

[4] Plaintiff does not challenge Ms. Kuehn's expert qualifications.

trucks," and "whether [the defendant's] conduct complied with the applicable standard," but that "[q]uestions of whether [the defendant] violated a law . . . remain reserved for the jury"); *Intervention911 v. City of Palm Springs*, 2014 WL 12966791, at *26 (C.D. Cal. Aug. 4, 2014) ("The court will not permit [the expert] to instruct the jury on the appropriate application of the Palm Springs Zoning Code[.]"). Here, the Court will not permit either party's expert witness to opine about whether RHI did or did not violate FCRA or whether RHI's practices were "FCRA compliant."

The parties also disagree about whether Ms. Kuehn may testify, based on her experience and knowledge, about whether RHI's practices in providing pre-adverse action notices conformed to "industry standards." Plaintiff objected to the admissibility of this testimony in her moving papers and at the evidentiary hearing, arguing that Ms. Kuehn could not point to any generally accepted practices for employers (let alone, employment agencies) related to compliance with FCRA's pre-adverse action notice requirement. Plaintiff contends that compliance with FCRA's pre-adverse action notice requirement is an all-or-nothing proposition—an employer complies with the pre-adverse action notice requirement by sending the pre-adverse action notice before taking adverse action or that employer violates FCRA. Thus, according to Plaintiff, the relevance of "industry standards," to the extent such standards even exist, is minimal. RHI submitted a supplemental brief explaining why "industry standards" are relevant to the issues for the jury.[5]

---

[5] RHI argues in its supplemental brief that Ms. Kuehn's "industry standards" testimony is relevant to the issue of RHI's liability because Ms. Kuehn will be able to explain to the jury that employers "must evaluate applicants with criminal histories to provide them with a 'fair chance' at employment opportunities." ECF 267 at 5. RHI also argues that "industry standards" are relevant for the jury's evaluation of "willfulness." *Id.* at 5-8.

Expert testimony about "industry standards" is generally considered to be properly admissible, when relevant. *See, e.g.*, *United States v. Holmes*, 2021 WL 2035177, at *4 (N.D. Cal. May 21, 2021) ("The Ninth Circuit has permitted experts to testify about industry standards even where the testimony 'relies in part on the expert's understanding of the requirements of law.'" (alterations omitted) (quoting *Hangarter*, 373 F.3d at 1017)); *Sands v. Integon Nat'l Ins.*, 2020 WL 7027442, at *4 (D. Colo. Nov. 30, 2020) ("[The expert] may not opine whether defendants met their duties under applicable caselaw or violated various statutes, but may testify whether, in his opinion, defendants' conduct conformed with specific insurance industry standards, including ones identified in those statutes.").

At the evidentiary hearing, Ms. Kuehn elaborated on her opinions regarding "industry standards" for employers related to FCRA compliance. Ms. Kuehn explained that, based on her experience, employers take a variety of approaches to complying with the pre-adverse action notice requirement under FCRA. She did not, however, articulate any specific "industry standard." Ms. Kuehn also states in her report that RHI's practices related to providing the pre-adverse action notices to the class members "exceeds" or "surpasses" industry standards. ECF 198-2 at 17, 18. Other than explaining that a waiting period of five business days after sending a pre-adverse action notice is common among many employers, Ms. Kuehn did not identify any specific "industry standards" in her expert report. Under questioning from Plaintiff's counsel, however, Ms. Kuehn generally agreed that the standard for employers is to comply with FCRA. Thus, if "compliance" is the industry standard, Ms. Kuehn's proffered testimony that RHI surpasses industry standards is essentially a different way impermissibly to state the legal conclusion that RHI's practices do not violate FCRA. Because Ms. Kuehn has not articulated relevant industry standards, has explained that essentially there are no industry standards relevant

PAGE 16 – OPINION AND ORDER

to this dispute, and has generally conceded that "industry standards" are no more than compliance with FCRA, the Court will not allow Ms. Kuehn (or Mr. Hendricks) to testify about "industry standards."

