# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BONNIE MAGALLON**, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>**ROBERT HALF INTERNATIONAL, INC.**,<br><br>        Defendant. | Case No. 6:13-cv-1478-SI<br><br>**OPINION AND ORDER ON DEFENDANT'S MOTION TO DECERTIFY CLASS** |

Robert S. Sola, ROBERT S. SOLA, PC, 1500 SW First Avenue, Suite 800, Portland, OR 97201; and James A. Francis, John Soumilas, and Lauren K.W. Brennan, FRANCIS MAILMAN SOUMILAS PC, 1600 Market Street, Suite 2510, Philadelphia, PA 19103. Of Attorneys for Plaintiff.

Sarah J. Crooks, PERKINS COIE LLP, 1120 NW Couch Street, Tenth Floor, Portland, OR 97209; Alexander J. Bau, PERKINS COIE LLP, 1201 Third Avenue, Suite 4800, Seattle, WA 98101; Robert T. Quackenboss, Kevin J. White, and Evangeline C. Paschal, HUNTON ANDREWS KURTH LLP, 2200 Pennsylvania Avenue NW, Washington, DC 20037; and Roland M. Juarez, HUNTON ANDREWS KURTH LLP, 550 South Hope Street, Suite 2000, Los Angeles, CA 90071. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this certified consumer class action, class representative Bonnie Magallon (Magallon)

alleges that Robert Half International, Inc. (RHI) violated the Fair Credit Reporting Act (FCRA),

15 U.S.C. § 1681, *et seq*. The Court previously certified a class and the Court, without objection

by the parties, narrowed the class period. Thus, the current definition of the class and class

period is:

> All natural persons residing in the United States (including
> territories and other political subdivisions) who: (i) applied for
> temporary employment placement through RHI; (ii) about whom
> RHI obtained a consumer report for employment purposes from
> General Information Services, Inc. between October 1, 2010, and
> November 30, 2017; (iii) the consumer report contained either a
> red flag or a yellow flag; and (iv) RHI determined the applicant
> was "not placeable."

The class definition also excludes any individuals who signed RHI's arbitration acknowledgment

form and did not opt out of the arbitration agreement within 30 days. The parties have excluded

all such individuals from the agreed-upon class list. In addition, the parties have stipulated that

"[t]he class as defined by the court in this case is comprised of 2,363 class members." ECF 262

at 2. The Court previously held a pretrial conference on July 29, 2024 (ECF 268) and scheduled

a second pretrial conference for October 15, 2024. The Court also set a jury trial to begin on

October 21, 2024. Now before the Court is RHI's Motion to Decertify Class. ECF 273.

## STANDARDS

Rule 23(c)(1)(C) of the Federal Rules of Civil Procedure states, in relevant part: "An

order that grants or denies class certification may be altered or amended before final judgment."

Fed. R. Civ. P. 23(c)(1)(C). Indeed, a class certification order is "inherently tentative." *Gen. Tel.

Co. of the Sw. v. Falcon* (*Falcon*), 457 U.S. 147, 160 (1982) (quotation marks omitted). Thus,

"[a] district court may decertify a class at any time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d

948, 966 (9th Cir. 2009). In deciding whether to decertify a class, a court may consider

subsequent developments in the litigation including, among other things, "the nature and range

of proof necessary to establish the [class-wide] allegations." *Marlo v. United Parcel Serv., Inc.*,

251 F.R.D. 476, 479-80 (N.D. Cal. 2008) (quotation marks omitted), *aff'd*, 639 F.3d 942 (9th

Cir. 2011); *see also Falcon*, 457 U.S. at 160 (stating that subsequent litigation developments may be considered). Further, in the Ninth Circuit, the party opposing a motion to decertify bears the burden of showing that the motion should not be granted because that party also bears the burden of showing that the requirements of Rule 23 have been met. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).

## BACKGROUND

### A.  Legal Framework

On behalf of the certified class, Magallon alleges that RHI, an employment agency, willfully violated FCRA by failing to provide the statutorily mandated pre-adverse action notice before rejecting her application for temporary employment with an RHI client.

FCRA's pre-adverse action notice requirement provides:

> [When] using a consumer report for *employment purposes*, *before* taking any *adverse action* based in whole or in part on the report, the person *intending to take such adverse action* shall provide to the consumer to whom the report relates—
>
> (i) a copy of the report; and
>
> (ii) a description in writing of the rights of the consumer under this subchapter . . . .

15 U.S.C. § 1681b(b)(3)(A) (emphases added). This provision is sometimes referred to as "§ 1681b(b)(3)" or even "§ bb3."

FCRA also provides that "[t]he term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment[,] or retention as an employee." *Id.* § 1681a(h). Thus, when a person applies for a job, either directly with a prospective employer or indirectly with an employment or staffing agency (like RHI), and the prospective employer or the employment agency uses a consumer report (which can include a criminal history background investigation,

*see id.* § 1681a(d)(1)), the employer or agency must provide both a copy of the report and a written statement of rights (collectively, the "pre-adverse action notice") to the applicant *before* taking any "adverse action" based in whole or in part on the report. Failure to do so violates § 1681b(b)(3), and, if done willfully, can give rise either to actual damages or statutory damages. *Id.* § 1681n(a).