Instead, at trial Ms. Kuehn and Mr. Hendricks will each be permitted to testify only as follows. Ms. Kuehn and Mr. Hendricks may offer their opinions about the timing of the adverse action or actions that apply to the class.[6] Ms. Kuehn, however, may testify about the various considerations facing employers throughout the hiring process and how RHI's practices for complying with its FCRA obligations compare to those of similar employers, provided that she does not state or imply that RHI (or other any other employer) is complying with the law and provided that she does not frame her testimony in terms of "industry standards." Also, both Ms. Kuehn and Mr. Hendricks may rebut the other's testimony, and each may respond to the other's opinions with testimony within their expertise. The Court is satisfied that this testimony, as strictly limited, is relevant to the material issues and may be helpful to the jury. The Court also is satisfied that such testimony will be grounded in the experts' respective experience and expertise, and therefore will be sufficiently reliable to satisfy Rule 702's requirements for admissibility.[7]

---

[6] Further, neither Ms. Kuehn nor Mr. Hendricks will be permitted to testify as to the purpose of FCRA, the legislative history or amendment history of FCRA, or the intent of the FTC in its enforcement of FCRA, and they may not offer opinions as to whether RHI was or was not willfully non-compliant with FCRA.

[7] RHI also seeks to have Ms. Kuehn's opinions admitted for the purpose of rebutting Plaintiff's expert Dr. Willis. As explained below, however, the Court excludes Dr. Willis's testimony in full. Accordingly, the Court also excludes Ms. Kuehn's opinions pertaining to Dr. Willis's proffered testimony.

**B.    Dr. Linsey Willis**

Plaintiff seeks to offer the expert testimony of Dr. Linsey Willis to "aid the jury in understanding how the other evidence in this case translates into a willful violation of FCRA and diminished employment opportunities" for Plaintiff and the other class members. Dr. Willis offers three opinions. First, she states that "[a]s part of the hiring process, there is substantial value to obtaining prompt information regarding background checks for both employers and job candidates." ECF 203-3 at 8. Second, she notes that "[t]he timing of RHI's evaluation and decision-making process about background reports prevented the temporary job candidates in the class from meaningfully participating in the [hiring] process." *Id.* Third, she adds that "RHI's pre-adverse action notification practice here (as opposed to its written policy) impacted the earnings capacity of temporary job candidates in the certified class." *Id.* RHI moves to exclude Dr. Willis's opinions and testimony in their entirety. The Court held an evidentiary hearing at which Dr. Willis testified by videoconference.

Dr. Willis is a management and organizational consultant and Certified Senior Professional in Human Resources. Dr. Willis has more than 44 years' experience in human resource management and management principles and practices. *Id.* at 5. She has designed and conducted seminars on management and leadership principles and has taught modules in the Human Resource Management certificate programs for the College of Business-Executive Education Programs at Florida Atlantic University. *Id.* at 6-7. Plaintiff purports to offer Dr. Willis's testimony to provide insight into the hiring and background check process from a human resources perspective.

The Court finds that Dr. Willis is generally qualified by her education and experience to opine on the matters contained within her report. Even so, the Court is not satisfied that Dr. Willis's opinions are relevant to the specific issues in this case or would be helpful to the

jury. Dr. Willis opines throughout her report about the hiring process from the perspective of the employer, a topic that has no bearing on the pertinent issues for the jury. Dr. Willis also opines about how the timing of RHI's background check process prevented the class members from "meaningfully participating in the process." Dr. Willis explained that this opinion is based on her understanding that Magallon was not given the opportunity to explain the circumstances of her conviction to RHI during the legal review process. Dr. Willis's testimony is not precisely correct.