Two related questions are critical to the § 1681b(b)(3) analysis. The first asks, what is an "adverse action"? The second asks, when does an adverse action occur? Concerning the first inquiry, FCRA defines "adverse action" to include "a denial of employment or *any other decision* for employment purposes *that adversely affects* any current or prospective employee." *Id.* § 1681a(k)(1)(B)(ii) (emphases added). Relevant to the pending lawsuit, an "adverse action" is *any* decision relating to the hiring process that *adversely affects* a prospective employee (like Magallon and the other class members). Thus, if RHI makes a decision relating to the hiring process that adversely affects Magallon (and the other class members in a similar fashion) *before* RHI sends a pre-adverse action notice to those applicants, RHI has violated FCRA.

Concerning the second inquiry, which asks *when* an adverse action occurs, the Federal Trade Commission (FTC), the agency with primary enforcement authority for FCRA, offers the following guidance for employers seeking to comply with their FCRA obligations: "An employer can comply with the pre-adverse action disclosure requirement by sending a copy of the report to the consumer (with the summary of consumer rights) *as soon as it is* prepared by the [credit reporting agency] or *received by the employer* [or employment agency]" (emphasis added).[1] It does not necessarily follow from this guidance, however, that an employer or

---

[1] FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations* 52-53 (July 2011) (emphasis added),

employment agency who *fails* to send a copy of the report as soon as it is received has violated FCRA. Thus, the FTC's guidance may provide helpful context for this inquiry, but it does not provide a dispositive answer about *when* an adverse action occurs under the law.

Instead, courts have used varying approaches when evaluating the required timing of the pre-adverse action notice and whether an employer has complied with the pre-adverse action notice requirement under FCRA. For example, some district courts have construed FCRA's definition of "adverse action" to exclude situations in which an employer merely makes a "tentative" decision (also referred to as an "internal" decision) related to current or prospective employees. Under this construction, an employer is not required to send a pre-adverse action notice before the employer makes the tentative (or internal) decision to take an adverse action.

The starting point for this line of "tentative" decision cases is *Obabueki v. International Business Machines Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y 2001), *aff'd*, 319 F.3d 87 (2d Cir. 2003). There, the plaintiff had received a conditional offer of employment from a prospective direct employer, subject to a successful background check. *Id.* at 376. When the plaintiff's background report revealed a prior criminal conviction, members of the employer's human resources department met and decided to withdraw the plaintiff's conditional offer.[2] *Id.* at 376-77. Only after this tentative decision had been reached did the employer send a pre-adverse action notice to the plaintiff. *Id.* at 377. After receiving the pre-adverse action notice, the plaintiff attempted to explain the conviction but was unsuccessful. *Id.* at 378. Seven days after

---

https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

[2] The employer asserted that the decision to withdraw the plaintiff's conditional offer of employment was based on the plaintiff's failure timely to disclose his previous conviction, not on the fact of the conviction itself or any underlying details about the conviction.

the employer's internal meeting and five days after sending the pre-adverse action notice, the employer sent another letter to the plaintiff formally withdrawing the conditional offer of employment. *See id.* at 377-78.

The plaintiff sued, asserting, *inter alia*, a claim against the employer for violating § 1681b(b)(3). The plaintiff contended that the employer took an "adverse action" when the employer's human resources department met to review the background report and decided to withdraw the conditional offer of employment. *Id.* at 391. Because the employer had not sent the pre-adverse action notice *before* that internal meeting, the plaintiff argued, the employer violated the pre-adverse action notice requirement under FCRA. *Id.* The district court disagreed, holding that an "internal decision to rescind an offer [of employment] is not an adverse action" under the relevant provisions of FCRA and that the employer did not violate the statute merely by failing to send a pre-adverse action notice before that tentative decision was made. *Id.* at 391-92. According to the district court, because the internal decision, by itself, "had no impact on" the plaintiff, it did not constitute an adverse action. *Id.* at 392; *see also* 15 U.S.C. § 1681a(k)(1)(B)(ii) (stating that an adverse action includes "any . . . decision for employment purposes that *adversely affects* any current or prospective employee" (emphasis added)).

The district court further explained that the plaintiff did not suffer any adverse effect, and therefore did not suffer an adverse action, until the employer withdrew the offer of employment. The district court supported this conclusion by noting that the text of FCRA "expressly allows for the formation of an intent to take adverse action before complying with Section 1681b(b)(3)." *Obabueki*, 145 F. Supp. at 392; *see also* 15 U.S.C. § 1681b(b)(3)(A) ("before taking any adverse action based in whole or in part on the report, the person *intending to take* such adverse action shall provide to the consumer . . ." (emphasis added)).

Under this analysis, which this Court finds persuasive, a merely tentative decision by an employer (or in this case, an employment or staffing agency) to take an adverse action is insufficient, *by itself*, to constitute an "adverse employment action," *if there is no adverse effect on an applicant*. The relevant question for this lawsuit, therefore, is whether before sending a pre-adverse action notice, RHI did something *beyond* merely making a tentative decision that caused Magallon and each class member to suffer an "adverse effect." In other words, the relevant question is whether RHI did something that adversely affected Magallon and the other similarly situated class members before providing the pre-adverse action notices. If so, RHI violated § 1681b(b)(3); if not, it has not. Before exploring this topic further, a more thorough understanding of RHI's hiring practices may be helpful.