Regardless, this testimony will not be helpful to the jury. The same is true for Dr. Willis's opinion that RHI's practices meant that the class members were not able to reap the benefits of temporary employment. A jury does not need an expert witness to explain that class members "lost the opportunity to start work" as temporary employees and may have been "unable to pay their bills" as a result of those lost opportunities. *See* ECF 203-3 at 34. These are straightforward assertions that a jury can understand without the assistance of an expert witness. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046-47 (9th Cir. 2013) ("Specialized or technical knowledge is not required to understand Strong's straightforward assertions. A jury is perfectly capable of understanding that there is 'no handle mounted below the lock of the water closet stall door' or that the slope of the sidewalk exceeds 2.0%."). Accordingly, the Court excludes from trial Dr. Willis's testimony.

## C.    Dr. Jonathan Guryan

RHI seeks to offer at trial the expert opinions of Jonathan Guryan, Ph.D., to provide "insight into the class composition" and to rebut the opinions and methodology contained within the reports of Plaintiff's experts Mr. Hendricks and Dr. Willis. Dr. Guryan states in his report his opinion that the data extracted from RHI's MicroJ system, a database that tracks various events for candidates and their interactions with staffing professionals at RHI, cannot be used to systematically identify the class members in this case. ECF 199-2 at 9-17. Plaintiff moves to

exclude Dr. Guryan's opinions contained in both his expert report and his rebuttal report. The Court held an evidentiary hearing at which Dr. Guryan testified by videoconference.

Dr. Guryan is a Professor of Education and Social Policy at Northwestern University. ECF 199-2 at 4. He graduated from Princeton University with a Bachelor of Arts degree in Economics and from the Massachusetts Institute of Technology with a Ph.D. in Economics. *Id.* Dr. Guryan describes himself as a labor economist, and during his career he has conducted research on a wide range of topics related to labor economics. *Id.*

Dr. Guryan is sufficiently qualified by his education and experience to opine on the matters contained within his report.[8] Like the Court's conclusion regarding Dr. Willis's testimony, the Court concludes that Dr. Guryan's opinions will not be helpful to the jury. Dr. Guryan's conclusion that RHI's MicroJ data cannot be used to identify class members is irrelevant for two reasons. First, this opinion has become irrelevant based on the parties' stipulation that "[t]he class as defined by the court in this case is comprised of 2,363 class members." ECF 262 at 2. Accordingly, how individuals have been identified for inclusion in the class is not an issue for trial. Second, RHI has generally conceded, and evidence demonstrates, that "every single" yellow- or red-flagged report was forwarded to RHI's legal department for further review. Irish Dep. Tr. 103:23-104:1. Whether the MicroJ data can or cannot be used to show the specific timing or other mechanics related to that process is not germane to issues of liability and therefore is not helpful to the jury. Because Dr. Guryan's opinions are not relevant

---

[8] Plaintiff contends that Dr. Guryan is unqualified to opine as to the functioning of the MicroJ system and what RHI's MicroJ records mean because Dr. Guryan has no previous experience working with the MicroJ system. At the evidentiary hearing, Dr. Guryan explained that he has experience working with other relational databases with similar functionalities to that of RHI's MicroJ system. The Court is satisfied that Dr. Guryan has sufficient experience with data sets like that found in RHI's MicroJ system and declines to exclude Dr. Guryan's testimony on that basis.

to the issues for trial and are unhelpful to the jury, Dr. Guryan will not be allowed to offer his expert opinion at trial.[9]

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Plaintiff's motion to exclude or limit the testimony of RHI's expert witness Rebecca Kuehn (ECF 198) and GRANTS Plaintiff's motion to exclude the testimony of Dr. Jonathan Guryan (ECF 199). The Court GRANTS IN PART and DENIES IN PART RHI's motion to exclude or limit the testimony of Evan Hendricks (ECF 201) and GRANTS RHI's motion to exclude the testimony of Plaintiff's expert witness Linsey C. Willis (ECF 202).

**IT IS SO ORDERED**.

DATED this 31st day of July, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[9] RHI also seeks to offer Dr. Guryan to rebut testimony from any of Plaintiff's witnesses, whether expert or lay, who may testify as to the representativeness, statistical validity, or significance of RHI's MicroJ data. At the hearing, Plaintiff's counsel confirmed that they do not anticipate calling any witnesses in Plaintiff's case-in-chief that would speak to those issues.