## B. RHI's Hiring Practices

RHI places professional-level and quasi-professional applicants for employment in temporary and permanent jobs throughout the United States by matching applicants with RHI's clients that are employers seeking to fill a short-term or long-term position. RHI requires, under certain conditions, applicants for temporary employment to consent to a background investigation before RHI will consider them for placement. During the relevant class period, RHI, after receiving consent from an applicant, obtained a background report for that applicant from General Information Services, Inc. (GIS), a third-party credit reporting agency. Using hiring criteria provided by RHI, GIS graded applicants' background reports with green, yellow, or red "flags" before sending the reports to RHI. A report that was graded with a green flag meant that the applicant was generally eligible for immediate placement by RHI. A report graded with a yellow or red flag contained derogatory remarks that might preclude the applicant's placement. RHI's practice was to consider applicants with yellow- or red-flagged reports as not yet eligible for immediate placement.

In addition, RHI's internal policy, as described in a document dated April 9, 2013, provided that a pre-adverse action notice "must be sent immediately" to an applicant if that applicant's background report is marked with a yellow or red flag. RHI, however, did not comply with its own internal policy. Instead, as asserted by Magallon, RHI would send the files of all applicants whose background reports contain either a yellow flag or a red flag to RHI's legal department for further review. After such review, RHI's legal department would decide either (1) to remove the yellow or red flag and process the employment application or (2) to designate the applicant as "not placeable" and direct GIS to send a pre-adverse action notice to the applicant whose background report continued to have a yellow or red flag. The legal department review process would take anywhere from several days to more than two weeks to complete, and only after that review would RHI direct GIS to send a pre-adverse action notice. As discussed below, Magallon contends that RHI's regular practice of designating an applicant as "not placeable" after review of background reports containing yellow or red flags but before sending pre-adverse action notices constitutes an "adverse action."

The pre-adverse action notice consists of three documents: (1) a pre-adverse action letter that outlines the actions that an applicant may follow if the applicant wants to dispute the report's findings; (2) a copy of the applicant's background report; and (3) a prescribed summary of the applicant's rights under FCRA. RHI's stated policy requires RHI to refrain rejecting an applicant for 10 days after transmittal of the pre-adverse action notice to allow the applicant time to dispute the completeness or accuracy of the background report, if the applicant wanted to do that. If the applicant timely disputed the background report, then either RHI or GIS could begin a dispute resolution process. Depending on the result of that process, an applicant may or may not be placed in other temporary jobs. According to RHI, if the applicant did not timely raise a

dispute, RHI's "not placeable" determination became the final decision of RHI, and the applicant would be rejected.

## C.  Magallon's Theory of "Adverse Action"

As explained above, Magallon contends that RHI takes an "adverse action" against an applicant for placement in temporary employment when RHI, pursuant to its alleged regular and routine practice, designates an applicant as "not placeable." Under Magallon's theory, RHI's "not placeable" designation is an adverse action under FCRA because it is a decision for employment purposes that adversely affects all applicants who are deemed ineligible for placement (*i.e*., "not placeable") by RHI. According to Magallon, FCRA requires RHI to send a pre-adverse action notice to the affected applicant meaningfully before making this "not placeable" determination. Magallon contends this notice must be sent at or near the time that RHI receives from GIS an applicant's report containing a yellow or red flag, which is in the range of several days to more than two weeks before RHI makes the "not placeable" determination.

RHI disputes Magallon's theory, arguing that the *initial* "not placeable" designation is not an adverse action under FCRA. According to RHI, the initial "not placeable" determination constitutes only a "tentative" (or purely internal) decision that does *not* adversely affect an applicant. Thus, according to RHI, it has no obligation to send the applicant a pre-adverse action notice before RHI decides not to remove the yellow or red flag from the applicant's report. RHI argues that until that occurs there is no adverse effect on the applicant. RHI adds that after it decides not to remove a yellow or red flag, RHI directs GIS to send the applicant an adverse action notice and waits about 10 days before making a "final" "not placeable" determination. RHI contends that it is only this *final* "not placeable" determination that constitutes an adverse

action under FCRA and by that time, an adverse action notice would have already been sent and 10 days would have elapsed. Thus, argues RHI, there is no violation of FCRA.

Based on the circumstances of this case and the parties' respective positions, the Court has determined that a relevant factual dispute for the jury is determining whether having to wait several days and more than two weeks to learn that an applicant's report contains information that *may* make the applicant "not placeable" has an "adverse effect" on the applicant. If that delay in receiving this information has an "adverse effect" on an applicant, then under FRCA it is an adverse action and RHI's decision to wait to inform the applicant before providing an adverse action notice violates FCRA's § 1681b(b)(3). If, however, the delay does not have an adverse effect on the applicant (because the delay is *de minimis* or not meaningful), then no adverse action has yet occurred and thus there is no violation of FCRA. Further, the jury's determination about whether this action constitutes an adverse action serves not only as the threshold inquiry for whether there is a violation of § 1681b(b)(3) but also for whether RHI acted willfully and, if so, what amount of statutory damages (within the statutorily-directed range) should be awarded to the class members.

### DISCUSSION

In its motion to decertify the class, RHI makes three alternative arguments. First, RHI contends that Magallon cannot show Article III standing on a classwide basis. In support, RHI relies on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Second, RHI argues that the class definition is impermissibly arbitrary and untethered to the law and the facts of this case. Third, RHI asserts that individualized issues predominate on whether each class member experienced an "adverse action." The Court addresses each argument in turn.

**A.  Whether Magallon Can Show Article III Standing on a Classwide Basis**

The U.S. Constitution confers limited authority on federal courts to hear only active cases or controversies brought by persons who demonstrate standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 335-38 (2016); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 89-90 (2013). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 578 U.S. at 338.

To have standing, a plaintiff must have a "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The required personal interest must satisfy three elements throughout the litigation: (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection between the injury-in-fact and the defendant's challenged behavior; and (3) likelihood that the injury-in-fact will be redressed by a favorable ruling. *Id.* at 180-81; *see also Spokeo*, 578 U.S. at 338 (reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed by a favorable judicial decision").

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). An injury is "concrete" if it is "'*de facto*'; that is, it must actually exist," meaning that it is "'real' and not 'abstract.'" *Id.* at 340 (emphasis in original). "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," *Lujan*, 504 U.S.

at 578 (emphasis in original), but a plaintiff does not "automatically" satisfy "the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right," *Spokeo*, 578 U.S. at 341.

In *TransUnion*, the Supreme Court analyzed Article III standing in the context of a FCRA class action. The plaintiffs alleged that TransUnion, a credit reporting agency, violated FCRA by failing to "use reasonable procedures to ensure the accuracy of their credit files" and sending consumers the required copies of their credit files and summaries of their rights in two separate mailings, rather than one, as the statute requires. 594 U.S. at 417, 420-21. The Supreme Court held that the subset of class members whose inaccurate credit files were provided to third-party businesses had standing as to the first claim because they demonstrated "concrete reputational harm," but that the class members whose files were not disseminated had not demonstrated a concrete harm and lacked standing. *Id.* at 417. For the required disclosure claims, because the plaintiffs did not demonstrate on a classwide basis that each class member suffered any "concrete harm" from the "formatting violations" of receiving the information in two mailings, the Supreme Court held that the class had no Article III standing. *Id.* at 440.[3] The Supreme Court stated that "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *Id.* at 442 (quotation marks omitted). The Supreme Court also explained that the plaintiffs "argued only that they received [the required information] *in the wrong format*." *Id.* at 441 (emphasis in original).

The Ninth Circuit uses a two-part test to determine whether statutory violations are concrete injuries for standing purposes, analyzing: "(1) whether the statutory provisions at issue

---

[3] The Supreme Court also concluded that the named plaintiff had standing for the FRCA claims based on the required disclosure. 594 U.S. at 442.

were established to protect [a plaintiff's] concrete interests (as opposed to purely procedural

rights), and if so, (2) whether the specific procedural violations alleged in this case actually

harm, or present a material risk of harm, to such interests." *Tailford v. Experian Info. Sols.,

Inc.*, 26 F.4th 1092, 1099 (9th Cir. 2022) (quotation marks omitted). The Court next evaluates

each prong of the Ninth Circuit's *Tailford* test.

### 1. Statutory Purpose

Magallon argues that she and the class members suffered an "informational injury" by

not timely receiving information they were legally entitled to receive under FCRA's pre-adverse

action provision, 15 U.S.C. § 1681b(b)(3). For the first prong of its standing analysis, the Court

must examine the provision to determine if it was established to protect Magallon's concrete

interests. *Tailford*, 26 F.4th at 1099. The Ninth Circuit has not fully addressed the scope of the

interests protected by § 1681b(b)(3), but other federal appellate decisions are instructive.[4] In

---

[4] RHI argues that the Ninth Circuit concluded in *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082 (9th Cir. 2020), that the purposes of FCRA's disclosure requirements are only to protect a consumer's privacy and to allow a consumer to address inaccurate information. The Court disagrees that *Walker* so cabins the statutory purposes of FCRA.

In *Walker*, the Ninth Circuit first noted that the requirements in § 1681b(b)(2)(A) that an employer provide notice of the intent to procure a credit report and obtain clear consent to do so were intended to protect a consumer's privacy rights. *Id.* at 1086-87. That does not foreclose other statutory purposes for any other provisions or requirements of the statute.

The Ninth Circuit later explained that a "driving force" behind § 1681b(b)(3) "was the significant amount of inaccurate information that was being reported by consumer reporting agencies and the difficulties that consumers faced getting such errors corrected." *Id.* at 1094 (quotation marks omitted). This observation, however, also does not foreclose other statutory purposes. Additionally, the Ninth Circuit's analysis under § 1681b(b)(3) primarily involved whether FCRA created a *right* to discuss the report directly with the employer, with the Ninth Circuit concluding that it does not. Also, in *Walker*, the plaintiff's only alleged injury was that he was deprived of the opportunity to dispute his consumer report directly with his employer, whereas here the class members' asserted injuries are premised on not timely receiving a pre-adverse action report and thus not having the ability to make various decisions based on knowledge of the report's contents. Notably, the Ninth Circuit did not address standing in

---

*Long v. Southeastern Pennsylvania Transportation Authority*, 903 F.3d 312 (3d Cir. 2018), the

Third Circuit analyzed § 1681b(b)(3) and concluded that it "confers a broader right than simply

to be free from adverse action based on inaccurate information." *Id.* at 318. Citing FCRA's

statement of purpose, the Third Circuit explained that FCRA was enacted to ensure "fairness,

impartiality, and a respect for the consumer's right to privacy," 15 U.S.C. § 1681(a)(4), and thus

§ 1681b(b)(3) ensures not just accuracy, but also "relevancy, proper utilization, and fairness" in

consumer reporting. *Long*, 903 F.3d at 318-19. The court in *Long* explained that "it would not

make sense for § 1681b(b)(3) to apply only to inaccurate information, because the consumer

cannot know whether his report is accurate unless it is disclosed to him." *Id.* at 319. The Third

Circuit also concluded that Congress did not write § 1681b(b)(3) only to provide protection

against inaccurate consumer reports, unlike § 1681i, which explicitly provides for the right to

dispute and correct reports. *Id.*[5]

_____

*Walker*, because although the district court (this Court) concluded that the plaintiff had
sufficiently alleged Article III standing, that issue was not cross-appealed to the Ninth Circuit.

[5] The Third Circuit in *Kelly v. RealPage Inc.*, 47 F.4th 202 (3d Cir. 2022), addressed a
related issue under § 1681g, where the plaintiffs alleged that they received rental reports that did
not disclose the third-party vendors who created the reports. The court explained that "a plaintiff
seeking to assert an informational injury must establish a nexus among the omitted information
to which she has entitlement, the purported harm actually caused by the specific violation, and
the 'concrete interest' that Congress identified as 'deserving of protection' when it created the
disclosure requirement." *Id.* at 213 (quoting *Tailford*, 26 F.4th at 1100). Under this test, the court
held that the plaintiffs had standing because: (1) FCRA creates an entitlement to the disclosure of
this source information; (2) the plaintiffs alleged adverse effects from the lack of disclosure in
that they were denied housing; and (3) the plaintiffs were prevented "from obtaining fair and
accurate reporting of their credit information, frustrating Congress's goal of empowering
consumers to correct[] inaccurate information in their credit files and preventing them from
being unjustly damaged because of inaccurate or arbitrary information." *Id.* at 214-15 (cleaned
up). Based on this reasoning, Magallon and the other class members here have standing because:
(1) FCRA creates an entitlement to the timely disclosure of a consumer report before an adverse
action is taken; (2) Magallon asserts adverse effects in that she (and the other class members)
was delayed in having a meaningful opportunity to seek other employment in a timely fashion;

Similarly, the Seventh Circuit in *Robertson v. Allied Solutions, LLC*, 902 F.3d 690 (7th Cir. 2018), explained that "there is no reference to potential inaccuracies or any other specific reason for the disclosure" in § 1681b(b)(3). *Id.* at 695. The court added that § 1681b(b)(3)'s "unique pre-adverse action requirement assures that the applicant will have a chance to review the actual document on which the employer relied, and that she can do so *with time to respond to unfavorable information*. . . . [This section] contemplates a broad opportunity to respond." *Id.* at 696 (emphasis added). Thus, the Seventh Circuit concluded that the disclosure obligations "exist to serve interests *beyond the problem of inaccurate reports*," including to "allow the consumer to review the reason for any adverse decision and to respond. . . . A consumer might, for example, wish to concede the facts presented in the report but to bring additional facts to the employer's attention that put matters in a better light for the consumer." *Id.* (emphasis added). And though § 1681b(b)(3) requires that employers (and employment agencies) provide a description of a consumer's right to dispute the "completeness or accuracy" of information in the report pursuant to § 1681i, this right does not mean that the only purpose of disclosure is to correct inaccurate reports. The word "completeness" would be superfluous if consumers could only dispute the accuracy of the report, and such interpretations are disfavored. "Completeness" can refer to providing context—as the Seventh Circuit said, "[p]roviding context may be more valuable than contesting accuracy." *Id.* at 697. The Court finds this reasoning persuasive, and notes that there is no Ninth Circuit or Supreme Court precedent to the contrary.[6]

---

and (3) RHI's actions frustrated the statute's purposes of relevancy, proper utilization, and fairness.

[6] RHI argues that *Dutta v. State Farm Mutual Automobile Insurance Co.*, 895 F.3d 1166 (9th Cir. 2018), shows that any class member with an accurate background report has not suffered a concrete injury. In *Dutta*, the plaintiff alleged that he did not receive a pre-adverse action notice of his background report, which identified a charged-off account greater than $1,000 within the past 24 months. *Id.* at 1170-71. Such a debt was automatically disqualifying

These courts' analyses shows that the broad wording of § 1681b(b)(3) confirms that the statute was established to protect not just procedural rights, but also the concrete interests of, among others, accuracy, relevancy, proper use, and fairness in the reporting of consumer information. Moreover, § 1681b(b)(3) is not limited to situations with inaccurate reports; its required disclosure serves to protect these concrete interests in ensuring the fairness and proper use of credit reporting.[7]

---

for admission to the program to which the plaintiff applied. *Id.* at 1176. The plaintiff argued that the debt occurred in 2010, before the 24-month period, but did not dispute that the debt had been charged off within the 24-month period. *Id.* Accordingly, the Ninth Circuit held that any "inaccuracies or explanations [plaintiff] wanted to present" were "immaterial" because "the existence of the charge off within the 24-month ACT look back period alone disqualified [plaintiff]." *Id.* This decision does not mean, however, that all accurate credit reports fail to establish an injury, as RHI argues.

Here, Magallon's evidence shows that she and the other class members were deemed "not placeable" by RHI based on the existence of a criminal record or other information causing a yellow or red flag, before they were given a pre-adverse action notice. Moreover, Magallon asserts a different injury than not being hired: the inability to make a timely informed decision due to RHI's internal review period.

[7] In *Schumacher v. SC Data Center, Inc.*, 33 F.4th 504 (8th Cir. 2022), the Eighth Circuit analyzed § 1681b(b)(3) and held that the "legislative history does not evince a right afforded to an employee or prospective employee to provide context as to negative information in a consumer report," and therefore the court "decline[d] [Plaintiff's] request to create an additional right under the FCRA—that is, the right to explain to a prospective employer negative but accurate information in a consumer report prior to the employer taking an adverse action." *Id.* at 511-12. Neither Magallon nor RHI cite this case, but it is part of the FCRA landscape. *Schumacher* also cites *Dutta* to explain that the Ninth Circuit found no Article III standing when the plaintiff failed to show "actual harm or a material risk of harm." *Id.* at 510-11. The present case, however, is distinguishable from *Schumacher* because Magallon has asserted a risk of concrete harm beyond simply explaining negative information on a credit report. Further, like *Walker*, *Schumacher* focuses on the *right* to explain information in a report to an employer, but Magallon asserts that she did not timely receive a pre-adverse action notice and thus was delayed the opportunity to make important decisions.

### 2. Harm or Material Risk of Harm to Concrete Interests

As noted, Magallon contends that RHI's failure to send pre-adverse action notices led her and the other class members to lose the opportunity to make timely informed decisions about their employment. The Court must analyze whether this asserted harm from the procedural violation sufficiently impacts the relevant concrete interests that § 1681b(b)(3) protects: relevancy, fairness, and proper use in consumer reporting. *See Tailford*, 26 F.4th at 1099. As in *Syed v. M-I, LLC*, 853 F.3d 492 (9th Cir. 2017),[8] the pre-adverse action disclosure requirement is more than a "bare procedural violation;" it "creates a right to information." *Id.* at 499. The Ninth Circuit in *Tailford* elaborated that § 1681b(b)(3) "protect[s] substantive rights by requiring disclosures necessary for *informed decision-making*." 26 F.4th at 1100 (emphasis added).

The Court finds the Seventh Circuit's explanation in *Robertson* particularly instructive. The Seventh Circuit explained:

> That [plaintiff[ has not pleaded what she may have said if given the chance to respond, or that she may not have convinced [defendant] to honor its offer, is immaterial to the substance of her interest in responding. Article III's strictures are met not only when a plaintiff complains of being deprived of some benefit, but also when a plaintiff complains that she was deprived of *a chance to obtain a benefit*.

902 F.3d at 697 (emphasis added). A lost opportunity itself serves as a downstream consequence of the FCRA violation. Magallon contends that she and the class members were deprived of the opportunity to make timely and informed employment decisions, such as whether to apply to other employment positions, and this lost opportunity is a sufficiently concrete harm to establish standing.

---

[8] *Syed* was decided before *TransUnion*, but its reasoning was relied upon in *Tailford*, which was decided after *TransUnion*.

Essentially, without timely receipt of the information contained in the consumer report, a consumer (or prospective employee) lacks important information for decision-making. Even if all the information in a consumer report were accurate, and a class member were ineligible for a position, the lack of timely disclosure before an adverse action delays that applicant from searching for alternate employment or otherwise from trying to remedy the ineligibility. Whether Magallon "would have taken action on the [report] if disclosed is irrelevant," as a "consumer cannot know *ex ante*" if the report contains an error or disqualifying information. *Kelly v. RealPage Inc.*, 47 F.4th 202, 215 (3d Cir. 2022). FCRA's disclosure requirement allows a consumer to know if such an error exists, and "[i]t is therefore enough for standing purposes for plaintiffs to allege that, as a result of an omission, they experienced the adverse effects of being 'unable to . . . ensure fair and accurate reporting of their credit information.'" *Id.* (quoting *Tailford*, 26 F.4th at 1100).

RHI argues that Magallon has not shown "downstream consequences" or "adverse effects" caused by the lack of disclosure, and therefore lacks a concrete injury. *See TransUnion*, 594 U.S. at 442. RHI primarily relies on three decisions in support of this argument, all from outside the Ninth Circuit, and all distinguishable because the plaintiffs did not allege the same type of harm as asserted by Magallon.[9] *See Merck v. Walmart, Inc*, --- F.4th ---, 2024

_____

[9] RHI also cites three cases within the Ninth Circuit following *TransUnion* in which the courts emphasized that a plaintiff must show "downstream consequences" or "adverse effects" from an informational injury. *See Munoz v. PHH Corp.*, 2023 WL 2202228 (9th Cir. Feb. 24, 2023) (unpublished memorandum); *Ward v. LVNV Funding, LLC*, 2023 WL 7183329 (D. Or. Nov. 1, 2023); *Granados v. OnPoint Cmty. Credit Union*, 2023 WL 3570039 (D. Or. May 18, 2023). Putting aside that none of these cases involved FCRA, they do not support the conclusion that Magallon has not adequately asserted adverse effects. *Munoz* simply states the unremarkable proposition that a plaintiff needs to show downstream consequences. 2023 WL 2202228, at *1. In *Ward*, the court found that the statute at issue (the Federal Fair Debt Collection Practices Act) was not established to protect against the injury that the plaintiff alleged and that the plaintiff did not allege any type of concrete harm beyond a bare statutory violation. 2023 WL 7183329, at *2-

WL 3873373 (6th Cir. Aug. 20, 2024); *Davis v. Universal Prot. Servs., LLC*, 558 F. Supp. 3d

220 (E.D. Pa. 2021); *Gray v. Nachurs Alpine Sols., LLC*, 2023 WL 3004433 (N.D. Ohio Apr. 19,

2023). In *Davis*, the plaintiff only alleged that she was deprived "of a meaningful opportunity to

learn what the report contained and to discuss its contents with Defendant," but did not specify

any downstream effects. 558 F. Supp. 3d at 223. Because plaintiff did not specify another type of

injury, the court assumed that the only downstream harm was not getting hired. *Id.* at 228.

Similarly, in *Gray*, the plaintiff's only alleged injury was an inability to "explain the

inconsistencies between his representations on his employment application and the contents of

the consumer report." 2023 WL 3004433, at *4.

In *Merck*, the Sixth Circuit held that a plaintiff suffers an adverse effect when they have

"some personal 'interest in using the information.'" *Merck*, 2024 WL 3873373, at *7 (quoting

*Grae v. Corrections Corp. of Am.*, 57 F.4th 567, 571 (6th Cir. 2023)). "The denied information

must specifically relate to some negative outcome that the plaintiff suffered because he was

unable to use that information to his benefit." *Id.* The Sixth Circuit explained that the plaintiff

had not shown downstream consequences because he did not present any evidence to show that

the omitted information would have changed the outcome of his first job application, nor did he

present evidence that "he would have used the withheld information to do anything differently

during his second and third applications." *Id.*

*Merck* is distinguishable because Magallon has asserted the concrete harm of a lost

opportunity. The Court does not read *Merck* as foreclosing that type of harm. To the extent

---

5. And in *Granados*, the plaintiff did not allege any ways in which the misinformation affected
her. In fact, this Court in *Granados* acknowledged that an "allegation that [the plaintiff] made a
harmful decision about her finances based on misrepresentations in [the defendant's] Account
Agreement might suffice for standing," which is quite similar to what Magallon has asserted
here. 2023 WL 3570039, at *5.

*Merck* can be interpreted as doing so, the Court does not find it persuasive and instead finds the reasoning of *Robertson* persuasive.

RHI also argues, based on Magallon's testimony, that she concurrently sought jobs through at least three other temp agencies. ECF 274-4 at 3 (10:10-11:8). RHI thus contends that Magallon did not suffer any injury in being "unable" to seek other employment. That Magallon was already seeking other employment, however, does not mean that she did not suffer downstream consequences from RHI's lack of timely disclosure. If Magallon had known that RHI had determined her to be "not placeable," she could have, for example, applied to more temp agencies, applied to jobs such as fast-food establishments where background checks are less important, or quickly followed up with her other job applications. The delay caused by RHI's review process thus deprived (or at least delayed) Magallon and class members of opportunities, including timely knowledge on which to make informed decisions regarding other employment.

RHI's reliance on *TransUnion* also does not compel a contrary finding. In *TransUnion*, the class members who were found to lack standing on the "reasonable procedures" claim alleged no concrete harm from inaccurate information that was not disseminated. 594 U.S. at 349. As to the "formatting violation," the class members alleged only that they received information in the wrong format, not that they did not receive it timely or at all. *Id.* at 418. *TransUnion*, therefore, does not hold that plaintiffs can never establish standing from informational injuries. Magallon here has adequately asserted downstream consequences resulting from a lack of timely disclosure. This assertion satisfies *TransUnion*'s standing analysis.

**B. Whether the Class Definition is Appropriate**

RHI argues that class treatment is inappropriate because the class definition is arbitrary and untethered to any evidence of harm. *See, e.g.*, *Gbarbe v. Chevron Corp.*, 2017 WL 956628, at \*30, \*36-37 (N.D. Cal. Mar. 13, 2017). RHI misstates Magallon's theory of harm, discussing the harm as not being placed in a job instead of the lost opportunities caused by the delay in receiving the required pre-adverse action notice. Most of RHI's arguments—that most applicants to RHI are never placed in a job, that the class includes applicants who were eventually placed in a job, and that the class includes applicants who successfully disputed their background check— depend on that misstatement of Magallon's theory of harm. The class definition includes applicants who were deemed "not placeable" without first receiving the § 1681b(b)(3) notice and thus is sufficiently tied to the asserted harm.

RHI also argues that the class definition includes applicants who were not placed within 30 days and that this 30-day window is arbitrary. Although the class definition explicitly includes only those who RHI determined to be "not placeable," RHI contends that the class contains individuals who were never deemed "not placeable" by its legal department, but whose files included notations such as "failed" or "Do Not Use" (DNU) and who were not placed within 30 days of the background check. This assertion appears to come from the parties' 2020 dispute about who should be included in the class list. *See* ECF 133 (Magallon's argument as to what constitutes a "not placeable" determination); ECF 147 (Judge Aiken's Order accepting Magallon's updated class list). RHI reportedly had repeatedly failed to review the necessary documentation to identify class members; while RHI adequately identified individuals who applied, were subject to a GIS background check, and whose background check contained a red or yellow flag, RHI failed to determine whether those individuals were found "not placeable." Pursuant to RHI's request, Judge Aiken ordered RHI to produce documents about the identified

individuals who were not placed within 30 days of the background report. The 30-day period was merely a discovery mechanism to reduce the burden of RHI's compelled production.[10] It is not part of the class definition and the fact that it was used as a reasonable limit on discovery does not impart it into the class definition. Additionally, the class definition does not require that the legal department made the "not placeable" determination. It merely requires that RHI have determined a person to be not placeable, without distinguishing a particular department. Magallon's theory of harm depends on the delay between the adverse action of a "not placeable" determination and the applicant's receipt of a pre-adverse action notice, so the current class definition is not arbitrary and is tied to this harm.

Finally, RHI contends that the class definition is unworkable because RHI's records are insufficient, making the class list unascertainable. Though ascertainability is not a free-standing requirement, the superiority criterion of Rule 23(b)(3) encompasses "the likely difficulties in managing a class action." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017) (quoting Fed. R. Civ. P. 23(b)(3)(D)). RHI and Magallon have already created a class list based on criteria accepted by Judge Aiken after briefing, so this argument lacks merit. Thus, the class is adequately defined to include those who did not timely receive a pre-adverse action notice.

## C.  Whether Common Questions Predominate

RHI's final argument is that individualized questions whether each class member experienced an "adverse action" predominate under Rule 23(b)(3) of the Federal Rules of Civil Procedure. Specifically, RHI argues that not all applicants for whom RHI received a background check with red or yellow flags had their reports sent for legal review with the concomitant delay.

---

[10] If RHI had been required to produce documents for applicants not placed within a longer period, RHI likely would have objected to this requirement as unduly burdensome under Rule 26 of the Federal Rules of Civil Procedure.

RHI offers as an example a handful of applicants whose background reports had "derogatory information," and they received a pre-adverse action letter. ECF 273 at 40 (citing ECF 273 ¶ 13). The evidence regarding these candidates, however, does not support that they are members of the class. These candidates were placed before their background information came to light and were never removed from placement. Thus, it does not appear that they were ever designated as "not placeable," which is a requirement to be a member of the class. Additionally, at oral argument, RHI contended that the delay in receiving notice varies from several days to more than two weeks, and thus whether the delay was material and constitutes an adverse action is an individualized question.

Magallon responds that whether RHI's determination that a job candidate is "not placeable" is an adverse action and is a predominating question. The Court agrees with Magallon at this stage of the case. The class is defined as including all persons whose background reports from GIS came back with a yellow or red flag and who were deemed "not placeable" by RHI. RHI did not inform these applicants until after they were deemed "not placeable," anywhere from several days to more than two weeks after RHI received the background check. As counsel for Magallon explained at oral argument, it could be that with applicants for temporary employment like the class members, a delay of even one day to make informed decisions might be material because they can be placed for employment the next day after applying at an agency. Whether the delays at issue in this case are *de minimis* or rise to the level of an "adverse action" under FCRA is a factual question for the jury that informs this Court's predominance determination.

Regarding RHI's assertion in its reply brief and at oral argument that some class members may have immediately been deemed "not placeable" based on obviously disqualifying

events like major felonies, RHI offers no evidence of any class member who falls within this category. It may be that a few outlier putative class members do not satisfy the class definition. RHI may present this evidence to the jury, and such persons may be excluded from the class, either by the jury or the Court in post-trial motions. But hypothesizing that some persons on the class list may fall outside the class definition is insufficient to defeat predominance, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).[11] Individualized questions therefore do not predominate.

## CONCLUSION

The Court DENIES Defendant's Motion to Decertify Class (ECF 273).

**IT IS SO ORDERED**.

DATED this 13th day of September, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[11] RHI also argues that requiring RHI to provide evidence that some people fall outside the class definition improperly shifts the burden to RHI to prove predominance. The Court disagrees. It is a mechanism by which RHI can show that some persons fall outside the class definition, but it does not shift Magallon's burden on predominance. RHI provided no evidence that any persons fall outside the class definition, let alone enough people to cast doubt on predominance. The Court simply allows RHI to provide evidence if there are persons that should be excluded from the class so that this can be done at the earliest possible time, but class members often are excluded during the claims process for not falling within the class definition, sometimes at the defendant's behest, and that does not shift the burden of predominance or destroy predominance. Predominance does not require 100% of class members or putative class members ultimately to fall within the class definition.